# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

U.S. District Court
Wisconsin Eastern

Jun 17 2025

FILED
Clerk of Court

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. 25 MJ 99 |
| Timothy BEA (DOB X/X/84), FOAD Isa (DOB X/X/65), HAMMAD Isa DOB (X/X/95), ███████████████ Claudell SIMS (DOB X/X/72), Freddie ROBERTSON (DOB X/X/70), William THOMAS (DOB X/X/73), Antonio GREEN (DOB X/X/92), Ngadah KAMANDA (DOB X/X/87), Alonzo KIMBLE (DOB X/X/68), Dennis BROWN (DOB X/X/80), Alfonzo TREADWELL (DOB X/X/70), Frank AYALA-DEJESUS (DOB X/X/64), and Johnnie HAYNES (DOB X/X/70) ) ) ) ) ) ) ) ) | |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 1, 2023 to June 16, 2025___ in the county of ___Milwaukee___ in the

___Eastern___ District of ___Wisconsin___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b) & 846 | Possession with intent to distribute/distribution of controlled substances, use of a communication facility in furtherance of drug trafficking, and conspiracy to distribute controlled substances |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

SEAN MAYERBOCK (Affiliate) Digitally signed by SEAN MAYERBOCK (Affiliate) Date: 2025.06.10 13:50:07 -05'00'

*Complainant's signature*

Sean Mayerbock, DEA TFO

*Printed name and title*

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date: ___06/13/2025___

William E. Duffin

*Judge's signature*

City and state: ___Milwaukee, Wisconsin___        William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANTS, AND SEARCH AND SEIZURE WARRANTS

I, Sean Mayerbock, being duly sworn, do depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I am a Detective with the City of Brookfield Police Department and have been a sworn law enforcement officer for 10 years.  I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Drug Gang Task Force.  Since November 2019, I have been a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration.

2.      I am familiar with various methods of smuggling and trafficking controlled substances and their proceeds.  I am also familiar with methods used to by traffickers to evade detection of both the controlled substances and its' proceeds.  I have received training in the investigation of and am knowledgeable in investigations pertaining to drug trafficking, illegal firearm possession and trafficking, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.

3.      I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.  I have participated in numerous investigations involving violations of state and federal narcotics laws.  I have participated or assisted in numerous federal search warrants for narcotic related offenses, which have resulted in the seizure of controlled substances, firearms, United States currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

1

4.      I have extensive training and experience in the investigation of Drug Trafficking Organizations (DTO). I am familiar with the different structures, the motivations for criminal their activities, the hierarchies, and the variety of roles of the members within the organizations. I have applied my training in the investigation of these organizations and have charted and tracked them. My investigations have revealed the geographical locations that they inhabit, the level of violence and crimes they have committed and their hierarchy and the roles of their members within their respective organizations. I have participated in these types of investigations as both the lead investigator and co-agent and have successfully dismantled them by use of several law enforcement investigation techniques to include wiretaps.

5.      Through training, experience, and discussions with other experienced agents:

a.  I have learned about the manner in which individuals and organizations distribute controlled substances;

b.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c.  I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d.  I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e.  I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

2

f.  I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g.  I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.  I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to, safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.  I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages, and outbuildings), businesses or other locations over which they maintain dominion and control;

j.  I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l.  I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

3

m.  I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs in their possession;

n.  During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

o.  I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

p.  It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

q.  It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

r.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers use the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses that may generate large quantities of currency. To this end, I am also familiar with the analysis of financial documents;

s.  I know drug traffickers commonly maintain addresses or telephones numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

4

t. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

u. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

6. Pursuant to my official duties, I am submitting this affidavit in support of an application for search warrants for the properties and vehicles described in Attachments A1 to A9, as well a criminal complaint and arrest warrants for Timothy **BEA**, **FOAD** Isa, **HAMMAD** Isa, ████████ ████████████ Claudell **SIMS**, Freddie **ROBERTSON**, William **THOMAS**, Antonio **GREEN**, Ngadah **KAMANDA**, Alonzo **KIMBLE**, Dennis **BROWN**, Alfonzo **TREADWELL**, Frank **AYALA**-DEJESUS, and Johnnie **HAYNES**, for violations of federal laws, including violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and

Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies), collectively referred to as the TARGET OFFENSES.

7. I am personally involved in the investigation of the offenses discussed in this affidavit and I am familiar with all aspects of this investigation. The statements contained in this affidavit are based on my knowledge and, in part, information provided by LEOs, including (a) my personal knowledge and observations derived from participation in this investigation; (b) review of oral and written reports that I have received directly or indirectly from other LEOs about this and other drug-trafficking investigations; (c) discussions I personally had concerning this investigation with other experienced drug-trafficking case agents; (d) physical surveillance (by the DEA, Homeland Security Investigations (HSI), and local law enforcement agencies) and electronic surveillance, the results of which have been reported to me directly or indirectly; (e) public records; (f) review of telephone toll records, pen register and trap and trace information, telephone subscriber information, and precision phone location data (pings); (g) the use of a GPS tracking device (h) information provided by confidential sources working for the DEA, HSI, and North Central HIDTA; (i) Court Authorized Title III intercepts for six TARGET TELEPHONES; (j) review of driver's license and automobile registration records; (k) records obtained from law enforcement databases; (l) my training and experience as a DEA TFO and the training and experience of other LEOs involved in this investigation; and (m) the results of search warrants and a vehicle search.

8. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited

6

purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above occurred and that probable cause exists to believe that the property, and vehicles, described in Attachments A1 to A9, incorporated herein by reference, contain the items that are described in Attachments B. There is also probable cause to believe that the TARGET SUBJECTS have committed the TARGET OFFENSES.

## II.     PURPOSE OF AFFIDAVIT

### A.     Individuals for Whom a Criminal Complaint are Sought

9.   This affidavit is being submitted in support of applications for applications for arrest warrants and a criminal complaint naming the following individuals:

|    | Name | Date of Birth |
|----|------|---------------|
| 1  | TIMOTHY **BEA** | 03/21/1984 |
| 2  | **FOAD** ISA | 11/7/1965 |
| 3  | **HAMMAD** ISA | 05/10/1995 |
| 4  | ███████ ████████ | ███████ |
| 5  | Claudell **SIMS** | 08/24/1972 |
| 6  | Freddie **ROBERTSON** | 05/30/1970 |
| 7  | William **THOMAS** | 05/27/1973 |
| 8  | Antonio **GREEN** | 07/05/1992 |
| 9  | Ngadah **KAMANDA** | 12/18/1987 |
| 10 | Alonzo **KIMBLE** | 04/18/1968 |
| 11 | Dennis **BROWN** | 01/04/1980 |
| 12 | Alfonzo **TREADWELL** | 10/19/1970 |
| 13 | Frank **AYALA**-DEJESUS | 12/24/1964 |
| 14 | Johnnie **HAYNES** | 02/24/1970 |

8.   The above 14 individuals are herein collectively referred to as the TARGET SUBJECTS.

### B.     Properties for Which Search Warrants are Sought

9.    For the reasons discussed herein, there is probable cause to believe that located at and in the following properties, more fully described in Attachments A1 to A9 and collectively referred to as "SUBJECT PREMISES," are items that constitute evidence of the Target Offenses.

a.   2956 N. 50th Street, Milwaukee, WI (Lower) ("**SUBJECT PREMISES 1**")

- 2956 N. 50th Street, Milwaukee, Wisconsin, is a two-story, multi-family duplex residence containing two units (Lower unit is "2956 N. 50th Street) located on the east side of N. 50th Street. The exterior is described as having a white siding with brown accents, a wood porch on the upper landing and a gray/brown shingled roof. The front entry door for the lower unit is the northernmost door. There is an alley way directly east of the residence with an associated parking slab behind the residence leading to a detached garage. The residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Case agents are requesting to search **SUBJECT PREMISES 1** as well as the detached garage and any common areas including basements, attics, and common hallways. Additionally, case agents are requesting the search of SIM's black 2016 Nissan Altima bearing WI registration 625-RVL (VIN: 1N4AL3AP2GC203771)(herein **Subject Vehicle 1**). **SUBJECT PREMISES 1** is depicted below in Figure 1.

- **SUBJECT PREMISES 1** is Claudell **SIMS'** residence. As detailed below, **SIMS** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents have conducted physical surveillance at **SUBJECT PREMISES 1** and have observed **SIMS** at the residence on numerous occasions. Specifically, case agents have observed **SIMS** or his known black 2016 Nissan Altima at least five times over the last six months as recently as June 6, 2025. Case agents have last observed SIMS at this address on April 17, 2025. Case agents believe **SUBJECT PREMISES 1** is **SIMS'** primary address and case agents therefore will obtain evidence showing **SIMS'** involvement with the DTO at this location.

- Case agents obtained utilities records on January 31, 2025, that indicate Je▇▇▇ SIMS as the account holder for 2956 N. 50th Street Lower. Case agents know that Je▇▇▇ SIMS is Claudell **SIMS'** wife. Je▇▇▇ SIMS is also the registered owner of Claudell **SIMS'** known black 2016 Nissan Altima.

8



Figure 1

b.  6315 N. 90th Street, Milwaukee, WI ("**SUBJECT PREMISES 2**")

- 6315 N. 90th Street, Milwaukee, Wisconsin, is two-story, single-family residence located on the west side of N. 90th Street. The exterior is described as having tan brick with white trim on the lower half, brown siding and white trim on the upper half, and a brown shingle rooftop. The numbers "6315" are affixed in a horizontal fashion in bold black numbers with a white border south of the front door. The residence includes a detached garage with a white overhead door and a gray shingled roof. The front entry door has a black exterior door in front of a brown interior door. There is side entry door on the north side of the residence. The residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin; Case agents are requesting to search **SUBJECT PREMISES 2** as well as the detached garage. Additionally, case agents are requesting the search of ROBERTSON's blue 2022 Honda Accord bearing WI registration AXW-7184 VIN: (1HGCV1F49NA037260)(herein **Subject Vehicle 2). SUBJECT PREMISES 2** is depicted below in Figure 2.

- **SUBJECT PREMISES 2** is Freddie **ROBERTSON's** residence. As detailed below, **ROBERTSON** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents have conducted physical surveillance at **SUBJECT PREMISES 2** and have observed **ROBERTSON** at this residence. Specifically, case agents have most recently observed **ROBERTSON** leave this residence and enter his known blue 2022 Honda Accord that is registered to **ROBERTSON** at **SUBJECT PREMISES 2** on June 5, 2025. Furthermore, case agents intercepted a phone call between **BEA** and **ROBERTSON** in November 2024, where **ROBERTSON** provided **BEA** directions to **ROBERTSON**'s residence and stated his residence was near "90th and Bender" which is the intersection closest to **SUBJECT PREMISES 2**. Case agents believe **SUBJECT PREMISES 2** is **ROBERTSON's** primary address and case agents therefore will obtain evidence showing **ROBERTSON's** involvement with the DTO at this location.

9

- Case agents obtained utility records on January 31, 2025, that show Freddie **ROBERTSON** as the account holder for 6315 N. 90th Street (**SUBJECT PREMISES 2**).



Figure 2

c. 2935 N. 48th Street, Milwaukee, WI ("**SUBJECT PREMISES 3**")

- 2935 N. 48th Street, Milwaukee, Wisconsin is the lower level of a two-story, two-family residence located on the west side of N. 48th Street. The exterior is described as having cream siding with white trim on the lower half, and blue and cream siding with white trim on the upper half, with a brown shingled roof. The residence has steps leading up to the front porch, with brown brick pillars on the north and south sides of the steps. The numerals "**2935**" are affixed in a horizontal fashion on the south pillar in black numerals on a white background. There are two east-facing front doors, one for each unit. Each unit is separately addressed (2937 and 2935). Numerals "**2935**" are also fashioned in a horizontal fashion, consisting of black numerals, affixed to the cream siding to the south of the southernmost east-facing door. The residence also has a detached garage in the north-south alley behind the residence with a white west-facing overhead garage door. The garage has white siding and a brown shingled roof. This residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Case agents are requesting to search **SUBJECT PREMISES 3** as well as the detached garage and any common areas including basements, attics, and common hallways. Additionally, case agents are requesting the search of THOMAS' gold Chevrolet Blazer bearing WI registration 587-FPD)(herein **Subject Vehicle 3**). This vehicle does not list to the correct vehicle. This registration lists to a 1989 Cadillac to a separate individual expiring in 2017. **SUBJECT PREMISES 3** is depicted below in Figure 3(a). **Subject Vehicle 3** is depicted below is Figure 3(b).

- **SUBJECT PREMISES 3** is William **THOMAS's** residence. As detailed below, **THOMAS** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's**

10

behalf. Case agents have conducted physical surveillance at **SUBJECT PREMISES 3** and have observed **THOMAS** at this residence. Specifically, case agents observed **THOMAS** standing on the porch talking on his phone before returning back inside the residence on May 23, 2025. Case agents believe **SUBJECT PREMISES 3** is **THOMAS'** primary address and case agents therefore will obtain evidence showing **THOMAS'** involvement in the DTO at this location.

- Case agents obtained utility records on January 31, 2025, that show William **THOMAS** as the account holder for 2948 N. 48th Street (**SUBJECT PREMISES 3**).



Figure 3(a)



Figure 3(b)

d. 2642 N. 15th Street, Milwaukee, WI ("**SUBJECT PREMISES 4**")

- 2642 N. 15th Street, Milwaukee, Wisconsin, is a multi-story, single-family residence located on the east side of N. 15th St. The exterior is described as having gray siding with

11

white trim on the lower two-thirds, crème siding with crème trim on the upper one-third, and an gray/red shingled roof. The residence has steps leading up to the west-facing front entry door which consists of a white storm door and a white interior door. The numbers "2642" are in a horizontal fashion in white numerals over a black background affixed to the siding to the north of the entry door. The residence also has detached garage in the north-south alley behind the residence, with a white east-facing overhead door. The residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Case agents are requesting to search **SUBJECT PREMISES 4** as well as the detached garage. Additionally, case agents are requesting the search of **BROWN's** 2022 white Hyundai Santa Fe bearing WI registration AYJ-1328 VIN: (5NMS2DAJ2NH374277) (herein **Subject Vehicle 4**). **SUBJECT PREMISES 4** is depicted below in Figure 4.

- **SUBJECT PREMISES 4** is Dennis **BROWN's** residence. As detailed below, **BROWN** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents have conducted physical surveillance at **SUBJECT PREMISES 4** and have observed **BROWN** at this residence. Specifically, case agents have observed **BROWN** returning to **SUBJECT PREMISES 4** and utilizing keys to enter the front of residence. Case agents last observed **BROWN** at **SUBJECT PREMISES 4** on June 6, 2025. Case agents believe **SUBJECT PREMISES 4** is **BROWN's** primary address and case agents therefore will obtain evidence showing **BROWN's** involvement within the DTO at this location.

- Case agents observed that on May 17, 2025, the Milwaukee County Sheriff's Office issued a misdemeanor warrant for **BROWN** for Driving Under the Influence-Drugs. This warrant listed his address at 2642 N. 15th Street, Milwaukee, WI (**SUBJECT PREMISES 4**). A check of electronically maintained Milwaukee County Circuit Court records (CCAP) reveals that BROWN has an open bench warrant in misdemeanor case 24CT1169 and that he failed to appear for his court date on May 13, 2025. Additionally, case agents obtained utility records on February 17, 2025, that show L███ M██████ as the account holder for 2642 N. 15th Street (**SUBJECT PREMISES 4**). Case agents believe M██████ is BROWN's significant other.

12



Figure 4

e.  6104 N. 115th Street, Milwaukee, WI ("**SUBJECT PREMISES 5**")

- 6104 N. 115th Street, Milwaukee, WI, is a two-story, single-family residence on the northeast corner of N. 115th Street and W. Kaul Avenue. The exterior is described as being comprised of off-white Lannon stone with off-white trim and burgundy shutters, and a brown-shingled roof. The numerals "6104" are displayed in white numerals on a black background, affixed to a black stake in the front/west yard of the residence. The west-facing front entry door has a black Chicago-style gate in front of a brown wood interior door. The residence also has a south-facing entry door consisting of an off-white exterior door in front of a wood interior door. The residence also has a detached garage to the east of the residence. The garage has off-white siding, two white, south-facing overhead garage doors, and a brown-shingled roof. This residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin; Case agents are requesting to search **SUBJECT PREMISES 5** as well as the detached garage. Additionally, case agents are requesting the search of KIMBLE's gray 2018 Ford F-150 bearing WI registration SM5896 VIN: (1FTEW1EP1JFE08358)(herein **Subject Vehicle 5). SUBJECT PREMISES 5** is depicted below in Figure 5.

- **SUBJECT PREMISES 5** is Alonzo **KIMBLE's** residence. As detailed below, **KIMBLE** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents have conducted physical surveillance at **SUBJECT PREMISES 5** and have observed **KIMBLE's** known Ford F150 bearing WI registration SM5896 at this residence on numerous occasions. As recently as June 6, 2025, case agents have observed **KIMBLE** exiting the side door of **SUBJECT PREMISES 5,** throwing away garbage, standing near the F-150 **(Subject Vehicle 5**) and reentering the side door and returning inside **SUBJECT PREMISES 5.** Case agents believe **SUBJECT PREMISES 5** is **KIMBLE's** primary address and case agents therefore will obtain evidence showing **KIMBLE's** involvement in the DTO at this location.

13



Figure 5

f.  1528 S. 59th Street, West Allis, WI ("**SUBJECT PREMISES 6**")

- 1528 S. 59th Street, West Allis, WI, is a two-story, single-family residence on the east side of S. 59th Street. The exterior is described as having off-white siding and brown trim, and a brown-shingled roof.  The numerals "1528" are affixed in a horizontal fashion, with black numerals on a white background, above the west-facing front entry door. The front entry door has a cream-colored exterior door in front of a cream-colored interior door. The residence also has a detached garage in the north-south alley behind the residence with a brown east-facing overhead garage door. The garage has off-white siding and a brown-shingled roof. The numerals "1528" are also affixed in black numerals to the south side of the east-facing exterior wall of the garage. This residence is located in the City of West Allis, County of Milwaukee, State of Wisconsin Case agents are requesting to search **SUBJECT PREMISES 6** as well as the detached garage. Additionally, case agents are requesting the search of **GREEN's** gray 2016 Chevrolet Tahoe bearing WI registration ANF-4348 VIN: (1GNSKBKC8GR440552) (herein **Subject Vehicle 6**).  **SUBJECT PREMISES 6** is depicted below in Figure 6.

- **SUBJECT PREMISES 6** is Antonio **GREEN's** residence. As detailed below, A. **GREEN** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents know that 1528 S. 59th Street, West Allis, WI is Antonio **GREEN's** current listed address with the Wisconsin Department of Transportation. Case agents have observed A. **GREEN's** known black Chevrolet Tahoe **(Subject Vehicle 6)** parked at this residence in the back of the residence. Additionally, as recently as June 6, 2025, case agents observed, A. **GREEN** walk from the back yard into the front yard via the residence's fenced gate. A. **GREEN** proceeded to check **SUBJECT PREMISES 6's** associated mailbox and smoke a cigarette in the front yard of the residence before returning to the back yard via the same gate. Case agents believe **SUBJECT PREMISES 6** is A. **GREEN's** primary address and case agents therefore will obtain evidence showing A. **GREEN's** involvement in the DTO at this location.

14



Figure 6

g.  2863 N. 56th Street, #2 Milwaukee, WI ("**SUBJECT PREMISES 7**")

- 2863 N. 56th Street #2, Milwaukee, Wisconsin, is a two-story single-family residence located on the west side of N. 56th Street. Note: Despite the unit number "#2" for this premises, tax records show that it is a single-family residence. The exterior is described as having blue/gray siding with white trim, and a brown shingled roof. The numbers "2863" are affixed in a horizontal fashion in black numerals on a white background, on the southernmost east-facing siding. The front, east-facing entry door has a white exterior storm door in front of a wooden interior door. There is a side entry door along the south side of the residence. The residence has a driveway along the south side of the residence leading to a garage which has blue/gray siding, a white overhead garage door. The residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin. Case agents are requesting to search **SUBJECT PREMISES 7** as well as the detached garage. Additionally, case agents are requesting the search of **AYALA's** black 2008 Ford Crown Victoria bearing WI registration ALN-4825 VIN: (2FAFP71V48X164508) (herein **Subject Vehicle 7**) and his beige 2004 Toyota Sienna bearing WI registration ATE-7714 (VIN: 5TDBA22C84S026552) (herein **Subject Vehicle 8**). **SUBJECT PREMISES 7** is depicted below in Figure 7. Case agents have observed AYALA driving **Subject Vehicle 8** on numerous occasions including at Bar 1000.

- **SUBJECT PREMISES 7** is Frank **AYALA's** residence. As detailed below, **AYALA** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents know that 2863 N. 56th Street, #2 Milwaukee, WI is Frank **AYALA's** currently listed address with the Wisconsin Department of Transportation. Case agents have observed **AYALA** at this residence on numerous occasions as recently as May 9, 2025. As recent as June 9, 2025, case agents observed **AYALA's** known 2004 beige Toyota Sienna bearing WI registration ATE-7714 (**Subject Vehicle 8**), listing to **AYALA** at **SUBJECT PREMISES 7**, parked in the associated driveway to the residence. Case agents believe **SUBJECT PREMISES 7** is **AYALA's** primary address and case agents therefore will obtain evidence showing **AYALA's** involvement within the DTO at this location.

15



Figure 7

h. 5349 N. 91st Street, Apartment 204, Milwaukee, WI ("**SUBJECT PREMISES 8**")

- 5349 N. 91st Street, Apartment 204, Milwaukee, WI, is a single unit within a multi-family apartment building that is two-stories and located on the west side of N. 91st Street. The exterior is described as having tan siding with tan stone and red brick, brown trim, and a brown shingled rooftop. The numbers "5349" are affixed in a horizontal fashion in brown numbers on a tan background on a wooden fixture at the corner of the premises. The south-facing entry door has is red in color leading to the apartment door. The apartment complex is titled Willow Tree Apartments owned by Berrada Properties. Apartment 204 is a single unit within this larger building and is located on the north east corner on the second floor of the building. The specific unit has a wooden entry door. The numbers "204" are affixed in a horizontal fashion in black numbers on a silver placard. The residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin; Case agents are requesting to search **SUBJECT PREMISES 8,** as well as any common areas including basements, attics, and common hallways. Additionally, case agents are requesting the search of **KAMANDA's** brown 2018 Chevrolet Equinox bearing WI registration AAG-1261 VIN: **(**3GNAXMEV9JL272344)(herein **Subject Vehicle 9).** **SUBJECT PREMISES 8** is depicted below in Figure 8.

- **SUBJECT PREMISES 8** is Ngadah **KAMANDA's** residence. As detailed below, **KAMANDA** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents learned that **KAMANDA** is a currently on state probation for Possess Firearm-Convicted of a felony and Child Abuse-Recklessly Cause Harm as of October 5, 2023. **KAMANDA** listed his residence with the Wisconsin Department of Corrections

16

as 5349 N. 91st Street Apt #204 Milwaukee, WI (**SUBJECT PREMISES 8**). As recently as June 7, 2025, case agents observed **KAMANDA's** known vehicle, a brown 2016 Chevrolet Equinox listing to Tina KAMANDA (**Subject Vehicle 9**), parked in front of **SUBJECT PREMISES 8.** Later on June 7, 2025, after following E911/GPS pings generated from **KAMANDA's** known cell phone, case agents observed **KAMANDA** getting out of the driver seat of this vehicle at an auto shop located on 68th Street and Villard Ave. Case agents believe **SUBJECT PREMISES 8** is **KAMANDA's** primary address and case agents therefore will obtain evidence showing **KAMANDA's** involvement in the DTO at this location.



Figure 8

i.   2200 N. 31st Street Apartment #403, Milwaukee, WI ("**SUBJECT PREMISES 9**")

- 2200 N. 31st Street Apartment #403, Milwaukee, WI is a single unit within a multi-family apartment building that is multiple stories and located on the east side of N. 31st Street and south of North Ave.  The exterior is described as having tan brick with black trim, and green awnings over the exterior doors. The numbers "2200" are affixed in a horizontal fashion in white numbers on a glass fixture above the entry door.  The west-facing entry door is glass with black trim leading to the #403 apartment door. The apartment complex is titled Garfield Park Apartments. Apartment #403 is a single unit within this larger building located on the 4th floor. The entry door is black in color and has the numbers "403" affixed in a horizontal fashion in white numbers on a black placard located on the wall next to the door. The unit is located in the center of the building and on the east side of the hallway The residence is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin; Case agents are requesting to search **SUBJECT PREMISES 9**, as well as any common areas including basements, attics, and common hallways**.** Additionally, case agents are requesting the search of **TREADWELL's** white 1996 Mercury Grand Marquis bearing WI registration ANF-4070 VIN: (2MELM74WXTX654677) (herein **Subject Vehicle 10**). **SUBJECT PREMISES 9** is depicted below in Figure 9.

17

- **SUBJECT PREMISES 9** is Alfonzo **TREADWELL's** residence. As detailed below, **TREADWELL** is supplied with narcotics by **BEA** and distributes narcotics on **BEA's** behalf. Case agents linked **TREADWELL** to **SUBJECT PREMISES 9** because CCAP records involving the Wisconsin Department of Workforce Development show that **TREADWELL** updated **SUBJECT PREMISES 9** as his primary residence on January 13, 2025. On June 7, 2025, case agents observed **TREADWELL's** known white Mercury Grand Marquise bearing WI registration ANF-4070 (listing to **TREADWELL-- Subject Vehicle 10**) parked in front of **SUBJECT PREMISES 9**. On June 9, 2025, case agents observed **TREADWELL** leave through the front door of 2200 N. 31st Street and return utilizing keys to open the same front door. Case agents believe **SUBJECT PREMISES 9** is **TREADWELL's** primary address and case agents therefore will obtain evidence showing **TREADWELL's** involvement within the DTO at this location.



Figure 9

10. **SUBJECT PREMISES 1** to **9** are collectively referred to herein as the

**SUBJECT PREMISES.**

III. **ISA/BEA DTO MEMBERS**

11. Through this investigation, the following persons have been identified and for whom

there is sufficient personal or criminal history information to ensure their accurate identification. In

sum, (1) **BEA** secured controlled substances from **HAMMAD** and **FOAD** Isa; (2) some of the controlled substances were sourced by **HAMMAD** and **FOAD** through ██████ ██████████ (3) **HAMMAD** and/or **FOAD** would meet **BEA** (often at Bar 1000) and provide **BEA** with the narcotics and, in at least one instance, ████ ██████ drove **HAMMAD** to distribute to **BEA**; (4) **BEA** had a Milwaukee-area distribution network involving **SIMS**, **ROBERTSON**, **THOMAS**, **GREEN**, **KAMANDA**, **KIMBLE**, **BROWN**, **TREADWELL**, **AYALA**, and **HAYNES**. Herein, these subjects are sometimes referred to as **BEA's** customers insofar as they purchased narcotics from **BEA** for resale, not for personal use. I believe that they were **BEA's** co-conspirators, not simply customers, as **BEA** frequently fronted narcotics, repeatedly supplied them with narcotics, and collected the money obtained from their subsequent distribution hierarchy. I believe these subjects purchased quantities of narcotics from **BEA** that are consistent with that of a higher-level narcotics dealer.

    a.    TIMOTHY **BEA** (**BEA**) is a black male born on March 21, 1984. **BEA's** primary residence is 2636 S. 76th Street, West Allis, Wisconsin. **BEA** is the user of TARGET TELEPHONE 1 ((630) 363-1087) and TARGET TELEPHONE 3 ((414) 206-8589). **BEA** owned a bar called Bar 1000, located at 3941 N. Teutonia Avenue, Milwaukee, Wisconsin, which he used to conduct narcotics activity.

        •  Case agents have intercepted drug-related communications between **BEA** and others. Since approximately September 2023, case agents have observed **BEA** utilize Bar 1000 to receive narcotics from the **ISAs** and to further distribute narcotics. In April 2025, case agents conducted a traffic stop of a vehicle driven by **BEA** and recovered approximately one kilogram of heroin in the engine compartment. The next day, case agents executed search warrants at **BEA's** home and Bar 1000 and located approximately 5 kilograms of heroin and 40 grams of cocaine in Bar 1000, along with numerous firearms. Additional firearms, kilogram

19

presses, and other evidence were recovered at **BEA's** residence. In total, case agents have seized approximately five kilograms of fentanyl, one kilogram of heroin, and 13 firearms, including one with a machinegun conversion device, from **BEA's** business, home, and vehicles. Based on this investigation to date, case agents believe that **BEA** has personally engaged in narcotics discussions and/or transactions involving all of the Target Subjects and has done so using TARGET TELEPHONE 1 and TARGET TELEPHONE 3.

b. **HAMMAD** ISA, herein referred to as **HAMMAD**, is a white male born on May 10, 1995. He is the current user of TARGET TELEPHONE 2 ((708) 986-7822). **HAMMAD** is the son of **FOAD** ISA. **HAMMAD** is a large-scale narcotics distributer and money launderer. It is believed that **HAMMAD**, together with **FOAD** ISA, distributed narcotics in the Milwaukee, Wisconsin area by supplying **BEA** with kilogram quantities of drugs. **HAMMAD's** main residence is 8509 S. Natoma Avenue, Burbank, Illinois, which he shares with **FOAD**.

- Case agents have intercepted drug-related communications between **HAMMAD** and others. Since approximately September 2023, case agents have observed **HAMMAD** travel to Bar 1000 over 20 times. Case agents have observed **HAMMAD** transfer what case agents believe to be narcotics from his engine compartment into Bar 1000 and transfer currency (suspected to be proceeds from narcotic sales) that came from inside Bar 1000 into his engine compartment on a number of these visits. Through this investigation, case agents have learned that **HAMMAD** conducts narcotic trafficking activities at the direction of his father, **FOAD**. For example, during a trip to Milwaukee conducted by **HAMMAD** in December 2024, **HAMMAD** informed **FOAD** that **HAMMAD** could not get a

20

hold of **BEA** and **FOAD** informed **HAMMAD** that he (**FOAD**) would call **BEA**. Subsequently, case agents observed that **BEA** sent **HAMMAD** a text indicating **BEA's** home address "2656 76th St." (2656 is presumably a typo for the correct number of 2636). Case agents observed **HAMMAD** arrive and pull into the garage of 2636 S. 76th Street. After leaving the address, **HAMMAD** and **FOAD** spoke again and had what case agents believe to be a narcotics-related conversation talking about **BEA**. Based on this investigation to date, case agents believe that **HAMMAD** has personally engaged in narcotics discussions and/or transactions with **FOAD**, and **BEA**, and has done so using TARGET TELEPHONE 2.

c. **FOAD** ISA, herein referred to as **FOAD**, is a white male born on November 7, 1965. **FOAD's** primary residence is 8509 S. Natoma Avenue, Burbank, Illinois. **FOAD** is the father of **HAMMAD** and is a large-scale narcotics distributor and money launderer. **FOAD** is the DTO's main facilitator of the movement of narcotics. **FOAD** is coordinates directly with ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ among others, to facilitate narcotics trafficking. **FOAD** is the user of TARGET TELEPHONE 4 ((312) 375-5886) and TARGET TELEPHONE 5 ((312) 841-4635).[1]

---

[1] On January 31, 2025, I learned that **FOAD** submitted a naturalization application claiming he suffered a fall in 2021 that resulted in head trauma, after which he experienced symptoms such as cognitive function decline, memory loss, learning challenges, day-to-day activity challenges, memory challenges regarding important dates and personal information, and physical symptoms such as headaches, dizziness, and sensitivity to light. The application further indicates that testing was done in the ER and **FOAD** was diagnosed with moderate, Fragile X syndrome and Multiple Endocrine Neoplasia "via MRI." The application additionally stated that **FOAD** has lost his ability to perform cognitive processes, relies on his children for everything, cannot learn new things, including to read or write English, and that while he can understand verbal language, he has cognitive problems with word processing in written form. Throughout this investigation, including evidence gleaned through interceptions, case agents have not noted any apparent cognitive difficulties, and **FOAD** has competently communicated with and directed others in DTO activities.

21

- Case agents have intercepted communications between **FOAD** and others that are drug related in nature. Case agents identified **FOAD** as the DTO leader and **BEA's** main narcotics source of supply. Case agents have intercepted multiple phone calls between **FOAD** and his Mexico source of supply, ████████████ discussing and coordinating narcotics distribution. Case agents believe the narcotics that **FOAD** coordinated through ████████████ were ultimately destined to be distributed to **BEA** in Milwaukee. For example, in February 2025, **FOAD** traveled to **BEA's** home in West Allis. While at **BEA's** residence, **FOAD** called ████████████ and ████████████ ████████ to send more narcotics and that they would pay for it without any problem. **BEA** was heard in the background of this conversation. In April 2025, **BEA** and **FOAD** met in Pleasant Prairie, Wisconsin. Upon **BEA's** return to Milwaukee County, a traffic stop was conducted of his vehicle. Case agents recovered approximately one kilogram of heroin in the engine compartment. Following **BEA's** arrest, **FOAD** made multiple attempted calls to **BEA**. Based on the investigation to date, case agents believe that **FOAD** has personally engaged in narcotics discussions and/or transactions with **HAMMAD**, **BEA**, and ████████████ and has done so using TARGET TELEPHONE 4 and TARGET TELEPHONE 5.

d. ████████████████ is a Hispanic male born on August 30, 1963. ████████████ is a large-scale narcotics distributor and is the current user of Mexico-based cellular telephone assigned number ████████████ In 2014, ████████████ was indicted in the Central District of California and charged

22

with conspiracy to traffic cocaine and methamphetamine and other drug-related felony offenses. ██████████████████ is a fugitive and is believed to reside in Mexico.

- Case agents have intercepted communications between ████████████ ██████████ and **FOAD** that are drug related in nature. Case agents identified ████████████████ as the **ISA** DTO's source of supply. Case agents have intercepted multiple phone calls between **FOAD** and ████████████████ discussing and coordinating narcotics distribution. Case agents believe the narcotics that were coordinated through ██████████████████ were ultimately destined to be distributed to **BEA**. Throughout the interception period of this investigation, **FOAD** asked ████████████████ for narcotics. For example, in an incepted phone call between **FOAD** and ██████████████ ██████████ in January 2025, **FOAD** asked ██████████████████ for two "Old Man", which case agents later identified to mean two kilograms of heroin. **FOAD** informed ██████████████ that he would pay for the kilograms with cash on delivery. In further conversations, **FOAD** and ██████████████ ██████████ discussed kilograms of "Guerra" which case agents later identified as cocaine. Case agents believe that **FOAD** places his narcotics order through ████████████████ and ██████████████████ coordinates the order with his counterparts within the United States. Based on this investigation to date, case agents believe that ████████████████ has personally engaged in narcotics discussions and/or transactions with **FOAD** and **HAMMAD** as well as **BEA** through **FOAD**. ██████████████████ has done so using ████ ██████████.

e. Claudell **SIMS** is a black male born on August 24, 1972. **SIMS** is a DTO distributor, obtaining controlled substances from **BEA**. **SIMS** is the current user of telephone number assigned (414) 737-1183. **SIMS'** primary address is 2956 N. 50th Street Milwaukee, Wisconsin (**SUBJECT PREMISES 1**).

- Case agents have intercepted communications between **SIMS** and **BEA** that are drug related in nature. Case agents identified **SIMS**, not only a distributer for **BEA's** DTO, but a key associate of **BEA**'s distribution network. Case agents have intercepted multiple phone calls between **SIMS** and **BEA** discussing breaking down or cutting narcotics for further distribution. Based on the interceptions between **SIMS** and **BEA**, case agents believe that **SIMS** instructed **BEA** on stretching his product with a cutting agent that would ultimately result in a larger profit. For example, in an intercepted phone call in October 2024, **SIMS** discussed stretching the product and informed **BEA** that his customers rated the product a "10." The two further discussed their strategy moving forward and how they could make more money. Based on the investigation to date, case agents believe that **SIMS** has personally engaged in narcotics discussions and/or transactions with **BEA**. **SIMS** has done so using his assigned number of (414) 737-1183.

f. Freddie **ROBERTSON** is a black male born on May 30, 1970. **ROBERTSON** is a DTO distributor, obtaining controlled substances from **BEA**. **ROBERTSON** is the current user of telephone number assigned (414) 248-7180. **ROBERTSON**'s primary address is 6315 N. 90th Street, Milwaukee, WI (**SUBJECT PREMISES 2**).

- Case agents identified **ROBERTSON** as a distributer supplied with narcotics by **BEA**. In an intercepted phone call in October 2024, **BEA** called **ROBERTSON** checking on his status. **ROBERTSON** informed **BEA** he was "walking it down,"

24

implying **ROBERTSON** has previously received narcotics from **BEA** and that **ROBERTSON** was still in the process of selling the narcotics. In a November 2024 phone call between **ROBERTSON** and **BEA**, **BEA** informed **ROBERTSON** that **BEA** only had "fire." Case agents know that "fire" is common term used for fentanyl/heroin. **ROBERTSON** agreed to purchase "28" worth. Later that same day, case agents observed **ROBERTSON**'s vehicle arrive at 3941 N. Teutonia Avenue (Bar 1000). **BEA** met with **ROBERTSON** for a short amount of time and **ROBERTSON** left the area. Furthermore, on April 17, 2025, on **BEA's** return from obtaining a kilogram of heroin from **FOAD**, **BEA** called **ROBERTSON**, and I believe this was to inform **ROBERTSON** that **BEA** now had heroin. Based on this investigation to date, case agents believe that **ROBERTSON** has personally engaged in narcotics discussions and/or transactions with **BEA**. **ROBERTSON** has done so using his assigned number of (414) 248-7180.

g. William **THOMAS** is a black male born on May 27, 1973. **THOMAS** is believed to be a DTO distributor, obtaining controlled substances from **BEA**. **THOMAS** is the current user of telephone number assigned (262) 887-9040. **THOMAS**' primary address is 2935 N. 48th Street, Milwaukee, WI (**SUBJECT PREMISES 3**)

- Case agents identified **THOMAS** as a distributer supplied with narcotics by **BEA**. In an intercepted phone call in October 2024, **BEA** called **THOMAS** to check **THOMAS**' status. **THOMAS** informed **BEA** that **THOMAS** would get back to **BEA but** told **BEA** to hold "two" for **THOMAS**. In a separate conversation in February 2025, **BEA**, referencing narcotics, informed **THOMAS** that **BEA's** people had it. **THOMAS** asked the cost and **BEA** informed **THOMAS** it was "17" for a

whole one. **BEA** then references the border tightening up and how it's going to be harder to get narcotics. **THOMAS** referenced a past deal they had, which case agents believe to have involved bad quality narcotics that **BEA** sold **THOMAS**. Based on this investigation to date, case agents believe that **THOMAS** has personally engaged in narcotics discussions and/or transactions with **BEA**. **THOMAS** has done so using his assigned number of (262) 887-9040.

h. Ngadah B. **KAMANDA** is a black male born on December 18, 1987. **KAMANDA** is a DTO distributer who obtains narcotics from **BEA** for distribution in the Milwaukee area. He is the current user of telephone number (414) 467-4928. **KAMANDA**'s primary residence is 5349 N. 91st Street, Apartment 204, Milwaukee, WI (**SUBJECT PREMISES 8**).

- Case agents identified **KAMANDA** as a distributer supplied with narcotics by **BEA**. Through interceptions, case agents believe **KAMANDA** obtains marijuana and heroin from **BEA**. For example, in December 2024, after **BEA** obtained marijuana from **HAMMAD, BEA** called **KAMANDA** in order to sell **KAMANDA** the marijuana. During this same phone call, **KAMANDA** inquired if **BEA** was still "fucked up on the other side" and **BEA** replied that **BEA** was still waiting. Case agents believe this was in reference to **BEA** not having any heroin or cocaine on hand. Case agents know that in December 2024, and January, February, and March 2025, **BEA** was still trying to obtain heroin and/or cocaine from **FOAD**. Based on this investigation to date, case agents believe that **KAMANDA** has personally engaged in narcotics discussions and/or transactions with **BEA**. **KAMANDA** has done so using his assigned number of (414) 467-4928.

26

i.  Alonzo **KIMBLE** is a black male born on April 18, 1968. **KIMBLE** is a DTO distributor, obtaining controlled substances from **BEA**. Case agents have observed one suspected narcotics transaction between **BEA** and **KIMBLE** at Bar 1000, but case agents have also observed contact between **KIMBLE** and **BEA** on or around days that the ISAs deliver suspected narcotics to **BEA** at Bar 1000. **KIMBLE** is the current user of cellular telephone assigned number (414) 610-1305, which has been in contact with **BEA**. **KIMBLE's** primary address is 6104 N. 115th Street, Milwaukee, Wisconsin (**SUBJECT PREMISES 5**).

- Case agents identified **KIMBLE** as a distributer supplied with narcotics by **BEA**. **KIMBLE** was first identified in August 2024 when **KIMBLE** arrived at Bar 1000 after the **HAMMAD** brought narcotics to Bar 1000 earlier that same day. On that day, **KIMBLE** arrived at Bar 1000 in his known green/gray F-150 (**Subject Vehicle 5**). **BEA** was observed exiting Bar 1000 with a multi-colored box underneath his arms. **BEA** approached the F-150 (**Subject Vehicle 5**), opened the door, stood by the vehicle for a short duration and returned back to the bar no longer carrying the box. Through interceptions, case agents later confirmed **KIMBLE's** role within **BEA's** distribution network. Based on this investigation to date, case agents believe that **KIMBLE** has personally engaged in narcotics discussions and/or transactions with **BEA**. **KIMBLE** has done so using his assigned number of (414) 610-1305.

j.  Dennis L. **BROWN** is a black male born on January 4, 1980. **BROWN** is a DTO distributor who obtains narcotics from **BEA** for distribution in the metro-Milwaukee area. He is the current user of telephone number (414) 581-0916. **BROWN's** primary residence is 2642 N. 15th Street, Milwaukee, WI (**SUBJECT PREMISES 4**)

- Case agents identified **BROWN** as a distributer supplied with narcotics by **BEA**. Case agents intercepted multiple phone calls between **BEA** and **BROWN** where **BEA** is requesting money that **BROWN** owed him from previously fronted narcotics. For example, in December 2024, after intercepting communication between **BEA** and **BROWN**, case agents observed **BEA** and **BROWN** meet in a Qdoba parking lot. Case agents believe this meeting was for **BROWN** to pay **BEA** money **BROWN** owed **BEA** for previously fronted narcotics. Based on this investigation to date, case agents believe that **BROWN** has personally engaged in narcotics discussions and/or transactions with **BEA**. **BROWN** has done so using his assigned number of (414) 581-0916.

k. Antonio **GREEN** is a black male born on July 5, 1992. **GREEN** is a DTO distributor who obtains narcotics from **BEA** for distribution in the metro-Milwaukee area. He is the current user of telephone number (262) 395-5337. **GREEN's** primary residence is 1528 S. 59th Street, West Allis, WI (**SUBJECT PREMISES 6).**

- Case agents identified A. **GREEN** as a distributer supplied with narcotics by **BEA**. Case agents intercepted phone calls between **BEA** and A. **GREEN** discussing narcotics. For example, in December 2024, case agents observed a what they believe to be a narcotics deal at a separate location connected to A. **GREEN**, his father's residence located at 4641 N. 41st Street. Additionally, in December 2024, during an intercepted phone call, A. **GREEN** informed **BEA** that A. **GREEN** was still collecting from a customer and then A. **GREEN** would meet up with **BEA**. A. **GREEN** introduced **BEA** to his cousin, ███████████ for **BEA** to supply ██ ████ with narcotics with the intention of further expanding **BEA's** narcotics

network. Furthermore, on April 17, 2025, upon **BEA's** return from obtaining a kilogram of heroin from **FOAD**, **BEA** placed an outgoing phone call to A. **GREEN**, and I believe this call was to inform A. **GREEN** that **BEA** now had heroin. Based on this investigation to date, case agents believe that A. **GREEN** has personally engaged in narcotics discussions and/or transactions with **BEA**. A. **GREEN** has done so using his assigned number of (262) 395-5337.

l.  Alfonzo **TREADWELL** is a black male born on October 19, 1970. **TREADWELL** is a DTO distributor who obtains narcotics from **BEA** for distribution in the metro-Milwaukee area. He is the current user of telephone number (414) 982-8254. **TREADWELL's** primary residence is 2200 N. 31st St APT #403, Milwaukee, WI (**SUBJECT PREMISES 9**).

- Case agents identified **TREADWELL** as a close associate to both **BEA** and **SIMS**. **TREADWELL** has been observed going to Bar 1000 with **SIMS** on multiple occasions. Case agents believe that **TREADWELL** assists **BEA** and **SIMS** with breaking down or "cutting" narcotics for further distribution. For example, in October 2024, **TREADWELL** and **SIMS** were observed on electronic surveillance days after a suspected narcotics delivery made by **HAMMAD**. **TREADWELL** and **SIMS** were observed meeting with **BEA** at Bar 1000, presumably to view the narcotics. Furthermore, on April 17, 2025, upon **BEA's** return from obtaining a kilogram of heroin from **FOAD**, **BEA** placed an outgoing phone call to **TREADWELL**, and I believe this call was to inform **TREADWELL** that **BEA** now had heroin. Based on this investigation to date, case agents believe that **TREADWELL** has personally engaged in narcotics discussions and/or transactions with **BEA**. **TREADWELL** has done so using his assigned number of 414-982-8254.

m. Frank **AYALA**-DEJESUS is a Hispanic male born on December 24, 1964. **AYALA** is **BEA's** trusted associate who distributes narcotics on behalf of **BEA**. He is the current user of telephone number 414-350-0829. **AYALA's** primary residence is 2863 N. 56th Street, #2 Milwaukee, WI (**SUBJECT PREMISES 7**).

- Case agents identified **AYALA** as a distributor who obtains drugs from **BEA** for distribution in the metro-Milwaukee area as well as a key associate to **BEA**. Since the beginning of this investigation, **AYALA** was identified as **BEA's** close associate. Case agents have observed **AYALA** at Bar 1000 at least 20 times via electronic surveillance. Case agents have intercepted communications between **AYALA** and **BEA**. Case agents know that **AYALA** is trusted by **BEA**. For example, in December 2024, **BEA** traveled to Miami, Florida for a leisure trip. While in Miami, **BEA** received a call from an associate, ███████████ who resides at 3947 N. Teutonia Ave. (next door to Bar 1000) asking **BEA** for a quantity of "1" of what case agents believe to be a quantity of narcotics. **BEA,** in turn, sent **AYALA** to meet ██████. Case agents observed **AYALA** arrive at 3947 N. Teutonia Ave. via electronic surveillance and conduct a suspected hand to hand deal with ██████. Additionally, **AYALA** was identified as a suspect in an overdose investigation in West Allis, WI. This suspected overdose occurred in February 2025. Case agents believe that the narcotics supplied to the victim of the suspected overdose were delivered by **AYALA** and ultimately supplied by **BEA**. Furthermore, on April 17, 2025, on **BEA's** return from obtaining a kilogram of heroin from **FOAD**, **BEA** placed an outgoing FaceTime call to **AYALA**, and I believe this call was to inform **AYALA** that **BEA** now had heroin.

30

n. Johnnie **HAYNES** is a black male born on February 24th, 1970. **HAYNES** is an associate of **BEA** who obtains narcotics from **BEA** for distribution in the metro-Milwaukee area. He is the current user of telephone number 414-514-7166. **HAYNES'** primary residence is 9005 W. Lisbon Avenue, Milwaukee, Wisconsin.

- Case agents identified **HAYNES** as a narcotics distributer and associate of **BEA**. In the earlier stages of this investigation, case agents observed **HAYNES** at Bar 1000 and at the address of 3947 N. Teutonia Avenue on a consistent basis. During the execution of a search warrant at 3947 N. Teutonia Avenue, Apartment #3, for a separate investigation, investigators located approximately 29.9 grams of fentanyl, 56.6 grams of cocaine, 311 grams of methamphetamine, 77.7 grams of heroin, and 478.6 grams of marijuana. **HAYNES** was not at the apartment at the time of the search warrant. Later, on the same day, **HAYNES** began calling **BEA**. Case agents believe that the narcotics located in **HAYNES'** apartment ultimately belonged to **BEA**. Based on this investigation to date, case agents believe that **HAYNES** has personally engaged in narcotics discussions and/or transactions with **BEA**.

## IV. SUMMARY OF PROBABLE CAUSE

### A. Background and Summary of Investigation

12. In August 2023, law enforcement officers in Milwaukee, Wisconsin, initiated an investigation into Timothy **BEA**, who is believed to be distributing large quantities of controlled substances throughout Milwaukee, Wisconsin, and elsewhere. Through investigation, **BEA** was identified as the owner and operator of Bar 1000, which is located at 3941 N. Teutonia Avenue, Milwaukee, Wisconsin. The investigation has revealed that **BEA** is obtaining suspected kilogram quantities of narcotics from **FOAD** and **HAMMAD**, both of whom are located in Burbank,

31

Illinois. Evidence reflects that **BEA** uses Bar 1000 as a location to conduct a large portion of his narcotics distribution activities.[2] Investigators believe the controlled substances are trafficked from California to Illinois for distribution throughout the Midwest by **FOAD** and **HAMMAD**. Evidence reflects that once **FOAD** and **HAMMAD** have narcotics ready for distribution, the narcotics are driven to Milwaukee, Wisconsin, from Burbank, Illinois, at the direction and control of **FOAD** and **HAMMAD** several times a month. When drug shipments arrive in Milwaukee, **BEA** quickly distributes the narcotics to metro-Milwaukee area-based customers/high-level DTO distributors. **BEA**'s drug activities decrease in between deliveries from **FOAD** and **HAMMAD**.

13. Additionally, the investigation has further revealed that **FOAD** and **HAMMAD** use hidden compartments under the hoods of vehicles within the engine block to transport controlled substances and/or drug proceeds. Investigators identified the use of hidden compartments by **FOAD** and **HAMMAD** by using electronic surveillance near Bar 1000. As further detailed throughout this affidavit, case agents have observed a consistent pattern of **FOAD** and **HAMMAD** taking items out of the engine block area or placing items within the engine block area during trips made to Bar 1000. Case agents have also observed **BEA** using the engine block area of his and others' vehicles to conceal contraband for transportation. Investigators believe the DTO uses this as a concealment method to avoid any potential detection by law enforcement. In April 2025, the evidence shows that **BEA** met with **FOAD** in Kenosha County, Wisconsin, where **BEA** obtained a kilogram of heroin. While enroute back to Milwaukee, **BEA** contacted members of his Milwaukee-area DTO, including Target Subjects **A. GREEN, TREADWELL, AYALA** and **ROBERTSON**. **BEA** was stopped by law enforcement and arrested. Federal search warrants

---

[2] As of October 1, 2024, **BEA** has transformed Bar 1000 into a daycare business. For continuity, the business is referred to herein as "Bar 1000."

were then executed at **BEA's** residence and Bar 1000, resulting in the recovery of cocaine, approximately five kilograms of fentanyl and/or heroin, and over a dozen firearms.

## V.    TIII ORDERS FOR ISA/BEA DTO MEMBERS

14.    In the course of this investigation, the United States District Court for the Eastern District of Wisconsin authorized the following interceptions pursuant to 18 U.S.C. § 2518:[3]

a. On October 16, 2024, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from TARGET TELEPHONE 1, used by **BEA**, and from TARGET TELEPHONE 2, used by **HAMMAD**. Interceptions over TARGET TELEPHONE 1 terminated at 11:59 p.m. on November 14, 2024.  Interceptions over TARGET TELEPHONE 2 were extended for an additional 30 days as detailed below.

b. On November 14, 2024, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from TARGET TELEPHONE 2, used by **HAMMAD**.  Judge Stadtmueller also ordered the initial interception of wire and electronic communications to and from TARGET TELEPHONE 3, used by **BEA**, the initial interception of wire communications to and from TARGET TELEPHONE 4, used by **FOAD**, and the initial interception of wire communications to and from TARGET TELEPHONE 5, used by **FOAD**. Interceptions over TARGET TELEPHONES 2, 3, 4, and 5 were scheduled to terminate at 11:59 p.m. on December 13, 2024, but were extended for an additional 30 days as detailed below.

c. On December 13, 2024, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from TARGET TELEPHONE 2, used by **HAMMAD**, the continued interception of wire and electronic communications to and from TARGET TELEPHONE 3, used by **BEA**, and the continued interception of wire communications to and from TARGET TELEPHONE 4 and TARGET TELEPHONE 5, used by **FOAD**. Judge Pepper also ordered the initial interception of wire communications to and from TARGET TELEPHONE 6, used by ████████████████ Interceptions over TARGET TELEPHONES 2, 3, 4, 5, and 6 were scheduled to terminate at 11:59 p.m. on January 11, 2025, but were extended for an additional 30 days as detailed below.

d. On January 10, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the continued interception of wire communications to and from TARGET TELEPHONE 2, used by **HAMMAD**, the continued interception of wire communications to and from TARGET TELEPHONE 3, used by **BEA**, the continued interception of wire communications to and from TARGET

---

[3] The affidavits in support of these orders are hereby incorporated into this Affidavit.

33

TELEPHONE 4 and TARGET TELEPHONE 5, used by **FOAD** and the continued interception of wire communications to and from TARGET TELEPHONE 6, used by ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Interceptions over TARGET TELEPHONE 2 and 6 were terminated at 11:59 p.m. on February 8, 2025. Interceptions over TARGET TELEPHONES 3, 4, and 5 were extended for an additional 30 days as detailed below.

e.  On January 23, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin, entered an order allowing for the renewal of interceptions of electronic communications to and from TARGET TELEPHONE 3, used by **BEA**. Electronic interceptions over TARGET TELEPHONE 3 was scheduled to terminate at 11:59 p.m. on February 21, 2025.

f.  On February 7, 2025, the Honorable Pamela Pepper, United States District Judge, Eastern District of Wisconsin entered an order allowing for the continued interception of wire and electronic communications, to and from TARGET TELEPHONE 3, used by **BEA**, and the continued interception of wire communications to and from TARGET TELEPHONE 4 and TARGET TELEPHONE 5, used by **FOAD**. Interceptions over TARGET TELEPHONE 3, 4 and 5 were terminated at 11:59 p.m. on March 8, 2025.

## VI.    PROBABLE CAUSE

15.    In the section below, I describe the progression of the investigation into the ISA/**BEA** DTO before, during, and after the Title III interceptions.

### A.    Identification of the ISA/BEA Drug Trafficking Organization and Investigative Findings Prior to TIII Authorization

16.    During surveillance operations between approximately mid-September 2023 up to April 2025 (when **BEA** was arrested), case agents have observed **BEA** at Bar 1000 on a very regular basis. Early in the investigation, case agents located a Facebook page for **BEA** (https://www.facebook.com/tim.BEA.96). On this Facebook page, **BEA** listed that he lives in Milwaukee, Wisconsin and is from Bellwood, Illinois. Additionally, **BEA** has had multiple posts marketing Bar 1000, further showing his involvement/ownership of the Bar. Through surveillance of Bar 1000, case agents observed that the bar has multiple exterior surveillance cameras covering every side the bar. Based on training and experience, case agents know that surveillance cameras are often used by narcotics dealers to conduct counter surveillance on any law enforcement activity

34

and to prevent robberies by rival narcotic dealers. In October 2024, **BEA** closed Bar 1000 and began transitioning the building into a daycare center (ICare Childcare). As of **BEA**'s arrest in April 2025, ICare Childcare was not yet in operation. From October 2024 through April 2025, **BEA** was consistently observed at Bar 1000 and Bar 1000 remained **BEA**'s primary location to conduct narcotics trafficking activities.

17.     Based on physical and electronic surveillance, phone record data, Title III interceptions, and court-authorized location data, there is probable cause to believe that **BEA** has engaged in narcotics trafficking and that he uses Bar 1000 to facilitate the DTO. Furthermore, the evidence also shows there is probable cause that other DTO members, to include **HAMMAD** ISA and **FOAD** ISA, meet **BEA** at Bar 1000 to further their narcotics trafficking, as detailed below.

18.     Throughout this investigation, case agents have identified multiple phones utilized by **BEA**, **FOAD** and **HAMMAD**. For the purposes of this affidavit, the following phones will be labeled as followed throughout this affidavit:

| Phone Number | In Possession of: | Herein Referred To As: |
|---|---|---|
| 630-363-1087 | TIMOTHY **BEA** | TARGET TELEPHONE 1 |
| 708-986-7822 | **HAMMAD** ISA | TARGET TELEPHONE 2 |
| 414-206-8589 | TIMOTHY **BEA** | TARGET TELEPHONE 3 |
| 312-375-5886 | **FOAD** ISA | TARGET TELEPHONE 4 |
| 312-841-4635 | **FOAD** ISA | TARGET TELEPHONE 5 |
| 414-628-1258 | TIMOTHY **BEA** | 414-628-1258 |
| 414-552-2844 | TIMOTHY **BEA** | 414-552-2844 |
| 262-525-9081 | TIMOTHY **BEA** | 262-525-9081 |
| 708-513-3943 | **FOAD** ISA | 708-513-3943 |

**B.**     **Meetings Between BEA and HAMMAD and/or FOAD ISA in Milwaukee**

19.     In sum, between September 2023 and October 2024, case agents conducted physical and/or electronic surveillance of **BEA, HAMMAD, FOAD**, Bar 1000, and **BEA's** residence in West Allis, Wisconsin. This included reviewing video surveillance from pole cameras depicting Bar 1000, **BEA**'s residence, **FOAD** and **HAMMAD**'s residence, and monitoring precision phone location data for telephones used by **BEA, HAMMAD**, and/or **FOAD**. **HAMMAD** and/or **FOAD** would meet with **BEA** at Bar 1000, and occasionally at **BEA's** residence. Based on my training and experience, and the overall investigation, I believe that each time **FOAD** and/or **HAMMAD** came to Milwaukee to meet with **BEA** it was to supply **BEA** with narcotics, to acquire drug proceeds from **BEA** for previously fronted narcotics, or to meet with **BEA** to discuss their drug trafficking enterprise. Several examples of these meetings are synopsized below.

**1.**     September 19, 2023 – **HAMMAD** Milwaukee Trip and Identification of **HAMMAD** and **FOAD** ISA

20.     Case agents first identified **HAMMAD** and **FOAD** as **BEA**'s suspected narcotics suppliers on September 19, 2023, when **HAMMAD** was observed at Bar 1000 engaging in a suspected narcotic transaction with **BEA**. At that time, a gray Lexus RC350 Bearing Illinois registration Q198950 listing to **FOAD** at 8509 S. Natoma Burbank, Illinois, pulled into a parking stall next to a gold Cadillac operated by **BEA**. **HAMMAD** exited the Lexus and entered the back gate door of Bar 1000. When **HAMMAD** left the bar, he came out from the back gate door carrying a large blue box with both hands. The box appeared heavy and appeared to contain contents. **HAMMAD** walked to the front area of his Lexus and opened the hood of the vehicle, while **BEA** peered his head outside of the back gate door and looked around. **BEA** closed the back gate door while **HAMMAD** was still at the front of his vehicle with the hood open. Approximately one

36

minute later, **HAMMAD** closed the hood of the vehicle and proceeded to walk to the driver's door carrying the blue box (that now appeared to be empty) with one hand. **HAMMAD** sat in the Lexus and before closing his vehicle door, he threw the blue box away in front of his Lexus with one hand, further leading agents to believe that the box no longer contained any contents. **HAMMAD** proceeded to back out and drive away. Based, in part, on **BEA**'s known large-scale narcotics distribution, and the previous detailed events at Bar 1000, case agents believe that **HAMMAD** picked up drug proceeds at Bar 1000 on September 19, 2023, and concealed them within the engine compartment of the Lexus to transport back to Illinois.

21. Since September 19, 2023, case agents have observed multiple similar transactions between **BEA**, **HAMMAD**, and/or **FOAD**. Between September 19, 2023 and April 20, 2025, **HAMMAD** and/or **FOAD** have traveled to the Milwaukee area for meetings with **BEA** on at least thirty separate occasions. Throughout the investigation, **HAMMAD** and **FOAD** have often used the engine compartment of vehicles to conceal narcotics and currency. This method of transport has been observed by case agents with several different vehicles used by the DTO. Based on the frequency and consistency of this method being used, case agents believe the DTO is using the engine compartment of vehicles as a concealment method. The short duration of the "vehicle hood" being lifted eliminates the possibility of the targets checking the engine area for vehicle faults or malfunctions. Further, based on training and experience, case agents know that it is common for drug traffickers to conceal drugs or drug-proceeds in hidden vehicle compartments or within the engine compartment as a way to thwart law enforcement. This suspicion was confirmed when, in April 2025, **BEA** was traffic stopped after apparently meeting with **FOAD** and there was a kilogram of heroin concealed in **BEA**'s engine compartment.

37

22.     Case agents have not observed an obvious transaction during every visit made by either **HAMMAD** or **FOAD** to Milwaukee. At Bar 1000, physical and electronic surveillance was often obstructed, limiting case agents' ability to observe transactions. During some of the visits made by either **HAMMAD** or **FOAD**, they did not approach the engine compartment or bring anything in or out of the bar. This limited case agents' ability to predict whether **BEA** was receiving narcotics or discussing logistics with **HAMMAD** or **FOAD**. There have been a few occasions where court-authorized location data for **HAMMAD**'s and **BEA**'s phones reflected a suspected meeting between the two in the Milwaukee area but not at Bar 1000.

- Pole camera footage showed **HAMMAD** at Bar 1000 on:

| September 2023 | 19th |
| October 2023 | 17th, 25th, 27th |
| November 2023 | 9th, 15th, 30th |
| December 2023 | 11th, 24th, 27th |
| July 2024 | 3rd, 4th, 5th, 7th, 8th, 15th, 22nd, 24th |
| August 2024 | 2nd, 5th, 29th |
| September 2024 | 30th |
| October 2024 | 1st, 9th |

- Pole camera footage showed **HAMMAD** at **BEA's** residence on June 6, 2024.

- Pole camera footage showed **FOAD** at Bar 1000 on:

| November 2023 | 15th, 30th |
| March 2024 | 9th, 20th |
| April 2024 | 29th |
| May 2024 | 25th |

| July 2024 | 14th |
|---|---|

**2.** October 27, 2023 – **HAMMAD's** Milwaukee Trip

23. On October 27, 2023, at approximately 5:57 p.m., electronic surveillance showed **BEA** arrive at Bar 1000 in the silver Jaguar XJ8, park in the back, exit the vehicle, and enter into the back gate of Bar 1000. At approximately 6:09 p.m., **HAMMAD**'s gray Lexus parked behind Bar 1000. **HAMMAD** parked the Lexus with the vehicle's front positioned near the back gate of Bar 1000. **HAMMAD** exited the driver seat and approached the back gate of Bar 1000. **BEA** opened the gate for **HAMMAD** and let him into the bar.

24. At approximately 6:11 p.m., Target Subject Johnnie **HAYNES** arrived in his Maroon Dodge Ram pickup truck Bearing Wisconsin registration TY6749 and parked in the rear of Bar 1000. Through investigation, **HAYNES** has been identified as an associate to **BEA**. **HAYNES** exited his vehicle and walked into the back of the bar. Shortly afterwards, **HAMMAD** exited the bar and approached the back of the Lexus. **HAMMAD** opened the trunk of the Lexus and reached in. **HAMMAD** closed the trunk and approached the front passenger door of the Lexus. **HAMMAD** opened the front passenger door, reached in, and then closed the door. **HAMMAD** walked around to the driver door, reached in and walked to the front of the Lexus. **HAMMAD** stood between the hood of the Lexus and the back gate of Bar 1000, looking around the area in a suspicious manner. As **HAMMAD** stood near the back gate and scanned the area, the back gate of the bar opened. **HAMMAD** stepped close to the back gate and was handed a black bag by someone wearing a black sweatshirt similar to the one **BEA** was wearing when he entered the bar. With the bag in hand, **HAMMAD** quickly turned around and opened the hood of his Lexus. **HAMMAD** retrieved approximately five rectangular-shaped items wrapped in a shiny film from

the engine compartment and placed them into the black bag. These items were consistent in shape and size with that of a kilogram of narcotics. After filling the bag, **HAMMAD** closed the Lexus' hood and quickly entered the back gate of Bar 1000. At almost the same time that **HAMMAD** entered the back gate with the black bag, **HAYNES** exited the back gate of the bar and left in his pickup truck.

25. At approximately 6:14 p.m., **BEA** exited the back gate of the bar with a black bag in his hand and approached the area where his vehicle was parked. **BEA** parked his vehicle in an area that was partially blocked from case agents' view. **BEA** returned from the area of his vehicle and went back into the bar with nothing in his hands. At approximately 6:20 p.m., a gold Cadillac SUV Bearing Wisconsin registration ABU-1610 pulled into the alleyway behind Bar 1000 and parked. Case agents have observed **BEA** operating this same vehicle in the past. **BEA** exited the bar, walked in the direction of his Jaguar, which case agents could not observe. Shortly afterwards, **BEA** walked from the area of his Jaguar to the gold Cadillac SUV. **BEA** briefly met with the operator of the gold Cadillac SUV before returning to the bar. The gold Cadillac left immediately after meeting with **BEA**. At approximately 6:32 p.m., **BEA** exited the bar again and again met with the operator of the gold Cadillac, which had returned to the bar. After a quick exchange between **BEA** and the driver of the gold Cadillac, **BEA** went back into the bar again. At approximately 6:40 p.m., **HAMMAD** exited the bar and again opened the hood of his vehicle. **HAMMAD** was observed either removing something from under the hood, or placing something in the engine block area, before closing it and getting into his vehicle. **HAMMAD** left the area immediately after getting into his vehicle.

3. March 9, 2024 – **FOAD**'s Milwaukee Trip

26.     Between December 27, 2023, and March 9, 2024, case agents did not observe any trips to Milwaukee by either **FOAD** or **HAMMAD**. However, on March 9, 2024, at approximately 5:04 p.m., electronic surveillance reflected that a black 2024 Ford Edge Bearing Illinois registration EA93867, listing to **FOAD** at Subject Premises arrived and parked in the rear of Bar 1000. **FOAD** exited the passenger seat of the vehicle, and an unknown Middle Eastern male (later identified as ███ ███████ exited the driver's side of the vehicle. **FOAD** and ███████ approached the bar, knocked on the back gate of Bar 1000, and stood outside for approximately one minute. After they received no response at the gate, ████████ sat back in the driver seat of the vehicle, and **FOAD** walked to the front of Bar 1000. At approximately 5:07 p.m., the back gate of Bar 1000 opened, and **FOAD** and **BEA** exited the bar. **FOAD** approached the front of his Ford Edge and lifted the hood. **BEA** then walked to the front of the Ford Edge at which time it appeared that **FOAD** handed something to **BEA**. **BEA** quickly turned around and returned to the inside of Bar 1000. **FOAD** closed the hood of the car and followed **BEA** into the bar. Simultaneously, ██████████ exited the driver seat of the vehicle and followed **BEA** and **FOAD** into the bar. Once all three subjects were inside of Bar 1000, they closed the gate behind them. At approximately 5:15 p.m., **FOAD** exited the back gate of Bar 1000 carrying an object in his left hand. ███████ exited the back gate of Bar 1000 immediately after **FOAD** and walked to the driver door of **FOAD**'s vehicle. **FOAD** walked to the hood of the vehicle and waited. ████████ opened the driver door of the vehicle, reached in, and hit the vehicle's hood release. **FOAD** then lifted the hood of the vehicle, placed the object he was carrying under the hood of the vehicle, closed the hood, and got into the passenger seat. At approximately 5:16 p.m., the **FOAD** and ████████ left the area.

4.     March 20, 2024 – **FOAD** and ████████ Milwaukee Trip

27.     On March 20, 2024, at approximately 1:16 p.m., electronic surveillance showed **BEA** arrive at Bar 1000 in his Escalade and park in the back of the bar. At approximately 3:34 p.m., case agents observed, via E-911/GPS data from TARGET TELEPHONE 4, that **FOAD's** device crossed the Illinois border, traveling into Wisconsin. At approximately 4:24 p.m., **FOAD's** cell phone was in the area of Bar 1000. At approximately 4:20 p.m., electronic surveillance reflected that **FOAD's** known black Ford Edge, Bearing IL registration EA93867, parked in the back of Bar 1000, next to **BEA's** vehicle. After parking the vehicle, **FOAD** exited the front passenger seat while ▆▆▆▆ exited the driver's seat. Both subjects approached the rear driver's side door. **FOAD** leaned into the Ford Edge while ▆▆▆▆ stood behind looking around. **FOAD** proceeded to hand multiple large white grocery-type plastic bags containing contents to ▆▆▆▆ **FOAD** and ▆▆▆▆ proceeded to go inside the Bar 1000 area with the large white plastic bags.

28.     At approximately 4:23 p.m., **BEA** and **FOAD** exited the back gate of the bar. **BEA** walked straight to the front hood of **FOAD's** vehicle, while **FOAD** proceeded to the driver's seat area and unlatched the hood for **BEA**. **BEA** opened the hood with **FOAD** standing beside him and appeared to be placing an item in the engine compartment or looking at something inside the engine compartment. **FOAD** closed the hood and **FOAD** and **BEA** returned to the Bar 1000 area.

29.     At approximately 4:45 p.m., a black Honda sedan parked in the alleyway behind Bar 1000, perpendicular to **BEA** and **FOAD's** vehicles. An unknown male (herein referred to as UM-1) exited the Honda and went to the back driver's seat of the Honda. UM-1 then went inside the Bar 1000 area. At approximately 4:48 p.m., UM-1 exited the bar area and walked to the Honda. As UM-1 walked over to the Honda, UM-1 appeared to be holding an item underneath his jacket, cupping underneath the item, which appeared to be consistent with the size of a kilogram of

narcotics. UM-1 walked towards the trunk area of the Honda, out of view of electronic surveillance, for around 8 seconds before getting into the driver's seat of the Honda and departing.

30.     At approximately 5:01 p.m., **FOAD** and ▮▮▮▮▮ exited the bar area. **FOAD** was holding a white plastic bag underneath his left arm (bag appeared to contain less weighty contents than the bags that were originally brought into Bar 1000, consistent with U.S. Currency). **FOAD** approached the driver's seat, reached in, and unlatched the hood of his vehicle. **FOAD**, still holding the white bag under his arm, walked to front of his vehicle, opened the hood, and placed the white bag into the engine block area of the vehicle. **FOAD** got into the front passenger seat, ▮▮▮▮▮ got into the driver's seat, and they left the area.

31.     At approximately 5:14 p.m., **BEA** exited the back gate holding multiple white bags (these appear to be the same bags that were brought into the bar by ▮▮▮▮▮ earlier). **BEA** was holding at least 4 bags. **BEA** opened the Escalade's back driver's side door and placed the bags inside the Escalade. **BEA** closed the Escalade's door and walked back inside the bar area. A few seconds later, **BEA** came back outside holding one black plastic bag. **BEA** appeared to lock the Bar 1000 back gate and entered his Escalade. At approximately 5:15 p.m., **BEA** left the area. Case agents reviewed the GPS data generated from **BEA**'s Cadillac Escalade after he left Bar 1000. After leaving the bar, **BEA** drove straight to his known storage unit at 535 S. 84th Street, Milwaukee, WI, arriving there at approximately 5:46 p.m. After leaving his storage unit at approximately 5:48 p.m., **BEA** stopped at the Jetz gas station at 607 S. 70th Street. At approximately 6:41 p.m., **BEA** stopped at the Taco Bell at 8030 W. Brown Deer Rd. Milwaukee, WI. At approximately 6:58 p.m., **BEA** traveled to the BP gas station at 7222 N. Teutonia Ave. Milwaukee, WI. **BEA** remained at this location until approximately 7:19 p.m. **BEA** then traveled back to Bar 1000, arriving at approximately 7:27 p.m. **BEA** parked in back of the bar, exited

carrying a white plastic bag in his hand, which contained contents, and entered the bar area. At approximately 7:53 p.m., **BEA** exited the bar area, approached his Escalade, and reached into the driver's seat area. **BEA** closed the door and leaned into the back driver's side door, grabbed a white plastic bag containing contents, and returned inside of the bar.

     **5.**     June 6, 2024 – **HAMMAD's** Milwaukee Trip

32.     On June 6, 2024, at approximately 1:09 p.m., E-911/GPS ping data for TARGET TELEPHONE 2 (**HAMMAD's** device) indicated that TARGET TELEPHONE 2 crossed the border from Illinois into Wisconsin. Case agents checked **BEA's** E-911/GPS ping data and noted it was in the area of **BEA's** residence located at 2636 S. 76th Street. Case agents established physical surveillance at **BEA**'s residence, where they suspected **HAMMAD** may travel.

33.     At approximately 1:53 p.m., **HAMMAD**'s Silver Lexus RC 350 Bearing Illinois registration Q198950 arrived and parked in the driveway of **BEA**'s residence. Case agents observed **HAMMAD** exit the vehicle and approach the front door of **BEA**'s residence. **HAMMAD** knocked on the door and stood outside for several minutes. After receiving no answer at the door, **HAMMAD** began walking back toward his vehicle with his cell phone in hand.

34.     Pen data for TARGET TELEPHONE 2 reflected an outgoing call to **FOAD** at approximately 1:57 p.m. At approximately 2:00 p.m., TARGET TELEPHONE 2 called **BEA**'s (414) 552-2844 phone number. TARGET TELEPHONE 2 also called (414) 346-6282 (unknown user) at approximately 2:00 p.m. and 2:02 p.m.

     **6.**     July 4, 2024 – **HAMMAD's** Milwaukee Trip

35.     On July 4, 2024, at approximately 3:08 p.m., case agents observed that TARGET TELEPHONE 2 (**HAMMAD's** device) crossed the border from Illinois into Wisconsin. Case agents reviewed electronic surveillance and observed **HAMMAD** arrive in the rear of Bar 1000 at

approximately 3:49 p.m. **HAMMAD** was an occupant of his girlfriend's vehicle (2016 Mercedes Benz Bearing Illinois registration DZ36857). **HAMMAD** remained in the Mercedes until **BEA** arrived and parked in the rear of Bar 1000 at approximately 4:01 p.m. **BEA** exited the driver seat of his vehicle, and **HAMMAD** exited the passenger seat of the Mercedes. **HAMMAD** and **BEA** shook hands and hugged before **BEA** entered the back gate of Bar 1000. **HAMMAD** walked to the front area of the Mercedes and lifted the hood. **HAMMAD** retrieved a white package from under the hood of the Mercedes and handed it to **BEA**, who was standing inside of the back gate of Bar 1000. The back gate of Bar 1000 then closed. **HAMMAD** walked back to the driver side of the Mercedes and entered the driver seat. At approximately 4:23 p.m., a white Volkswagen (VW) sedan, Bearing WI registration AMK-7144, pulled up and parked in the rear of Bar 1000. As the VW was parking, **BEA** exited the rear of Bar 1000, carrying a cardboard box in his left hand. **BEA** walked toward the area where the VW was parking, out of view of electronic surveillance. Approximately ten seconds later, **BEA** returned to the back gate of the bar, no longer carrying the box. Once **BEA** was back inside of the bar, the VW left the area. **HAMMAD** immediately exited the driver seat of the Mercedes and walked into the back gate of Bar 1000. At approximately 4:26 p.m., **HAMMAD** exited Bar 1000 carrying a box and a plastic grocery bag in his hands. **HAMMAD** opened the back driver door of the Mercedes and placed these items inside. As **HAMMAD** placed these items in the back of the Mercedes, **BEA** exited the back gate, entered his vehicle, and left the area. **HAMMAD** also entered the driver seat of the Mercedes and left the area. Based these observations, case agents believe that **HAMMAD** brought narcotics to Bar 1000 (traveling with the narcotics underneath the hood of the Mercedes), **BEA** sold the narcotics to the operator of the VW, and **HAMMAD** retrieved the proceeds gained from the narcotics sale.

**7.** <u>July 8, 2024 – **HAMMAD's** Milwaukee Trip</u>

45

36.     Investigators reviewed the court-authorized location data and phone toll information for TARGET TELEPHONE 1 and TARGET TELEPHONE 2 for July 8, 2024. Phone toll information for TARGET TELEPHONE 2 and TARGET TELEPHONE 4 reflect that **HAMMAD**'s device received an incoming phone call from **FOAD**'s device at approximately 12:41 p.m. This phone call did not connect. After this missed call, **FOAD**'s device called TARGET TELEPHONE 2, which call connected (31 seconds in duration). Phone toll information from TARGET TELEPHONE 2 reflected that **HAMMAD**'s device then called ████████ device (**HAMMAD's** girlfriend) at 12:46 p.m., 2:20 p.m., and 2:24 p.m. (29 seconds, 1 minute and 20 seconds, and 17 seconds in duration, respectively). Location data for TARGET TELEPHONE 2 indicated **HAMMAD's** device then left the Burbank, Illinois area at approximately 2:28 p.m. **HAMMAD's** device received incoming WhatsApp calls from **FOAD's** device at 4:03 p.m. and 4:22 p.m. (24 seconds and 48 seconds in duration). At approximately 4:23 p.m., case agents observed **HAMMAD** arrive in the rear of Bar 1000 operating ████ Mercedes Benz. **HAMMAD** parked the Mercedes of view of electronic surveillance. Shortly after arriving, **BEA** opened the rear gate of the bar and looked outside. **HAMMAD** was observed walking from the area where the Mercedes was parked into the back gate of Bar 1000.

37.     At approximately 4:26 p.m., **HAMMAD** exited the rear of the bar and walked toward the Mercedes. Approximately one minute later, **HAMMAD** returned to the view of electronic surveillance carrying an object in his right hand. **HAMMAD** returned to the bar, and the gate was closed behind him. Due to **HAMMAD**'s vehicle being out of view of electronic surveillance, case agents were unable to determine from where the object in his right hand came. **HAMMAD's** device received an incoming WhatsApp call from **FOAD's** device (TARGET TELEPHONE 4) at approximately 4:48 p.m.

46

38.     Pen data for TARGET TELEPHONE 1 reflected that, at 5:01 p.m., a known customer of **BEA** called TARGET TELEPHONE 1 (call went unanswered), and **BEA**'s device, using TARGET TELEPHONE 1, immediately returned a call to the customer. According to pen data, this phone call lasted five seconds. At approximately 5:13 p.m., **BEA** walked out of the bar and toward his vehicle that was parked in the rear of the bar. **BEA** looked southbound in the alleyway and returned to the gate, which was still partially open. **BEA** retrieved an orange-colored box from just inside of the gate as the customer's known Volkswagen arrived and parked next to **BEA**'s vehicle. **BEA** opened the front passenger door of the Volkswagen and placed the box inside. After closing the door of the vehicle, **BEA** briskly walked back to the gate of the bar. Electronic surveillance showed **BEA** carrying an object in his right hand that he attempted to conceal in front of his body. Case agents believe that **BEA** placed a box containing controlled substances (supplied by **HAMMAD** earlier) in the customer's vehicle and, obtained money from this customer that **BEA** concealed in his right hand when he walked away. After **BEA** walked into the bar, the customer's Volkswagen left the area.

39.     At approximately 5:22 p.m., pen register/trap and trace data shows that **HAMMAD's** device placed an outgoing WhatsApp call to **FOAD's** device. At 5:46 p.m., **BEA** exited the back gate of the bar carrying a light orange box between his right arm and his body. **BEA** walked to a black SUV Bearing Wisconsin registration ATF-4524 listing to a known customer of **BEA's** who arrived and parked in the alleyway. **BEA** approached the vehicle carrying the box until he could no longer be seen by electronic surveillance. Approximately 30 seconds later, **BEA** returned to view of electronic surveillance, no longer carrying the box, and concealing his left hand in front of his body. Case agents believe that **BEA** placed a box containing controlled substances (supplied by **HAMMAD** earlier) in the customer's vehicle and obtained money from

47

this customer that **BEA** concealed in his left hand. Two minutes later, **HAMMAD** exited the bar carrying a large white bag in his left hand. **HAMMAD** walked toward his vehicle, which was out of view of electronic surveillance, and left the area. Case agents believe **HAMMAD** delivered controlled substances to **BEA**, which **BEA** distributed to two of his customers. Upon receiving payment, **BEA** provided the drug proceeds to **HAMMAD**, and **HAMMAD** left with the proceeds.

40.     At approximately 5:51 p.m., **HAMMAD's** device placed an outgoing WhatsApp call to **FOAD's** device. The E-911/GPS Ping data on TARGET TELEPHONE 2 reflected that TARGET TELEPHONE 2 travelled back to the area of **HAMMAD**'s residence in Illinois.

### 8.     July 15, 2024 – **HAMMAD's** Milwaukee Trip

41.     Investigators reviewed the court-authorized location data for TARGET TELEPHONE 2 and **FOAD**'s device for July 15, 2024. In reviewing this data, case agents observed that **FOAD** and **HAMMAD**'s devices were both in the area of their residence in Illinois before **HAMMAD's** device left at approximately 3:45 p.m. Phone toll information for TARGET TELEPHONE 2 did not reveal any phone contact between **FOAD** and **HAMMAD's** devices before **HAMMAD**'s departure at 3:45 p.m. Phone toll information for TARGET TELEPHONE 1 revealed **BEA's** device called **FOAD's** device, (312) 841-4635. Based on their training, experience, and familiarity with this investigation, case agents believe that **BEA** talked with **FOAD** regarding the incoming narcotics shipment.

42.     Before **HAMMAD** arrived at Bar 1000, **FOAD**'s device, TARGET TELEPHONE 4, placed two outgoing calls to TARGET TELEPHONE 2 at 5:21 p.m. and 5:43 p.m. (45 seconds, and 18 seconds in duration). At approximately 5:48 p.m., **FOAD**'s black Ford Edge arrived and parked in the rear of Bar 1000. Based on their training, experience, and familiarity with this investigation, case agents believe that **HAMMAD** talked with **FOAD** to advise **FOAD** that he was

due to arrive at Bar 1000 with the suspected narcotics and was not intercepted by law enforcement. Upon arriving, **HAMMAD** exited the driver seat of the vehicle and attempted to enter the rear gate of Bar 1000. **HAMMAD** appeared to be on his telephone making phone calls for several minutes before opening the rear tailgate of the vehicle and sitting in the back. Phone tolls from TARGET TELEPHONE 2 reflected that **HAMMAD**'s device placed an outgoing call to **FOAD**'s device, TARGET TELEPHONE 4, at 5:49 p.m. (24 seconds in duration). Electronic surveillance from the pole camera showed **HAMMAD** standing outside of the rear gate of Bar 1000 while placing this phone call. Based on their training, experience, and familiarity with this investigation, case agents believe that **HAMMAD** called **FOAD** to advise **FOAD** that he was waiting on **BEA** to open the rear gate of Bar 1000 to complete the transaction.

43. Case agents checked E-911/GPS ping data from **BEA**'s other cellular phone (414-628-1258) and noted that **BEA**'s device was not at the bar at this time. At 5:52 p.m., **BEA** arrived and parked his Cadillac Escalade in the rear of Bar 1000. **BEA** and **HAMMAD** walked into the back gate of the bar together. A few minutes later, **HAMMAD** exited the rear gate of the bar and walked to the driver door of his vehicle. **HAMMAD** leaned in the driver door and opened the hood. As **HAMMAD** was near his vehicle, **BEA** reached outside of the gate and placed a brown box on the ground near the hood of **HAMMAD**'s vehicle. **HAMMAD** walked to the front of his vehicle, opened the hood, and began to retrieve items, suspected to be kilogram quantities of narcotics, from under the hood and place them in the brown box **BEA** had placed on the ground. After putting the suspected narcotics in the box, **HAMMAD** picked up the box using two hands and carried it inside of the bar. After **HAMMAD** returned inside Bar 1000, phone toll information reflects that at 6:28p.m., TARGET TELEPHONE 2 received an incoming call from **FOAD**'s device, TARGET TELEPHONE 4 (approximately 2 minutes and 29 seconds in duration). Based

49

on their training, experience, and familiarity with this investigation, case agents believe that **FOAD** called TARGET TELEPHONE 2 (**HAMMAD**) to inquire if **BEA** had arrived at Bar 1000, and if the suspected narcotics made it safely to their destination without law enforcement detection.

44.     Shortly after, **HAMMAD** carried the suspected narcotics into Bar 1000, electronic surveillance depicted **BEA** engaging in a series of hand-to-hand transactions with various individuals, which case agents believe are consistent with narcotics transactions. More specifically, at approximately 6:37 p.m., **BEA** exited the rear gate of Bar 1000 as a black Honda sedan arrived and parked in the alleyway. **BEA** was carrying a large brown box with both hands as he approached the vehicle. **BEA** placed the box in the back seat of the vehicle, as the driver door opened. **BEA** appeared to speak with the operator who handed him a brown grocery style bag that appeared full. As the Honda left the area, **BEA** returned to the bar. At approximately 6:43 p.m., the same previously mentioned white Volkswagen arrived and parked in the rear of the bar. **BEA** exited the bar carrying a large white box in his hands and approached the passenger side of the Volkswagen. **BEA** opened the front passenger door and placed the box inside. **BEA** returned to the bar, and the Volkswagen left the area. Based on case agents training, experience, and familiarity with this case, case agents believe **BEA** distributed narcotics to the operator of the white Volkswagen from the narcotics that **HAMMAD** just delivered to **BEA**.

45.     At 7:06 p.m., **HAMMAD** exited the gate with **BEA**. **HAMMAD** was carrying a brown paper bag in his hand as he exited the bar. He placed the bag in front of his vehicle, opened the driver door, and pulled the hood release. **HAMMAD** returned to the hood of his vehicle and opened it. **HAMMAD** then retrieved items, suspected to be U.S. currency, from the brown paper bag and placed them under the hood of his vehicle. After placing the suspected U.S. currency under the hood, he closed it and pushed down to ensure it was securely latched. **HAMMAD** and **BEA**

then briefly spoke before **HAMMAD** entered the driver seat of his vehicle and left the area. Phone toll information indicates that at approximately 7:10 p.m., or approximately four minutes after **HAMMAD** left Bar 1000, TARGET TELEPHONE 2 received an incoming call from **FOAD**'s device, TARGET TELEPHONE 4 (23 seconds in duration). Case agents believe **FOAD** called **HAMMAD** to ensure that the narcotics transaction with **BEA** occurred and that **HAMMAD** was traveling back with narcotics proceeds. E-911/GPS ping data for TARGET TELEPHONE 2 reflected that after **HAMMAD** left Bar 1000, **HAMMAD**'s device travelled back to the area of his residence in Burbank, Illinois

**9.**    July 22, 2024 – **HAMMAD's** Milwaukee Trip

46.    On July 22, 2024, at approximately 2:38 p.m., case agents observed that **HAMMAD**'s E-911/GPS ping data indicted **HAMMAD's** device crossed into Wisconsin from Illinois. At approximately 2:50 p.m., case agents set up physical surveillance in order to observe the back of Bar 1000. The following events were observed by both electronic surveillance and physical surveillance.

47.    At approximately 3:12 p.m., case agents observed **FOAD**'s known vehicle (black Ford Edge Bearing IL plates EA93867) parking in the back of Bar 1000. A review of **FOAD**'s E-911/GPS ping data showed that **FOAD's** device was still in Illinois at that time, leading case agents to suspect that **HAMMAD** was driving **FOAD**'s vehicle.

48.    At approximately 3:18 p.m., case agents observed **BEA** arrive at Bar 1000 in his known black Cadillac Escalade. After parking, **BEA** exited his vehicle and proceeded to unlock the back gate of Bar 1000 and enter the bar area. At approximately 3:21 p.m., **BEA** placed a larger cardboard box right outside of the back gate of Bar 1000 and immediately went back inside of Bar 1000. A few seconds later, **HAMMAD** (wearing a neon yellow hat with a black t-shirt and glasses)

51

walked up to the cardboard box and grabbed it with one hand. Based on how **HAMMAD** was holding onto the box, the box appeared to be empty. **HAMMAD** approached the front area of **FOAD's** black Ford Edge, out of view of physical and electronic surveillance. Approximately a minute later, **HAMMAD** was observed carrying the same cardboard box that now appeared to contain contents. The cardboard box appeared to be heavy as **HAMMAD** was carrying the box from the bottom. **HAMMAD** proceeded to enter the bar area.

49.    At approximately 3:33 p.m., a beige/gold Toyota Sienna Bearing WI registration ATE-7714 (**Subject Vehicle 8** and "gold Minivan") pulled in and parked in between the Ford Edge and the Cadillac Escalade, in the back of Bar 1000. Case agents know this vehicle (**Subject Vehicle 8**) belongs to Frank **AYALA**. Case agents observed **AYALA** as the driver and observed a passenger sitting in the front passenger seat. At approximately 3:39 p.m., an unknown male wearing a white t-shirt walked through the side walkway, in between Bar 1000 and 3947 N. Teutonia Ave. to the back of Bar 1000. The unknown male was holding a blue backpack and approached the passenger side the gold Minivan (**Subject Vehicle 8**). The unknown male and the occupants inside of the gold minivan had a quick exchange before the unknown male entered the back gate of Bar 1000 with the blue backpack in his hand. At approximately 3:40 p.m., **AYALA** got out of the driver seat of the gold minivan (**Subject Vehicle 8**) and an unknown Hispanic male exited the front passenger seat. The two walked over to the driver's side back seat, opened the door, and stood by **Subject Vehicle 8** for approximately 15 seconds. **AYALA** closed the door and both subjects went inside the Bar 1000 area.

50.    At approximately 3:47 p.m., **BEA** opened the back gate of Bar 1000 carrying a brown cardboard box that appeared to contain contents. **BEA** placed the box down directly behind **AYALA**'s minivan (appeared to be an attempt to hide the box) and walked back by the gate.

51.     **BEA** remained at the gate for approximately 15 seconds looking around the alley area while maintaining eyesight on the box. A black BMW SUV traveled through the alley and **BEA** immediately walked over to the brown cardboard box. The black BMW SUV continued to travel past the bar and turned around, heading back through the alley way. The black BMW SUV pulled up directly in back of Bar 1000 (perpendicular to **AYALA**'s minivan (**Subject Vehicle 8**) and **BEA**s Escalade). **BEA** immediately picked up the brown cardboard box, walked it over to the black BMW SUV, opened the back passenger door and placed the box inside the BMW SUV. **BEA** remained at the BMW SUV for approximately a minute and a half. The black BMW SUV left the area and **BEA** returned to the Bar 1000 area carrying a large brown paper bag. **BEA** entered into the Bar 1000 area with the brown paper bag. Based on these observations, case agents believe the cardboard box that **BEA** placed into the black BMW SUV contained narcotics (delivered earlier by **HAMMAD**) and the brown paper bag that **BEA** returned to the bar with contained currency (drug proceeds).

52.     At approximately 3:53 p.m., **AYALA** and the unknown Hispanic male exited the back gate of Bar 1000 and entered the gold minivan (**Subject Vehicle 8**). **AYALA** and the unknown Hispanic male left the area.  At approximately 4:01 p.m., a black Chevy sedan pulled through the alleyway and stopped in back of Bar 1000. The black Chevy sedan was followed by **AYALA**'s gold minivan. An older unknown black male wearing a white hat walked from what appeared to be 3947 N. Teutonia Ave. and approached the Chevy. At approximately 4:03 p.m., the older black male wearing a white hat left the Chevy and the Chevy pulled away. **AYALA** and his passenger parked the gold minivan next to **BEA**'s Escalade. **AYALA** and his passenger exited the gold minivan (**Subject Vehicle 8**) and began looking at the tire areas of the gold minivan. The two remained outside until approximately 4:07 p.m., before being let in the Bar 1000 area. After

53

AYALA and the unknown Hispanic male entered the bar area, **BEA** was peeked over the back fence appearing to look around the alley. At approximately 4:10 p.m., a white Volkswagen pulled up and parked perpendicular to **BEA** and **AYALA**'s vehicles behind Bar 1000. **BEA** exited the back gate of Bar 1000 carrying another box. **BEA** walked to the white Volkswagen, opened the back driver's side door, and placed the box inside the vehicle. **BEA** remained at the white Volkswagen for approximately 30 seconds before returning to the Bar 1000 area. It could not be determined if **BEA** had anything in his hands as he returned to the bar. The Volkswagen left.

53.     At approximately 4:15 p.m., case agents terminated physical surveillance but continued to monitor electronic surveillance. At approximately 4:31 p.m., **BEA** and **HAMMAD** exited the back gate of Bar 1000. Based on the camera angle, case agents could not see if **HAMMAD** was carrying anything in his hands. Case agents could not see **HAMMAD**'s vehicle due to vegetation blocking the view. At approximately 4:33 p.m., **HAMMAD** stood in between **BEA**'s Escalade and the **AYALA**'s minivan (**Subject Vehicle 8**) as **HAMMAD** walked in and out of electronic surveillance view. At approximately 4:36 p.m., **HAMMAD**'s vehicle backed out and left the area. Case agents monitored **HAMMAD**'s E-911/GPS ping data. At approximately 5:40 p.m., **HAMMAD's** device pinged back across the Illinois border. At approximately 6:11 p.m., case agents observed a 1,411-meter ping that appeared to be off of the highway in Wheeling, Illinois. Case agents observed that at 5:30 p.m., **HAMMAD's** device made an outgoing phone call to 847-243-3700, the Boston Fish Market located in Wheeling, Illinois.

### 10.     August 5, 2024 – **HAMMAD's** Milwaukee Trip

54.     Investigators reviewed the court authorized location data and phone toll information for TARGET TELEPHONE 1 and TARGET TELEPHONE 2 for August 5, 2024. Phone toll information for **FOAD's** device, TARGET TELEPHONE 5, showed that **BEA's** device

called **FOAD's** device at 1:33 p.m. from TARGET TELEPHONE 3. The location data on TARGET TELEPHONE 2 indicated that **HAMMAD's** device left the area of his residence (8509 Natoma Avenue) at approximately 2:01 p.m. At approximately 3:37 p.m., electronic surveillance showed **HAMMAD** arrive in the rear of Bar 1000. **HAMMAD** parked **FOAD**'s black Ford Edge on the rear parking slab of the bar. **BEA** was not at Bar 1000. **HAMMAD** used TARGET TELEPHONE 2 to call **FOAD**'s TARGET TELEPHONE 4, at 3:38 p.m. (24 seconds). Case agents believe **HAMMAD** called **FOAD** to let **FOAD** know that he arrived at Bar 1000 without being detected by police and was waiting for **BEA** to arrive. It is believed **HAMMAD** arrived at Bar 1000 with a narcotics delivery for **BEA**. Approximately one minute later, **BEA** arrived in his black Cadillac Escalade and parked next to **HAMMAD**. **BEA** exited the vehicle and entered the rear gate of Bar 1000.

55. Case agents observed **BEA** open the rear gate of the bar and place what appeared to be an empty blue box outside of the gate. **HAMMAD** exited the driver seat and walked to the front of his vehicle. **HAMMAD** opened the hood of his vehicle and retrieved rectangular shaped objects from within the engine compartment. **HAMMAD** placed these objects inside of the blue box that **BEA** had placed outside of the gate. The shape and size of these objects were consistent with the shape of kilograms of narcotics. After removing several of these objects from under the hood and placing them in a box, **HAMMAD** retrieved a sheet of aluminum foil from the engine compartment. Case agents believe **HAMMAD** used the foil as a barrier to protect the narcotics from the engine heat during transportation.

56. After **HAMMAD** placed the suspected kilograms inside of the box, **BEA** picked up the box and took it inside of the bar. **HAMMAD** followed **BEA** into the bar and closed the gate. At 3:52 p.m. while inside of Bar 1000, **HAMMAD's** device, TARGET TELEPHONE 2,

called **FOAD's** device, TARGET TELEPHONE 4 (15 seconds in duration). **HAMMAD's** device also placed a WhatsApp call to **FOAD's** device using at 4:04 p.m. **FOAD's** device returned a phone call to **HAMMAD's** device at 4:06 p.m. on WhatsApp. Based on their training, experience, and familiarity of this investigation, case agents believe **HAMMAD** called **FOAD** to discuss the narcotics transaction being conducted with **BEA**.

57. At approximately 4:16 p.m., **BEA** exited the back gate of Bar 1000 carrying the same blue box and walked to the previously mentioned black BMW that had parked in the alleyway behind the bar. **BEA** approached the vehicle, and opened the rear driver side door, placing the blue box inside of the vehicle. After placing the box inside, **BEA** returned to the bar, carrying something in his hands. Case agents were unable to see what **BEA** was carrying, but it was not the blue box he previously had. After **BEA** returned to the bar, the black BMW left through the alleyway. Based on their training and experience, case agents believe that **BEA's** hand-to-hand transaction with the operator of the black BMW was consistent with a narcotics transaction, and that **BEA** distributed drugs in the blue box (and delivered earlier by **HAMMAD**) to the operator, who gave **BEA** money (drug proceeds), which **BEA** carried back to the bar.

58. At approximately 5:15 p.m., **HAMMAD** exited the rear of Bar 1000 and walked to his vehicle carrying a large brown paper bag. **HAMMAD** entered his vehicle and left the area. At approximately 5:33 p.m., **HAMMAD** arrived back at Bar 1000 and parked in the rear. **HAMMAD** stood outside of the rear gate of the bar and placed a phone call from TARGET TELEPHONE 2 to TARGET TELEPHONE 1 at 5:34 p.m. (28 seconds). Case agents believe **HAMMAD** called **BEA** at this time to let **BEA** know he arrived back at Bar 1000 and needed to let back into the bar. After placing the phone call, **HAMMAD** was let into the back gate of the bar.

59.     At approximately 5:35 p.m., a gray/green Ford F-150 pick-up truck pulled into the alley and parked perpendicular to **HAMMAD**'s vehicle. At approximately 5:36 p.m., **BEA** exited the bar area carrying a multi-colored box underneath his left arm. **BEA** approached the F-150, opened the passenger door, stood by the open door for a few seconds, started walking back to bar area (no longer carrying the box), turned around and had a quick exchange with the operator of the F-150, and returned into the bar area while the F-150 left the area. At 6:23 p.m., **HAMMAD** exited the rear of the bar and went to the driver seat of his vehicle and closed the driver door.

60.     At approximately 6:39 p.m., a black Chevrolet Malibu Bearing WI registration AMX-5560 arrived at Bar 1000. Case agents know this vehicle belongs to ███████████ who is a previous girlfriend of **BEA** and who resides in the Fond du Lac area.  After exiting her vehicle, ███████ met with **BEA** and entered Bar 1000. At 7:01 p.m., while **HAMMAD** was still seated in his vehicle outside of Bar 1000, **HAMMAD's** device received an incoming WhatsApp call from **FOAD's** device. Phone toll information reflects that at 7:22 p.m., TARGET TELEPHONE 2 called TARGET TELEPHONE 1 (24 seconds in duration). Shortly after this phone call, **HAMMAD** exited his vehicle and entered the bar. At 7:24 p.m., **HAMMAD's** device placed an outgoing WhatsApp phone call to **FOAD's** device while **HAMMAD** was inside Bar 1000. Based on their training and experience, case agents believe that **HAMMAD** contacted **BEA** to see if his narcotics transaction with ██████ had been completed, and to arrange for **HAMMAD** to be let in the back gate of the bar. Case agents believe that **HAMMAD** then called **FOAD** to notify him of the status of the narcotics transactions.

61.     At approximately 7:33 p.m., **HAMMAD** exited the bar area (empty handed), approached the driver's seat of his vehicle, and opened the driver door. A few seconds later, **HAMMAD** closed the door and approached the Bar 1000 area. **HAMMAD** was concealing an

object under his right arm when he re-entered the bar. At approximately 7:40 p.m., **HAMMAD** exited the bar holding onto a bag in his left hand. **HAMMAD** placed the bag down in front of his vehicle and walked toward **BEA**'s vehicle. A few seconds later, **HAMMAD** walked to the front of his vehicle and lifted the hood. **HAMMAD** picked up the bag and placed the contents within the engine compartment. Due to an obstructed view while the hood was up, case agents could only observe **HAMMAD** maneuvering items from the bag into the engine compartment and could not observe what the items were. Based on my training, experience, and familiarity with this investigation, I believe **HAMMAD** was placing U.S. currency (that was obtained from narcotics sales **BEA** conducted during **HAMMAD**'s visit) inside the engine compartment. I believe this because case agents observed multiple suspected deals occurring while **HAMMAD** was present at Bar 1000. After **HAMMAD** finished loading the suspected currency inside the engine compartment, he closed the hood and entered the driver's seat of his vehicle. At approximately 7:49 p.m., **BEA** exited the bar area, approached **HAMMAD**'s passenger side, opened the passenger door and began speaking with **HAMMAD**. A few seconds later, **BEA** closed the door and re-approached the bar area. It was undetermined if **BEA** took anything out of **HAMMAD**'s vehicle. At approximately 7:49 p.m., **HAMMAD** left Bar 1000. After leaving the bar, **HAMMAD's** device received an incoming WhatsApp call from **FOAD's** device at approximately 8:20 p.m. E-911/GPS ping data on TARGET TELEPHONE 2 reflected that after **HAMMAD** left Bar 1000, **HAMMAD's** device travelled back to the area of his residence in Burbank, Illinois.

62.     At approximately 7:54 p.m., **BEA** and ▮▮▮▮ exited the bar area. **BEA** approached the front of ▮▮▮▮ vehicle, and ▮▮▮▮ followed behind, carrying a black bag. ▮▮▮▮ walked in front of **BEA** (in between the vehicle and **BEA**) and placed the black bag by **BEA**'s feet and continued walking to the front driver's seat of her vehicle, looking around conspicuously. **BEA**

58

was hunched over manipulating what was suspected to be the black bag, and simultaneously ▮▮▮▮ popped the hood of her vehicle. **BEA** lifted the hood about halfway and appeared to place an item, or possibly more than one item, inside the engine compartment. After a few seconds, **BEA** closed the hood and used his shirt to wipe off any of his fingerprints. Case agents believe, based on the DTO's use of the engine compartment of their vehicles to transport suspected narcotics and drug proceeds, that **BEA** placed narcotics in the engine compartment of ▮▮▮▮ vehicle and then wiped off his fingerprints from the hood of the vehicle in an attempt to keep himself insulated from criminal activity and avoid law enforcement detection. Thereafter, **BEA** returned to the bar area empty handed, and ▮▮▮▮ then left the bar area.

**11.** September 30, 2024 – **HAMMAD's** Milwaukee Trip

63.     Case agents reviewed E-911/GPS ping data and pen data of **HAMMAD**, **FOAD**, and **BEA's** devices from September 30th. Case agents observed **HAMMAD's** device traveled to Wisconsin. In review of **HAMMAD's** device E-911/GPS ping data, case agents observed **HAMMAD's** device left the area of 8509 Natoma Ave. in Burbank, Illinois at approximately 1:41 p.m. At approximately 2:57 p.m., **HAMMAD's** device crossed into Wisconsin from the Illinois/Wisconsin border. **HAMMAD's** device arrived at the Bar 1000 area at approximately 3:43 p.m. **HAMMAD's** device E-911/GPS ping remained in the area of Bar 1000 until approximately 7:00 p.m.

64.     In review of **BEA**'s E-911/GPS ping data, case agents observed that **BEA**'s device was in the area of the bar at approximately 3:30 p.m. **BEA**'s device remained in the area until approximately 7:47 p.m. In review of electronic surveillance in the back of Bar 1000, case agents were unable to observe either **BEA** or **HAMMAD** from 3:30 p.m. until about 6:30 p.m. Case

agents believe that they were not able to observe the subjects due to a partial view obstruction caused by a semi-truck in the back or the two subjects were parked in the front of the bar.

65.    In review of pen data generated from both **HAMMAD**'s TARGET TELEPHONE 2 and **BEA**'s TARGET TELEPHONE 1, case agents observed that **HAMMAD's** device placed an outgoing phone call to **BEA's** device at 5:57 p.m. Case agents observed that **BEA's** device placed an outgoing phone call to **HAMMAD's** device at 6:35 p.m. followed by **HAMMAD's** device calling **BEA's** device right back at 6:36 p.m. At approximately 6:36 p.m. case agents observed a vehicle pull into the back area of the bar via electronic surveillance. **HAMMAD** was observed exiting the driver's seat of the vehicle. Again, due to the partial obstruction caused by the semi-truck, case agents were unable to confirm which vehicle **HAMMAD** was driving. As **HAMMAD** stepped out of the vehicle, **BEA** came into view carrying a white garbage bag that appeared to contain trash. **HAMMAD** remained outside of the vehicle for a few minutes before going back inside the vehicle. At approximately 6:55 p.m., **BEA** approached **HAMMAD** at his driver's side window. The two spoke for approximately a minute. **BEA** walked away from the vehicle and **HAMMAD** exited his vehicle at approximately 6:57 p.m. Case agents were unable to observe what **HAMMAD** or **BEA** were doing due to the semi-truck obstruction. At approximately 6:59 p.m., **HAMMAD** reentered his vehicle and drove away. According to **HAMMAD**'s pen data, at 6:59 p.m., **HAMMAD's** device called **FOAD**'s TARGET TELEPHONE 5 at 6:59 p.m. (same time that **HAMMAD** left the bar). Case agents additionally observed that **BEA**'s device placed an outgoing call to **FOAD**'s TARGET TELEPHONE 5 at 5:59 p.m. After **FOAD** had left, case agents observed **BEA's** device have multiple phone calls/texts with his identified customers. Based on case agents' belief that **FOAD** and **HAMMAD** are **BEA**'s source of supply, and due to the timing of calls occurring either during or quickly following **HAMMAD**'s visit, case agents believe **BEA**

was contacting his narcotics customers in order to distribute the narcotics supplied by **HAMMAD**. **HAMMAD's** device was back in the area of his Burbank residence at approximately 9:00 p.m.

### C. Search Warrant at 3947 N. Teutonia Avenue, Apartment #3

66. On March 1, 2024, at approximately 2:08 P.M., members of the Milwaukee Police Department executed the search warrant at 3947 N. Teutonia Avenue, Apartment #3, Milwaukee, WI. This search warrant was obtained due to a homicide investigation unrelated to the **ISA/BEA** DTO investigation. The tenant of apartment #3, Target Subject **HAYNES**, was not in the apartment at the time of the warrant. **HAYNES's** known phone number of 414-514-7166 was in frequent contact with **BEA**'s then-known phone number of 414-628-1258. Through digital surveillance, case agents have observed **HAYNES** entering and exiting the door to 3947 N. Teutonia Avenue on a frequent basis. Case agents know that **HAYNES** regularly operates a 2017 maroon Dodge Ram 1500 bearing WI registration TY6749. Case agents have observed this vehicle parked in the rear of Bar 1000 on several occasions.

67. Prior to the execution of the search warrant, on March 1, 2024, at approximately 10:40 a.m., case agents were monitoring digital surveillance at Bar 1000, and observed **HAYNES** arrive and park his Dodge Ram in front of 3947 N. Teutonia. **HAYNES** exited the driver seat and walked to the exterior apartment door that leads to his apartment. **HAYNES** was inside of the apartment until he exited at approximately 11:26 A.M. After exiting the apartment, **HAYNES** walked back to his vehicle and left the area.

68. During a search of **HAYNES'** apartment, Milwaukee Police Department took custody of approximately 29.9 grams of fentanyl, 56.6 grams of cocaine, 311 grams of

methamphetamine, 77.7 grams of heroin, and 478.6 grams of marijuana. Milwaukee Police Department weighed, and field tested these substances and received presumptive positive results.

69.     After completion of the search warrant, case agents reviewed the pen activity from **BEA**'s known phone number of 414-628-1258. At approximately 2:50 p.m. and 2:51 p.m., 414-514-7166 (believed to be **HAYNES**) called 414-628-1258 (believed to be **BEA**). At approximately 3:02 p.m. and 3:19 p.m. 414-628-1258 (believed to be **BEA**) called 414-514-7166 (believed to be **HAYNES**). At 3:36 p.m. 414-514-7166 (believed to be **HAYNES**) called 414-628-1258 (believed to be **BEA**) again. 414-628-1258 (believed to be **BEA**) returned a phone call to 414-514-7166 (believed to be **HAYNES**) at 3:38 P.M. The final call between 414-514-7166 (believed to be **HAYNES**) and 414-628-1258 (believed to be **BEA**) was at 3:44 P.M. This string of phone calls between **HAYNES** and **BEA** after the search warrant at **HAYNES'** residence further establishes their association/relationship as it pertains to narcotics distribution. Case agents suspect the narcotics that were located within this apartment unit were being stored there on behalf of **BEA**.

**D.     Identification of DTO Source of Supply** ▬▬▬▬ ▬▬▬▬▬▬

70.     On November 7, 2023, case agents received information from HSI that **HAMMAD** had a scheduled flight for November 10, 2023, from O'Hare International Airport in Chicago, Illinois (ORD), to Puerto Vallarta, Mexico. On November 10, 2023, at approximately 7:48 a.m., TARGET TELEPHONE 2's E-911/GPS pings reflected it was in the area of ORD. However, **HAMMAD** returned to the Burbank, Illinois area for the rest of the day. Case agents received information from HSI that **HAMMAD** re-booked his flight to Puerto Vallarta, Mexico for November 11, 2023, and did not book a return flight.

71.     On November 11, 2023, at approximately 6:58 a.m., case agents observed TARGET TELEPHONE 2's E-911/GPS ping indicated to be in the area of ORD. At approximately

8:44 a.m., case agents stopped receiving E-911/GPS ping data, indicating **HAMMAD** was in the airplane without service. On November 13, 2023, case agents received information from HSI that **HAMMAD** was scheduled to return from Mexico to ORD on November 14, 2023. Upon **HAMMAD**'s return, he was observed alone and was stopped and questioned by U.S. Customs agents. **HAMMAD** stated he stayed at the Marriot Puerto Vallarta Resort & Spa and that he was at a friend's wedding. **HAMMAD** stated he owns a business called Al Aqsa Supermarket located at 8515 S. Harlem Avenue, Burbank, Illinois, and that he owned the business for the past year and a half after taking over for his uncle. **HAMMAD** provided his address of 8509 S. Natoma Avenue, Burbank, Illinois, and provided his number as (708) 986-7822 (TARGET TELEPHONE 2). **HAMMAD** was released without incident.

72.    During **HAMMAD**'s trip to Mexico, phone records reflect that on November 12, 2023, TARGET TELEPHONE 2 had a 41-second incoming phone call from the Mexican phone number ▮▮▮▮▮▮ using the WhatsApp platform. Following the phone call, TARGET TELEPHONE 2 received two incoming messages from the same Mexican phone number. In review of this phone number, case agents discovered multiple contacts between this Mexican phone number with both **FOAD** and **HAMMAD's** devices throughout the course of this investigation. Through law enforcement databases, case agents located a WhatsApp account photo associated to Mexican-based phone number ▮▮▮▮▮▮. Using the Homeland Security Office of Biometric Identity Management, case agents submitted the WhatsApp photograph to the database and received a "highly likely match." The match listed the subject, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Past DEA investigations reflect that ▮▮▮▮▮▮▮▮ has been identified as a person involved in drug trafficking activities along with a member of the ISA family. On May 9, 2014, ▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮

63

were among ███████ individuals who were indicted in the District Court for the ████████ ████████ and charged in a drug conspiracy with the distribution and possession with intent to distribute cocaine and methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). See United States v. ████████ ████████████████████ et al., Case No. ████ ████████ ████████████████ was also charged with other felony drug-related charges. The Indictment alleged that ████████████████ arranged for the shipment of large quantities of methamphetamine and cocaine from his suppliers in Mexico and would resell those drugs to brokers in Southern California and in and around Chicago, Illinois. ████████ was alleged to have sold large quantities of pseudoephedrine/ephedrine to ████████████████ and other co-conspirators for use in the large-scale production of methamphetamine. ████████ was also alleged to have purchased cocaine and marijuana from ████████████████ to resell in Chicago and other markets. ████████████████ is currently a fugitive and has been in wanted status since 2014. ████████████████ pled guilty to the drug conspiracy with which he was charged. He was sentenced ████████████ months of incarceration. Based on the past connection to members of the ISA family, the "highly likely match" of the WhatsApp photo, and ████████████████ known large-scale drug trafficking activities for the Sinaloa Cartel, case agents believe the contacts between ████████████████ and the ISAs are narcotics related and that ████████████████ is a source of narcotics supply for the ISA DTO.

73.    Additionally, flight information reflects that **HAMMAD** flew from ORD to Cancun, Mexico, on July 25, 2024. **HAMMAD** flew back to ORD on July 29, 2024. Upon his return, **HAMMAD** was encountered by U.S. Customs and was asked questions regarding his trip. **HAMMAD** stated that he was engaged, soon to be married, and that he stayed at "Temptations

Resort," not realizing that the resort was a "swingers" resort. **HAMMAD** stated that he was previously employed with his sister at a family-owned dessert shop called "Sweet Tooth" in Ohio, but for the last year and a half he has worked with Crypto/Bitcoin with multiple ATMs across the Chicago area. **HAMMAD** provided his contact address as 8509 S. Natoma, Burbank, Illinois, 60459, and phone as 708-986-7822 (TARGET TELEPHONE 2). According to phone toll records and WhatsApp records, **HAMMAD's** device had multiple contacts with **FOAD's** device (TARGET TELEPHONE 4) while in Mexico. **HAMMAD's** device also had multiple WhatsApp contacts (according to WhatsApp records) with ███████████████ device ██ ███████████) and an unidentified Mexico phone number of ███████████during the time frame.

### E. Court Authorized Interceptions

74.     Between October 2024 and March 2025, case agents actively intercepted communications on telephone lines associated with the ISA/**BEA** DTO. Examples of relevant interceptions are detailed below. Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means discussed above, including many conversations of intercepted communications over several months, phone records, information from confidential sources, public records searches, and electronic and personal surveillance. The intercepted calls detailed below are provided as a sample of what I believe are numerous inculpatory interceptions with the identified targets. The significance and meaning attributed to the intercepted communications are based on my training, experience, and knowledge gained during this investigation.

### Introduction of BEA's Narcotic Network

75.     As stated previously within this affidavit, case agents began establishing **BEA's** Milwaukee-area narcotic distribution network prior to the Title III applications. Through

interception, case agents confirmed that individuals like **HAYNES**, **AYALA**, **THOMAS**, **ROBERTSON**, and **KIMBLE** were **BEA's** narcotics customers who distributed narcotics provide by **BEA** (and ultimately sourced by the **ISAs**). Through interceptions, case agents identified additional co-conspirators, such as **SIMS**, **TREADWELL**, **BROWN**, A. **GREEN**, and **KAMANDA** who are also **BEA's** narcotics customers distributing narcotics provide by **BEA** (and ultimately sourced by the **ISAs**). Case agents established the DTO's narcotics network was supplied and led locally by **BEA.**

### Initial Interception of TT-1 and TT-2

#### Identification of Claudell SIMS

76.     On October 16, 2024, at approximately 6:14 p.m., **BEA**, using TARGET TELEPHONE 1 (TT-1), called (414) 737-1183, later determined to be used by **SIMS**. **SIMS** was later identified as someone to whom **BEA** consistently supplied narcotics and case agents believe that **SIMS** assists **BEA** in cooking and cutting narcotics in order to maximize their profits. During this call, **BEA** asked **SIMS**, "You see what you can do with it?" **SIMS** responded, "Man, I still ain't got all the shit I need yet; I was finna go get this lock right now; I had to buy every motherfucking thing." **SIMS** further stated, "I said, 'Damn.' I forgot I throwed every fucking thing away, or gave that shit away." **BEA** responded, "Just let me know." **SIMS** then told **BEA**, "Alright; I am, soon as I'm on [U/I], well, shit, I'll know in a couple hours." **BEA** agreed, and **SIMS** stated, "I finna go grab this shit and then that would be it. Yeah."

77.     Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** and **SIMS** discussed **BEA** providing **SIMS** with narcotics. **BEA** was

checking with **SIMS** to see if **SIMS** was able to stretch out the narcotics that **BEA** provided. **SIMS** was trying to obtain cut and **SIMS** would let **BEA** know in a few hours. [4]

78.     On October 17, 2024, at approximately 9:07 a.m., **BEA**, using TARGET TELEPHONE 1, received a call from (414) 737-1183, used by **SIMS**.   During this phone call, **BEA** told **SIMS** he needed to get Facetime. **SIMS** told **BEA**, "Oh shit, man.  It's a go. I just did a little too much to it."  **SIMS** continued, "And it's still... and the motherfucker still was cool, you know what I'm saying?" **BEA** responded, "Yeah, that's what's fucked up.  We can do everything, we just gotta invest in what we need."  **SIMS** replied, "Man, that was this thing, man. Man, I had to go through some shit trying to find shit." **BEA** responded, "I gotta see if these that... I gotta bring, I gotta let you see these that I got yesterday; and see if we can ... if these the same moves. Uh, I got it from a pharmacy." **SIMS** replied, "Pharmacy, I ain't even do none of that," and continued, "I don't do none of that shit." The two continued talking, and **BEA** told **SIMS** that he would meet up with **SIMS** in an hour or two.

79.     Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **SIMS** told **BEA** that **SIMS** liked the drugs/product and that while cooking the narcotics **SIMS** did too much to it. This could mean **SIMS** put too much cutting agent or not enough cutting agent. **SIMS** indicated that whoever the buyer was, they were still happy with the quality of the drug/product. When **BEA** asked **SIMS** about pharmaceutical pills, **SIMS** was informing **BEA** that **SIMS** has never used pharmaceutical pills as a cutting agent.

---

[4] As previously noted, case agents have intercepted phone calls and text messages from October 16, 2024 through March 8, 2025. Throughout this time, case agents have learned the different roles of specific targets. Throughout the interception period, the roles of targets have evolved as well as the case agent's knowledge of said targets. Moreover, what case agents may have initially believed an intercepted phone call to be referencing in the early stages of interception at times turned out to have a slightly different meaning after review post interception.

80. On October 18, 2024, at approximately 6:19 p.m., **BEA**, using TARGET TELEPHONE 1, called (414) 737-1183, used by **SIMS**. **SIMS** told **BEA** "Oh, yeah; we just uh, somebody else just gave that motherfucker a ten (10)." **BEA** responded, "You in the races, man. That's all we need, seven (7) to ten (10), goddamn it." **BEA** continued, "Man, man. We might [U/I] get out some money then, shit." **SIMS** stated, "Yeah; here, two different types of motherfuckers; one one way, one the other way." **BEA** responded, "Yeah. Let me, let me, uh, I'mma, I'mma come up with something, man. We just gonna have to do, we just gonna have to do something, man. So, some can have... it can be ready; even when you ride up, we gonna have more ready, goddamn it." **BEA** continued, "I'm just gonna come up with a number and go from there, man." **SIMS** replied, "Alright; hell yeah; I just throw a [U/I]; I said, 'Man...' I'm like, 'Man, [U/I], we gotta come back with something, man; we gotta get that man some money for the [U/I], man. We can't come back saying where we got it, man.'" **BEA** replied, "Yeah, type shit. You know how that shit go, bro. But man, I fuck with you niggas, man; I'm, I'mma try to do all this shit and we eat together with this move right here, man. We go from there, shit." **BEA** continued, "I ain't fuck with nobody but you all with this move, so, we go from there, man." **SIMS** replied, "Oh, hell yeah. And that nigga just left, too." **BEA** responded stating, "Yeah. That's cool, man. I want the facetime [U/I] and see that shit, but; I'll see about a [U/I] or something, but I'm just gon' try to brainstorm to see how we can do it, but more than likely I'm just gonna have, need your help with doing it up and shit; I can, I can, I can do it from there; I can lock it back, I can lock it and see." **BEA** continued, "Yeah; I just need all, you have just doing it into that form, you know what I'm saying?" **SIMS** told **BEA** not to worry, and **BEA** replied, "Yeah, I can get it solid, that ain't no biggie. So, the move . . . you said you only used one of them motherfuckers, huh?" **SIMS** confirmed and **BEA** stated, "So I gotta, I gotta nice amount of them bitches so it's a stretch, this

68

should be able to do us for the whole move, so I don't know, man, push comes to shove, man, I might bump heads with you tomorrow just to brainstorm and see what we can do this shit, but, I'mma be getting with you soon, though, bro."

81.     Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** and **SIMS** discussed customers rating the narcotics. **BEA** informed **SIMS** that they could both make money out of this deal. **BEA** wanted **SIMS** to keep "doing it in that form" meaning to keep cooking the drug the way that **SIMS** did. **BEA** stated he "can get it solid," meaning getting the narcotics in a solid form from cooking it with a cutting agent. **BEA** continued by confirming that **SIMS** only used "one," and **BEA** had a "nice amount of them." **BEA** is referring to having multiple kilograms of narcotics.

**HAMMAD and ▓▓▓▓ - Suspected Narcotics Delivery on October 19, 2024**

82.     On October 19, 2024, at approximately 2:31 p.m., **HAMMAD**, using TARGET TELEPHONE 2 (TT-2), called ▓▓▓▓▓▓▓, used by his girlfriend, ▓▓▓ ▓▓▓ During the intercepted call, **HAMMAD** inquired, "You want to come with me somewhere?" ▓▓▓▓ asked "Where?" **HAMMAD** stated, "Milwaukee." **HAMMAD** additionally stated "[U/I] I'll drive. Can you bring your car?" in which ▓▓▓ agreed too. ▓▓▓ asked "Now?" **HAMMAD** confirmed.

83.     Case agents believe that **HAMMAD** used ▓▓▓▓ vehicle to avoid law enforcement detection. ▓▓▓▓ vehicle is registered to her, allowing **HAMMAD** to conceal his identity by not driving a vehicle registered in his name at his home address while driving to Milwaukee, Wisconsin for a drug transaction.

84.     On October 19, 2024, at approximately 2:46 p.m., **HAMMAD**, using TARGET TELEPHONE 2, called ▓▓▓▓▓▓, used by ▓▓▓ **HAMMAD** asked, "Can you pull my

69

[sic] drive way straight, like facing me? [Voice overlap]" ██████████ by asking, "Forward" in which **HAMMAD** responds, "Just regular, yeah."

85.    Following this phone call, case agents observed via E-911/GPS ping data, that **HAMMAD's** telephone was traveling northbound toward Milwaukee leading case agents to believe that **HAMMAD** was heading to meet **BEA** in Milwaukee. At approximately 4:52 p.m., case agents observed **HAMMAD** walk into view of electronic surveillance in the back of 3941 N. Teutonia Avenue (Bar 1000). **HAMMAD** was carrying a medium sized bag with the straps over his right arm and the bag portion under his right arm. The bag appeared to contain contents. **HAMMAD** walked inside the back gate of 3941 N. Teutonia Avenue out of view of case agents. At approximately 4:53 p.m., both **HAMMAD** and **BEA** exited the back gate of 3941 N. Teutonia Avenue. **HAMMAD** was still carrying the same bag and the two walked over to **BEA**'s Escalade and out of view of electronic surveillance. At approximately 5:06 p.m., **HAMMAD** was observed saying goodbye to **BEA**, still holding onto the same bag, and walking back to toward the area where ██████ vehicle was parked, out of view of electronic surveillance. ██████ was not observed on surveillance that day at Bar 1000.

86.    Case agents have historically observed **HAMMAD** utilize the engine block of his vehicles to transport suspected narcotics and/or any currency derived from narcotics. Based on the outgoing phone call from **HAMMAD** to ██████ at 2:46 p.m., case agents believe that **HAMMAD** instructed ██████ to park her vehicle a specific way so he could easily place items within the engine compartment of the vehicle without being seen by bystanders.

### BEA Attempting to Sell Recently Obtained Narcotics and Investigation of THOMAS, SIMS, and TREADWELL

87.    On October 22, 2024, at approximately 10:20 a.m., **BEA**, using TARGET TELEPHONE 1, called (262) 887-9040, used by **THOMAS**. **THOMAS** answered the phone call

70

and **BEA** stated, "Uh, I was just checking with you, man." **THOMAS** responded, "Oh, yeah shit I was gonna give you a call. I was gonna call you yesterday but, shit I gotta ... you know? oo a couple more thing and I'll be right at you. My brother said he hollered at you." **BEA** stated, "Oh yeah, I run into his ass." **THOMAS** replied, "Yeah. He had told me and shit. Yeah, I told him, I'll be getting up with him in a little bit though." **BEA** told **THOMAS**, "Oh okay, just let me know, boy. [U/I] on the side I was trying to save it for you god damn it." **THOMAS** replied, "Okay, I got you, don't even trip." The two continued speaking and **THOMAS** stated, "And that, that right there…Man, they killing that." **BEA** replied, "Yeah, yeah, that's why I say this one. This order seem like it's a little better." **THOMAS** replied, "Oh sir [Laughed]," and **BEA** stated, "Hell yeah. I always trying to get you [U/I] to this motherfucker." **THOMAS** replied, "Right, well don't even trip, I'm on it though."

88.  Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** was checking in with **THOMAS** to see if **THOMAS** wanted more narcotics. **BEA** told **THOMAS** that **BEA** was keeping some on the side for **THOMAS**. **THOMAS** told **BEA** that this specific batch of narcotics was really good, and **BEA** agreed. Based on the timing of this call (October 22, 2024), which was a few days after **HAMMAD** met with **BEA** at 3941 N. Teutonia Avenue, case agents believe that **HAMMAD** likely brought a new batch of narcotics to **BEA** on October 19, 2024, and **BEA** sold a portion of those narcotics to **THOMAS**.

89.  On October 22, 2024, at approximately 12:34 p.m., **BEA**, using TARGET TELEPHONE 1, called (414) 737-1183, used by **SIMS**. The conversation was already in progress and **SIMS** stated, "No, by the building." **BEA** responded, "Oh, you over there?" **BEA** asked if **SIMS** was waiting on him. **SIMS** informed **BEA** he just pulled up, and **BEA** responded, "A'ight, you can knock on that back, back door back there. I just told my boy, his name Pumkin. I told him

71

you was about come, gonna let him check it out." **BEA** followed up by saying, "You ain't got nothing?" In response, **SIMS** stated "no." **BEA** told **SIMS** "Well, you gotta wait then. Shit, I'll be through there [U/I]." The conversation continued with **BEA** explaining which door and telling **SIMS** that he should be over there by the time **SIMS** returns.

90.     Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** and **SIMS** agreed to meet to conduct a money/drug transaction. In anticipation of this, case agents monitored the court-authorized GPS telephone pings on **BEA**'s telephone. At approximately 12:51 p.m., **BEA**'s telephone was showing to be in the general area of his residence, located at 2636 S. 76th Street; West Allis, Wisconsin. At approximately 1:00 p.m., **BEA**'s telephone appeared to be north of this location.

91.     Case agents monitored electronic surveillance of 3941 N. Teutonia Avenue (Bar 1000). At approximately 1:09 p.m., case agents observed **BEA**'s black Cadillac Escalade arrive and pull in behind the business. **BEA** exited the Cadillac and simultaneously, **SIMS** and a black male later identified as Alfonzo **TREADWELL**, came into view of electronic surveillance. A case agent observed **SIMS** and **TREADWELL** walking from the alleyway and meeting with **BEA**. The three subjects approached the back east facing apartment door of 3947 N. Teutonia Avenue.

92.     **BEA, TREADWELL**, and **SIMS** stood by the door (still outside) speaking with an unknown male (presumably "Pumpkin") who was inside of the apartment unit for approximately 30 seconds. **BEA**, **SIMS**, and **TREADWELL** then walked over to the back gate of 3941 N. Teutonia Ave. and entered the back gate out of view of electronic surveillance.

93.     At approximately 1:15 p.m., surveillance units established physical surveillance in the immediate area of the residence at 3947 N. Teutonia Avenue. Surveillance units observed several vehicles parked in the parking lot adjacent to the address. At approximately 1:45 p.m., TFO

Mayerbock monitored electronic surveillance, and observed **SIMS** and **TREADWELL** exit from the back gate of 3941 N. Teutonia Avenue and walk towards the alleyway. Approximately 30 seconds later, surveillance observed the same two subjects emerge from behind the residence and walk towards a Mercury Grand Marquis (**Subject Vehicle 10**). Both **SIMS** and **TREADWELL** got into the vehicle.

94. The Mercury departed the area south on N. Teutonia Ave. Surveillance units followed the vehicle and obtained the Mercury's Wisconsin registration: ANF-4070 (registered to **TREADWELL** at 1329 W. Locust Street, Apt. 27; Milwaukee, WI. 53206 (**SUBJECT PREMISES 10**)). The Mercury continued to travel in a southwest direction until investigators lost sight of the vehicle. Surveillance units later conducted a spot-check of **SUBJECT PREMISES 10**, but did not observe the Mercury.

95. On October 26, 2024, at approximately 10:05 a.m., **BEA**, using TARGET TELEPHONE 1, called (414) 248-7180, used by Freddie **ROBERTSON**. **ROBERTSON** answered and **BEA** stated, "What's happening, man? Checking with you. You a'ight?" **ROBERTSON** responded, "Yeah. Know I-- you know I be--you know what, I be walking my thing down, man. [Laughs]." **BEA** responded, "You walking all that down huh, man?" **ROBERTSON** stated, "Yeah, I be working that thing down so... yeah, but you know, shit it's back. You know, I'm coming straight at you soon. Let you know." **BEA** responded, "Okay, I got you." **ROBERTSON** stated, "[U/I]. Yeah, I'm coming straight at you, bro. On the real. I ain't fucking around." Both parties acknowledged and the phone call ended.

96. Through this investigation, case agents know that **BEA** consistently supplies **ROBERTSON** with narcotics. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** was checking in with **ROBERTSON** to see if

73

ROBERTSON needed more narcotics. **ROBERTSON** informed **BEA** that **ROBERTSON** was still selling from the inventory of narcotics **ROBERTSON** already had, but when **ROBERTSON** ran out of narcotics, **ROBERTSON** would come straight to **BEA**.

97. On October 26, 2024, at approximately 10:08 a.m., **BEA**, using TARGET TELEPHONE 1, called (262) 887-9040, used by **THOMAS**. **THOMAS** answered the phone stating, "What's up, fam?" **BEA** stated, "Not much. Just checking with you, man." **THOMAS** responded, "Oh yeah, I should be getting up with you today. Man, I been dealing with my daughter with this covid shit." **BEA** replied, "Aw yeah, that change--that change in weather shit." **THOMAS** stated, "Hell yeah. So, I should be getting up with you sometime later on." **BEA** responded saying, "I got you, bro." **THOMAS** then replied, "Okay, just have the two aside for me." **BEA** replied, "I'm trynna keep it, god damnit. [Laughs]" **THOMAS** later stated, "I got you though, bro. I got you [U/I] things kinda been slow, you know?" **BEA** responded, "Yeah, I know, man. That's why I been on niggas neck like, 'Man, what's up? Where you at?'" **THOMAS** stated, "Right. You know what I'm saying?" **BEA** replied, "It's that time of the year, shit." **THOMAS** then told **BEA**, "Yeah, but you know me I'mma make it do what it do. You know what I'm saying?" **BEA** stated, "It's better to have than not have it. It's better to..." and **THOMAS** said, "[Voices overlap] Oh hell yeah." **THOMAS** continued, "Hell yeah. Yeah, but I'll be at you sometime later, though." Both parties acknowledged and the phone call ended."

98. Based on the context of this phone call and case agents' knowledge of this investigation, case agents know that **BEA** consistently supplies **THOMAS** with narcotics. Of note, this phone call between **BEA** and **THOMAS** occurred three minutes after **BEA**'s call with **ROBERTSON** referenced above. This further strengthens case agents' belief that **BEA** was contacting his narcotics customers with the intention of selling them more narcotics (previously

obtained from **HAMMAD** on October 19, 2024). Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **THOMAS** asked **BEA** to keep "two" aside for **THOMAS** in reference to two kilograms of narcotics. **THOMAS** then indicated that the drug trade has been slow, and **BEA** acknowledged, explaining that this is why **BEA** has been reaching out to **BEA's** customers. **BEA** additionally acknowledges that this time of the year is slow for distributing narcotics. **BEA** also notes that it is better to have narcotics than to not have narcotics, and **THOMAS** agreed. This conversation further shows **BEA's** intentions to call his suspected drug customers, such as **SIMS**, **ROBERTSON**, and **THOMAS**, and pressure them into buying more narcotics.

99.     A series of calls between **BEA** and **SIMS** were intercepted on October 27, 2024. At approximately 9:58 a.m., **BEA**, using TARGET TELEPHONE 1, called (414) 737-1183, used by **SIMS**. **SIMS** answered and **BEA** stated, "Yeah, whenever you ready, man." **SIMS** responded, "A'ight." **BEA** again stated, "I'm ready whenever you ready, man." **SIMS** replied, "[U/I] shit we might as well get on this shit now then." **BEA** stated, "Just text me when you ready, I'll come right out. My phones fucked up, but I get a text [U/I]." Both parties acknowledged and hung up. Case agents believe that **BEA** was trying to meet up with **SIMS**. **SIMS** agreed to meet. At approximately 12:07 p.m., **BEA**, using TARGET TELEPHONE 1, called (414) 737-1183, used by **SIMS**. **BEA** stated, "I was making sure you ain't hittin' [PH]. My phone fucked up." **SIMS** responded, "Bruh, no. I was gon' hit you around one o'clock (1:00)." **BEA** then stated, "A'ight, cool just text me...Text me after that. Just send me a text so I know. My phone--I just be tweaking--my phone. It's on the charger, but phones just tweaking, man." Both parties acknowledged and hung up. Case agents believe **SIMS** and **BEA** had not yet met and were still arranging a time to meet.

75

100. On October 27, 2024, at approximately 2:08 p.m., **BEA**, using TARGET TELEPHONE 1, received a phone call from (414) 737-1183, used by **SIMS**. **BEA** answered stating, "What's up, bro?" **SIMS** stated, "Shit, I'm waiting on you, man." **BEA** told **SIMS**, "You waiting on me, man? A'ight, finna leave out the house. I'll call you soon as I get over there." **BEA** then asked, "You back to smoking, dog?" **SIMS** responded, "Hell no, man. Motherfucking...being outside early in the morning...Putting no shoes on and shit fucking with them [U/I]." **BEA** responded, "A'ight, bet. I'm finna slide up on you then." Both parties acknowledged and hung up.

101. Following the phone calls exchanged between TARGET TELEPHONE 1 and **SIMS** on October 27, 2024, case agents conducted physical surveillance and monitored electronic surveillance at Bar 1000. Case agents observed that at approximately 3:09 p.m., **BEA** exited his Escalade. Shortly after **BEA** exited the vehicle, **SIMS** walked into view of electronic surveillance, toward 3941 N. Teutonia Avenue. **SIMS** and **BEA** left the area in **BEA**'s Cadillac Escalade for approximately 20 minutes before returning back to 3941 N. Teutonia Avenue. At approximately 5:29 p.m., **BEA** exited the back gate at 3941 N. Teutonia Avenue, carrying a white Target plastic grocery bag with contents inside. **SIMS** and an unidentified male ("UM") followed behind **BEA**. **SIMS** was carrying blue latex gloves. **SIMS** and the UM walked out of view of electronic surveillance. **BEA** approached the front passenger door of the Cadillac Escalade and opened it. A few seconds later, **BEA** closed the door. **BEA**, still carrying the Target grocery bag, approached the furthest west door of the apartment located at 3947 N. Teutonia Avenue, which is immediately to the north of 3941 N. Teutonia Avenue. At approximately 5:30 p.m., **BEA** exited the 3947 N. Teutonia Avenue apartment, no longer carrying the Target grocery bag, and left in the Escalade.

102. Based on my training and experience, case agents know that narcotics dealers often use latex gloves while dealing with narcotics to avoid getting their fingerprints on any packaging

material and from having any skin exposure to the narcotics. Additionally, case agents believe that the white Target grocery bag that **BEA** was holding likely contained packaging material from narcotics. Case agents believe that during the time that **SIMS** and **BEA** were in 3941 N. Teutonia Avenue, they were dealing with narcotics.

103. On October 29, 2024, at approximately 1:28 p.m., **BEA**, using TARGET TELEPHONE 1, received a call from **TREADWELL** using (414) 982-8254. **TREADWELL** informed **BEA** that **TREADWELL** was in back. According to electronic surveillance, case agents observed **TREADWELL** and **SIMS** approach the back gate of Bar 1000 at approximately 1:28 p.m. **TREADWELL** and **SIMS** were looking at their phones. Both **TREADWELL** and **SIMS** were placing their phones up to their ear indicating they were both speaking on their phones. Approximately 30 seconds later, the back gate of Bar 1000 opened up and **SIMS** and **TREADWELL** walked inside, out of view of electronic surveillance. At approximately 1:47 p.m., **BEA** walked out of the back gate of Bar 1000 and over to an apartment unit in 3947 N. Teutonia Ave. (building next door to Bar 1000). During the interceptions over **BEA's** telephones, case agents later learned that the occupant of this apartment unit located (who **BEA** refers to as "PUMPKIN,") provides **BEA** with prescription pills. "PUMPKIN" was later identified as ███████ ███████. Case agents believe that **BEA** uses the prescription pills to cut into his heroin and/or fentanyl. This belief is further substantiated by **SIMS** and **TREADWELL** being at Bar 1000 while **BEA** walked to 3947 N. Teutonia Ave. **SIMS** and **TREADWELL** are believed to assist **BEA** with the breaking down and stretching/cutting his product. At approximately 1:48 p.m., **BEA** exited 3947 N. Teutonia Ave. and walked back to Bar 1000, carrying something underneath his left arm. At approximately 2:33 p.m., **TREADWELL** and **SIMS** exited the back gate of Bar 1000. They stood outside the bar talking to someone not in view, before walking out of view.

104.     Case agents learned that TARGET TELEPHONE 1 was suspended as of October 30, 2024, by AT&T. Case agents established that TARGET TELEPHONE 3 was the replacement for TARGET TELEPHONE 1. Before it was suspended, TARGET TELEPHONE 1 was in frequent contact with **SIMS**, **THOMAS**, **ROBERTSON**, and ▮▮▮▮▮▮, but these same subjects had no contact with TARGET TELEPHONE 3. After TARGET TELEPHONE 1 was suspended, **SIMS**, **THOMAS**, **ROBERTSON**, and ▮▮▮▮▮▮ transitioned to contacting **BEA** on TARGET TELEPHONE 3.

### First Extension of TT-2 and Initial Interception of TT-3, TT-4, and TT-5

### FOAD Travels to Bar 1000 to Retrieve Currency

105.     On November 20, 2024, at approximately 6:23 p.m., **FOAD**, using TARGET TELEPHONE 5 (TT-5), called **HAMMAD** at TARGET TELEPHONE 2. **FOAD** stated, "I am in Wisconsin and just got here." **HAMMAD** responded saying, "Really?" **FOAD** stated, "I want to go get the money from him to hide it." **HAMMAD** asked, "How is the drive? Nothing." **FOAD** responded, "It is very crowded." **FOAD** and **HAMMAD** continued to speak about **FOAD**'s trip to Wisconsin before the call ended. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **FOAD** told **HAMMAD** that **FOAD** was heading to Wisconsin to pick up drug proceeds from **BEA** for previously fronted narcotics.

106.     At approximately 6:42 p.m., case agents observed **FOAD**'s black 2024 Ford Edge Bearing Illinois registration EA93867 arrive and park in the rear of 3941 N. Teutonia Avenue (Bar 1000). Approximately three minutes later, **BEA** arrived in his Cadillac Escalade. **BEA** parked next to **FOAD** and exited his vehicle. **BEA** walked to where **FOAD** parked his vehicle, which was not in full view of electronic surveillance. Shortly after **BEA** walked to **FOAD**'s vehicle, **BEA** and **FOAD** walked to the passenger door of **BEA**'s Escalade. **BEA** opened the passenger door, and

**FOAD** leaned inside. **FOAD** and **BEA** then returned to **FOAD**'s vehicle for a short time before returning once again to **BEA**'s open passenger door. **FOAD** leaned in again before closing the door and returning to his vehicle with **BEA**. **BEA** then got into the driver seat of his vehicle and left the area. **FOAD** also left the area in his vehicle shortly thereafter. Based on the call between **FOAD** and **HAMMAD**, and the observations of **FOAD** and **BEA's** meeting, case agents believe that **FOAD** picked up money owed to him from **BEA** for previously fronted drugs ("I want to go get the money from him to hide it.").

### FOAD in Contact with SOS ███████ ████████████████

107.    On November 15, 2024, at approximately 8:48 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ████████, used by ████████████████ The phone call went to voicemail, and ██████████████ stated, "What's happening.. brother... call me now." On November 17, 2024, at approximately 6:34 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ██████████, used by ████████████ ██████ The phone call went to voicemail, and ████████████████ stated, "Hello, hello, where are you sir? Give me a call my friend. Give me a call, brother. See you, bye." On November 26, 2024, at approximately 1:23 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ██████████, used by ████████████ The phone call went to voicemail, and ██████████████ stated, "Hello... hello... what's happing... what's happening [U/I] where are you going?"

108.    Case agents later confirmed their belief that ██████████████ is a source of supply for the **ISA** DTO. During the initial interception period (Interception of TT-1 and TT-2), case agents intercepted ██████████████ leaving multiple voicemails for **HAMMAD** on TARGET TELEPHONE 2. Case agents suspect that **FOAD** and **HAMMAD** were

79

not answering ▮▮▮▮▮▮▮▮▮▮▮▮ phone calls because they either owed him money for previously provided narcotics or had a disagreement with ▮▮▮▮▮▮▮▮▮▮▮▮

109.    On November 28, 2024, at approximately 4:34 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ▮▮▮▮▮▮▮, used by ▮▮▮▮▮▮▮▮▮▮ **FOAD** answered the phone and ▮▮▮▮▮▮▮▮▮▮▮▮ said, "How are you?" **FOAD** responded, "No good, man. Everything fucked up over here, you know." ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ stated, "Over here too. You know, two of my brothers died, bro." **FOAD** responded, "I understand. I know why you fucked up too. I got a friend there and he told me about it." ▮▮▮▮▮▮▮▮▮▮▮ stated, "It's really fucked up. Everything... we fucked up. But, ....[Voices overlap]" in which **FOAD** agreed. ▮▮▮▮▮▮▮▮▮▮▮▮ stated, "...Uh, still have people that want us to work, but were gonna wait till things calm down a little bit." **FOAD** asked ▮▮▮▮▮▮▮▮▮▮ "You got...about 'old man'... You got any 'old man'?" ▮▮▮▮▮▮▮▮▮▮ replied, "Huh? [U/I]. Yeah." **FOAD** asked again, "You have any 'old man'?" ▮▮▮▮▮▮▮▮▮▮▮ confirmed. ▮▮▮▮▮▮▮▮▮▮ asked, "Doing, doing.... You think we can do something with it." **FOAD** replied, "Yeah, I need one (1), two (2) old 'old man.' Good one." ▮▮▮▮▮▮▮▮▮▮ replied, "Yeah. okay. Okay, let me get back to you... Give me two days. Two days and I'll get back to you." **FOAD** agreed, and ▮▮▮▮▮▮▮▮▮▮ stated, "Hey, hey, try to get a number. Try to get a number. Uh,... [Voices overlap]." **FOAD** replied, "Okay, I will." ▮▮▮▮▮▮▮▮▮▮▮ stated, "Uh, a phone number... [Thought not finished]." **FOAD** stated, "I will, I will, I will." ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ stated, "Okay, okay. I'll get back to you in two days."

110.    Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **FOAD** indicated that things were not good "over here," referring generally

to the Midwest United States. ████████████████ indicated that things were not good "over here," meaning the Sinaloa state in Mexico. When both parties indicated things were not good, they were referring to the status of their narcotics distribution networks. ████████████ ████████ further stated that two of his brothers died. Historically, ██████████████ was a higher-ranking member of the Sinaloa Cartel. Furthermore, case agents knew that at that time, the Sinaloa Cartel was in a fractured state due to arrests of key leadership. During this time, the referenced arrests led to internal fighting within the Sinaloa Cartel. Case agents are unsure if ████████████████ was referring to his "brothers" as blood-related brothers or as fellow members of the Cartel. Case agents suspect that these "brothers" died from internal Cartel violence.

111.    Based on my training and experience, and knowledge of this investigation, I also believe that in this phone call: ██████████████ informed **FOAD** that he still has people that are willing to work (supply narcotics), but he wants to wait until things calm down. Case agents believe that ████████████ still had access to large quantities of narcotics and had people that were willing to work for him; however, due to an increased spotlight on their narcotic distribution network, he wanted to wait until things calmed down to lower the risk of law enforcement detection. **FOAD** later asked ████████████ if he has any "old man." In later intercepted phone calls between **FOAD** and ██████████████ "old man" is again referenced. Case agents believe, based on training, experience, familiarity with this case, and the context of these calls, that "old man" is coded speak for narcotics (likely heroin).

112.    In the above call, **FOAD** requested 1 or 2 "old man" which I believe refers to 1 or 2 kilograms of heroin. ██████████████ agreed to this order and asked **FOAD** to get a new phone number, and I believe this was so the two could speak freely and avoid being intercepted by law enforcement ("Try to get a number. Uh,...Uh, a phone number...").

113.    On December 2, 2024, at approximately 6:08 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ▌▌▌▌▌▌▌▌, used by ▌▌▌▌▌▌▌▌▌▌▌ **FOAD** answered and said "What's up ▌▌▌▌?" ▌▌▌▌▌▌▌▌▌▌ stated, "Yes, yes, brother." ▌▌▌▌▌▌▌▌▌▌ stated, "Do you know, uh, Saint Louis is not too far from you." **FOAD** stated, "I can't hear you. What you said?" ▌▌▌▌▌▌▌▌▌▌ responded, "Saint Louis, Saint Louis, Missouri, is not too far from you." **FOAD** answered, "Missouri?" ▌▌▌▌▌▌▌▌▌▌ stated, "Yeah, Louis, Saint Louis, Missouri." **FOAD** stated, "Yeah?" ▌▌▌▌▌▌▌▌▌▌ asked, "Uh, do you think you can..., be able go to Saint Louis?" **FOAD** replied, "To Missouri?" ▌▌▌▌▌▌▌▌▌▌ confirmed, "Yeah, Saint Louis, Missouri." **FOAD** replied, "I wanna see how far?" ▌▌▌▌▌▌▌▌▌▌ stated, "Okay, check; check.... [Thought not finished]. Hey, hey, uh, try to get that phone, so we can talk better." **FOAD** replied, "Okay, Okay. [Voices overlap]," and he continued, "Let me bring the phone tomorrow. I'll call you tomorrow." The two agreed and hung up the phone.

114.    Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: ▌▌▌▌▌▌▌▌▌▌ told **FOAD** that the "old man" (heroin) that was discussed on November 28, 2024, was currently in St. Louis, Missouri, and that **FOAD** needed to go there to get it. **FOAD** informed ▌▌▌▌▌▌▌▌▌▌ that he wanted to check how far St. Louis was from **FOAD**'s location. Case agents believe that **FOAD** wanted to evaluate the risk of traveling with a large amount of narcotics by seeing how far the trip would be. ▌▌▌▌▌▌▌▌▌▌ instructed **FOAD** to get a phone so they can "talk better." Case agents believe that ▌▌▌▌▌▌▌▌▌▌ wanted **FOAD** to get a temporary phone so they can talk about the St. Louis drug deal in more detail. Case agents know that ▌▌▌▌▌▌▌▌▌▌ and **FOAD** were both previously intercepted in a past wiretap investigation. Case

82

agents believe that ███████████████ is trying to avoid talking about the details of the deal over their known phones to avoid any potential law enforcement interception.

115. On December 7, 2024, at approximately 7:23 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ████████, used by █████████████. **FOAD** did not answer the phone call, and ████████████ left a voicemail stating, "Hello, hello, Bobaneza [PH], what's happening? What's happening? call me, bye." On December 8, 2024, at approximately 5:40 p.m., **FOAD** received a call from ████████████ and again did not answer the call. ████████████ left a voicemail stating, "Hey, what happened, brother? What happened/ please, call me. Call me sir." Later that same day, at approximately 6:30 p.m., ████████████ left another voicemail on TARGET TELEPHONE 5. In this voicemail, ████████████ was heard speaking to a third party in the background, stating (translated from Spanish to English) "I will ask him tomorrow to see what he says. Right now it's very windy. Yes, I did not go to work today, pops; I'll be home. I'm gonna do it; it it ends up being a whole month, oh well, it will be alright." Two minutes later, ████████████ called **FOAD** on TARGET TELEPHONE 5 again and left another voicemail stating, "Hello, hello, hello. What's happening? What's happening, Bobenenza [PH]? Where are you, brother? Pease, call me. Call me sir. see you, bye." On December 9, 2024, at approximately 12:35 p.m., ████████████ left another voicemail stating, "[U/I] Sir, I'm still waiting for you to call. Please, please call me sir see you my brother."

116. Case agents know that ████████████ is **FOAD**'s source of supply. Case agents have observed that **FOAD** has answered phone calls on TARGET TELEPHONE 5 for other individuals on the same dates he did not answer phone calls from ████████████ leading case agents to believe that **FOAD** knew ████████████ was

trying to reach him via phone call. **FOAD** previously did not answer calls from ████████████ ████████ Case agents believe that **FOAD** is a key distributor in ███████████ Midwest narcotics distribution network; however, case agents believe that **FOAD** will only accept ██████████████████ phone calls when **FOAD** is prepared and ready to receive narcotics. As detailed above, **FOAD** used TARGET TELEPHONE 5 to coordinate the receipt of a suspected narcotics load from ████████████████ in the area of St. Louis, Missouri. At the time of these voicemails, case agents believe that **FOAD** was not yet ready to acquire this narcotics load, leading him to intentionally avoid ████████████████ phone calls.

**BEA's Continued Conversations with Narcotics Customers – KIMBLE, ROBERTSON, THOMAS, BROWN and A. GREEN**

117. On November 16, 2024, at approximately 11:52 a.m., **BEA**, using TARGET TELEPHONE 3 (TT-3), called (414) 610-1305, used by **KIMBLE**. During the call, **BEA** stated, "Yeah, we good bro. Just gimmie a lil' more time, god damn it, still working on it." **KIMBLE** responded, "Bitch, I was gonna say, man, how they lookin'? I've been [U/I]. I keep saying I'm gonna call, I'mma—I'mma call my man tomorrow, tomorrow, man I keep forgetting." **BEA** then stated, "Yeah, yeah I'm working on it. God damn it, its, yeah I'm working on it. You know I'm gonna have all that for you in one little minute, god damn it. I'll probably just...give you ten (10) of the ten (10) when I get to ten (10), I'm almost there though god damn it. I'm just..." **KIMBLE** replied, "Alright, I appreciate it." **BEA** continued the conversation saying, "I'm just getting it together man, I got you." **KIMBLE** agreed and **BEA** continued stating, "Hey but ain't, it ain't gon' never happen again. Ever since that day I've been opening these motherfuckers up boy." **KIMBLE** replied, "Oh, okay." **BEA** stated again, "Yeah, I got you though."

118. Case agents identified **KIMBLE** as a suspected narcotics customer of **BEA** who then distributes narcotics supplied by **BEA**. Case agents initially believed this phone call was

referencing **BEA** telling **KIMBLE** that **BEA** needed a little more time to supply **KIMBLE** with 10 kilograms ("10") of a controlled substance. However, based on future intercepted calls, case agents now believe that **BEA** sold **KIMBLE** poor quality narcotics and **BEA** owed **KIMBLE** $10,000 from the sale of those narcotics. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** told **KIMBLE** that he almost had all of the money for **KIMBLE**. Case agents' belief that **BEA** sold **KIMBLE** a bad kilogram of narcotics in the past was further strengthened by **BEA** stating **BEA** is opening each kilogram and checking them to ensure they are of good quality ("Hey but ain't, it ain't gon' never happen again. Ever since that day I've been opening these motherfuckers up boy.").

119. On November 20, 2024, **BEA**, using TARGET TELEPHONE 3, had a text conversation and phone conversations with 414-248-7180, used by **ROBERTSON**. At 9:51 a.m., **BEA** stated, "Good?" At 1:06 p.m., **ROBERTSON** replied, "After work." At 3:21 p.m., **BEA** attempted to call **ROBERTSON** with no answer. At 3:23 p.m., **ROBERTSON** texted **BEA**, "Getting it together." At 3:31 p.m., **ROBERTSON** called **BEA**. **ROBERTSON** stated, "What's going on with it?" **BEA** responded, "Oh, shit, what time you're thinking?" **ROBERTSON** stated, "Shit, right now." **BEA** responded, "Oh, okay, well, that was uhh.. that was uhh.. the (Unintelligible) in there." **ROBERTSON** responded, "uh huh." **BEA** replied, "I'll, I'll, I'll double that." **ROBERTSON** agreed. **BEA** stated, "Let me see what I got; let me see. I'll call you right back." The phone call ended, and approximately 8 minutes later, at 3:39 p.m., **BEA** called **ROBERTSON**. **BEA** stated, "There's only fire right now." **ROBERTSON** responded, "For real?" **BEA** stated, "All of a sudden I got (Unintelligible) sons of bitches fire for (Unintelligible)." **ROBERTSON** stated, "Oh, uh, uh, uh, what you want for that?" **BEA** replied, "Uh, give me uh,

85

referencing **BEA** telling **KIMBLE** that **BEA** needed a little more time to supply **KIMBLE** with 10 kilograms ("10") of a controlled substance. However, based on future intercepted calls, case agents now believe that **BEA** sold **KIMBLE** poor quality narcotics and **BEA** owed **KIMBLE** $10,000 from the sale of those narcotics. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** told **KIMBLE** that he almost had all of the money for **KIMBLE**. Case agents' belief that **BEA** sold **KIMBLE** a bad kilogram of narcotics in the past was further strengthened by **BEA** stating **BEA** is opening each kilogram and checking them to ensure they are of good quality ("Hey but ain't, it ain't gon' never happen again. Ever since that day I've been opening these motherfuckers up boy.").

119. On November 20, 2024, **BEA**, using TARGET TELEPHONE 3, had a text conversation and phone conversations with 414-248-7180, used by **ROBERTSON**. At 9:51 a.m., **BEA** stated, "Good?" At 1:06 p.m., **ROBERTSON** replied, "After work." At 3:21 p.m., **BEA** attempted to call **ROBERTSON** with no answer. At 3:23 p.m., **ROBERTSON** texted **BEA**, "Getting it together." At 3:31 p.m., **ROBERTSON** called **BEA**. **ROBERTSON** stated, "What's going on with it?" **BEA** responded, "Oh, shit, what time you're thinking?" **ROBERTSON** stated, "Shit, right now." **BEA** responded, "Oh, okay, well, that was uhh.. that was uhh.. the (Unintelligible) in there." **ROBERTSON** responded, "uh huh." **BEA** replied, "I'll, I'll, I'll double that." **ROBERTSON** agreed. **BEA** stated, "Let me see what I got; let me see. I'll call you right back." The phone call ended, and approximately 8 minutes later, at 3:39 p.m., **BEA** called **ROBERTSON**. **BEA** stated, "There's only fire right now." **ROBERTSON** responded, "For real?" **BEA** stated, "All of a sudden I got (Unintelligible) sons of bitches fire for (Unintelligible)." **ROBERTSON** stated, "Oh, uh, uh, uh, what you want for that?" **BEA** replied, "Uh, give me uh,

85

give me twenty-eight. Give me twenty eight." **ROBERTSON** asked, "uh, okay, you down there?" **BEA** confirmed before the call ended.

120.    At approximately 4:09 p.m., a blue 2022 Honda Accord Bearing Wisconsin registration AXW-7184 **(Subject Vehicle 2**) pulled up and parked in the fenced in area of 3941 N. Teutonia Avenue (Bar 1000). The registration on this vehicle lists to **ROBERTSON** at 6315 N. 90th Street, Milwaukee, WI **(SUBJECT PREMISES 2).** After parking, **ROBERTSON** called **BEA** on TARGET TELEPHONE 3, which **BEA** did not answer. A short time later, **BEA** exited the rear gate of 3941 N. Teutonia Avenue and walked to the passenger door of **ROBERTSON**'s vehicle. Approximately one minute later, **BEA** exited the vehicle and walked back into the rear gate of the bar. **ROBERTSON** then left the area in his vehicle.

121.    Based on my training and experience, the context of the text and phone conversations between **BEA** and **ROBERTSON**, and the meeting between the two, I believe **BEA** sold **ROBERTSON** a kilogram of narcotics for $28,000. At the time of the phone call, it was not clear what kind of drugs were sold to **ROBERTSON**. Case agents believe that "fire" references heroin or fentanyl, but that "fire" can also refer to other kinds of controlled substances and is also often used to refer to good quality controlled substances.

122.    On November 25, 2024, at approximately 12:25 p.m., **BEA**, using TARGET TELEPHONE 3, called (262) 887-9040, used by William **THOMAS**. **THOMAS** stated, "What's going on fam?" **BEA** replied, "Man, I knew that shit, I knew that was gonna happen, shit. That's why I was tryna push you boy." **THOMAS** stated, "Yeah man, just, yeah." **BEA** said, "Man, I mean, God damn, I had that shit sitting around, boy; like, boy... I'm waiting on that shit." **THOMAS** replied, "Shit so you, you waiting now." **BEA** stated, "I know, I got probably; [U/I] ain't got too much shit; I probably have like fourteen (14) or twenty (20) [U/I] or something like

that, man." **THOMAS** stated, "Oh, no, you know I'm just [U/I], man." **BEA** told **THOMAS**, "I know that; shit, that's how I'm [U/I] boy; I'm waiting, though." **THOMAS** replied, "Yeah, alright; shit, I'm just gonna wait on you, man; shit." **BEA** replied, "I got you."

123. Since the beginning of interceptions, case agents have intercepted multiple calls between **BEA** and **THOMAS**. In many of these calls, **BEA** asked **THOMAS** if **THOMAS** was "good," indicating **BEA** was trying to sell **THOMAS** narcotics. Case agents suspected that **BEA** had possession of narcotics at the times of these calls. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call on November 25, 2024: **THOMAS** was looking for narcotics and **BEA** was explaining to **THOMAS** that **BEA** has been trying to sell **THOMAS** narcotics while **BEA** had drugs, but now **BEA** no longer has any drugs on hand. **BEA** indicated to **THOMAS** that **BEA** is currently waiting on narcotics.

124. On November 29, 2024, at approximately 5:55 p.m., **BEA**, using TARGET TELEPHONE 3, called (414) 610-1305, used by **KIMBLE**. **KIMBLE** answered and **BEA** stated, "I'm almost at ten (10), boss." **KIMBLE** stated, "Okay." **BEA** again stated, "I'm almost at ten (10), man. I'm trying to get all out the way." **KIMBLE** responded, "Okay; I said, 'Hey, man...' I was just thinking it; I said, 'Let me call this goddamn it, goddamn it,' and you done call me." **BEA** said, "Yeah, fo'sho. Hell, yeah; you know I'm, I'm trying to get out the way; I hate that I went through this bullshit but hey, mate, never again, goddamn it." **KIMBLE** replied, "Okay, well, yeah, I was just..." **BEA** stated, "A'int gonna go through that one again." **KIMBLE** told **BEA**, "Okay, well, I'm still around." **BEA** replied, "Okay; I got you; you know I'm on it."

125. Based on my training and experience, and knowledge of this investigation, I believe that: this phone call was a follow-up call to **BEA** and **KIMBLE**'s previous communication on November 16, 2024, when **BEA** said **BEA** would give **KIMBLE** "10." Case agents believe that

87

**BEA** was still trying to obtain the $10,000 that he owned to **KIMBLE** from what case agents believe was poor quality drugs that **BEA** previously sold to **KIMBLE**.

126.   On December 3, 2024, at approximately 10:56 p.m., case agents intercepted a phone call on TARGET TELEPHONE 3 between **BEA** and (262)887-9040, used by **THOMAS**. **BEA** indicated to **THOMAS** that "it's yours, though." **THOMAS** stated, "I'm waiting on you man." **BEA** stated, "hoping I could save that motherfucker for a rainy day, but I see you need it." **BEA** indicated to **THOMAS** that **BEA** would be available around 4 or 5 p.m. on December 4, 2024.

127.   On December 4, 2024, at approximately 4:48 p.m. **THOMAS** called **BEA** on TARGET TELEPHONE 3. **BEA** stated, "Yeah I'm on my way headed that way now, bro. I'll be getting to you shortly." **THOMAS** stated, "Man, I will sure appreciate it, glad you (UI) like this man." **BEA** stated, "I did, so, I got you. No doubt (UI) doing that." **THOMAS** replied, "Okay cool, okay cool." **BEA**: "Yeah, I'm about... I'm heading that way." **THOMAS** stated, "Okay cool."

128.   At approximately 5:32 p.m., **BEA,** using TARGET TELEPHONE 3, called **THOMAS**. **THOMAS** stated, "What's happening fam?" **BEA** replied, "Hey, you can come down and get it (UI)" **THOMAS** asked, "Yeah, where? Are you at the place?" **BEA** replied, "Yeah, I'm down here on Teutonia" **THOMAS** stated. "Okay, I'll be there in a second" **BEA** stated, "Alright"

129.   At 5:50 p.m., **THOMAS** called **BEA**. **BEA** stated, "What up bro?" **THOMAS** stated, "Yeah, I'm pulling in the back now" **BEA** replied, "Alright, I'll be right out." At approximately 5:51 p.m., a small older model SUV was observed on electronic surveillance pulling into the alleyway and parking behind Bar 1000. This vehicle was later identified as a gold Chevrolet Blazer license plate 587-FPD (**(Subject Vehicle 3)**. Approximately one minute later, **BEA** was exited the back gate and walked to the passenger door of the vehicle. **BEA** opened the passenger door of the vehicle and leaned inside. **BEA** was only leaning in the passenger side of

the vehicle for approximately one minute before closing the passenger door and returning inside the bar. After **BEA** entered the back gate, the vehicle left the area.

130. Several minutes later, at 6:09 p.m., **BEA** returned a phone call to **THOMAS**. **THOMAS** stated, "Hello." **BEA** asked, "What up bro" **THOMAS** stated, "Hey, yeah; I was calling to let you know I still want that half, the half, though, you know what I'm saying?" **BEA** asked, "A halfway?" **THOMAS** stated, "Yeah, you know" **BEA** replied, "For sure." **THOMAS** confirmed, "You know what I'm talking about" **BEA** asked, "oh yeah, you talking about on that side?" **THOMAS** replied, "Yeah, yeah." **BEA** replied, "Oh, yeah, for sure. I got you as soon as I touch it bro, I'm gonna let you know. You know that." **THOMAS** stated, "Okay, okay cool." **BEA** stated, "Alright" **THOMAS** answered, "Alright"

131. Based on the content of the phone conversations intercepted between **BEA** and **THOMAS**, case agents believe they conducted a narcotics transaction behind Bar 1000. Furthermore, case agents believe **BEA** and **THOMAS** were coordinating another drug transaction whenever **BEA** has access to the narcotics they discussed in the phone conversation at 6:09 p.m. Case agents believe that when **THOMAS** references a "half," he means a half kilogram.

132. On December 7, 2024, at approximately 10:17 a.m., **BEA**, using TARGET TELEPHONE 3, sent a text message to (414) 581-0916, used by Dennis **BROWN**. **BEA** stated, "I need some bread bro I owe ppl." On December 8, 2024, at approximately 6:39 p.m., **BROWN** sent **BEA** a text message saying "But I'm waiting bro." Following this text, at approximately 6:57 p.m., **BEA**, using TARGET TELEPHONE 3, called **BROWN**. The conversation was already in progress and was not fully captured. However, during the call, **BEA** stated, "There's a Qdoba before that." **BROWN** responded, "Yeah, right there; yeah. I'm right here on [U/I]; you wanna do

Qdoba's or..." **BEA** replied, "Yeah, pull on Qdoba." **BROWN** stated, "A'ight, yeah; I need me something to eat anyways." The two parties agreed and hung up the phone.

133. Based on my training and experience, and knowledge of this investigation, I believe that: **BROWN** owed money to **BEA** from narcotics that were previously fronted to **BROWN**. In the text message, **BEA** told **BROWN** that he needed the money because **BEA** owes his source of supply (**FOAD**) money. Case agents believe that **BEA** and **BROWN** discussed meeting in a Qdoba parking lot to exchange the money.

134. On December 10, 2024, at approximately 11:27 a.m., **BEA**, using TARGET TELEPHONE 3, called (262) 395-5337, used by A. **GREEN**. A. **GREEN** stated, "What's happening?" **BEA** replied, "Been good?" A. **GREEN** stated, "Yeah, yeah, yeah; [U/I], [U/I], [U/I], I can't call back, though, that's all." **BEA** stated, "Oh." A. **GREEN** stated, "Yes. What yous at? What it do?" **BEA** replied, "Shit, I'm by the crib right now." A. **GREEN** stated, "Okay, okay. Um, shit, damn... I'm trying to run into you, bro." **BEA** asked, "You at the crib?" A. **GREEN** replied, "Yeah; yup." **BEA** asked, "How long you gonna be there?" A. **GREEN** replied, "Shit... how long you gonna be?" **BEA** stated, "Shit, I can get over there; [U/I] that bullshit; [U/I] slide over there, [U/I] about a half an hour." A. **GREEN** stated, "Alright; that'd work." **BEA** stated, "Alright."

135. At approximately 11:39 a.m., case agents established surveillance at **BEA's** residence of 2636 S. 76th Street, West Allis, WI. Parked in **BEA's** driveway was Crystal ROBINSON's known gold Cadillac SUV bearing WI registration ABU-1610 and **BEA's** known silver Jaguar bearing WI registration AUW-1498. At approximately 11:48 a.m., case agents observed **BEA** exit the front door of his residence and enter the driver's seat of the gold Cadillac. **BEA** departed his driveway in the Cadillac and case agents followed. Case agents followed **BEA** as he drove directly to 4641 N. 41st Street, Milwaukee, WI (residence belonging

to GREEN's father), at which point, **BEA** parked in front of that residence. At about that time, **BEA**, using TARGET TELEPHONE 3, called A. **GREEN** at (262) 395-5337. A. **GREEN** answered, "Hello." **BEA** replied, "Yeah, I'm pulling up now." A. **GREEN** stated, "A'ight; I'm right here on Port Washington and Hampton, coming up." Both parties agreed.

136. At approximately 12:21 p.m., case agents observed a black Chevrolet Tahoe bearing WI registration ANF-4348 turn onto N. 41st Street from W. Courtland Avenue. The Tahoe (**Subject Vehicle 6**) then parked directly behind **BEA's** gold Cadillac. A. **GREEN** exited the driver's seat of the Tahoe, opened the front passenger door of **BEA's** Cadillac, and leaned in. A subsequent query of the WI Department of Transportation revealed the Tahoe (**Subject Vehicle 6**) to be registered to Tyara E. GREEN at XXXX Freedom Road, Little Chute, WI. At approximately 12:23 p.m., A. **GREEN** leaned away from **BEA's** Cadillac and closed its door. **BEA** then departed the area. Immediately thereafter, a black male with a small dog appeared from 4641 N. 41st Street and joined A. **GREEN** by the Tahoe. Case agents later identified this male as Antonio L. GREEN SR., A. **GREEN's** father. A short time later both A. **GREEN** Jr. and GREEN SR., entered the front door of 4641 N. 41st Street.

137. Based on the intercepted communication between **BEA** and A. **GREEN** along with the observation of the short meeting outside of 4641 N. 41st Street, case agents believe that **BEA** supplied narcotics **to A. GREEN.**

### Second Extension of TT-2, TT-3, TT-4, TT-5 and Initial Interception of TT-6

### FOAD in Contact with SOS ████████████

138. On December 14, 2024, at approximately 7:46 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ███████████, used by ██████████████ **FOAD** greeted ██████████████ as "Abu Nesta" or something similar.

███████████████ stated, "Hey, what's happening, my brother? How are you?" **FOAD** answered, "Call me tomorrow. I wanna get the phone tomorrow. Call me tomorrow." ███████████████ stated, "Okay, I will; I will..." **FOAD** again stated, "Call me tomorrow." ███████████████ stated, "I'm calling tomorrow." **FOAD** clarified, "Call me tomorrow around 2 or 3 o'clock. I wanna get the phone. We talk when I get the phone." ███████████████ stated, "I call you tomorrow. Okay, I will. [Voices overlap]" The two agreed and hung up the phone.

139.     Based on my training and experience, knowledge of this investigation, and previously intercepted phone calls between **FOAD** and ███████████████ I believe that: ███████████████ wanted **FOAD** to obtain a different phone number so they can discuss the logistics of another load of cocaine/heroin/fentanyl. **FOAD** and ███████████████ discussed a time that they should talk on the following day. ███████████████ ███████████████ did not want to discuss narcotics transactions over their regularly used phone numbers to avoid detection by law enforcement.

**BEA Sends AYALA to Serve "PUMPKIN" with Narcotics**

140.     Case agents learned that from approximately December 12, 2024 through December 20, 2024, **BEA** took a leisure trip to Miami, Florida. Prior to leaving on December 11, 2024, **BEA**, using TARGET TELEPHONE 3, called ███████████████ AKA "PUMPKIN" at ███████████████ PUMPKIN stated, "Hello." **BEA** asked, "What you think about it, bro?" PUMPKIN stated, "Oh, yeah; that shit's [U/I]." **BEA** asked "Yeah?" PUMPKIN stated, "Yeah; it's decent; boy, you can hear it in my voice, boy." **BEA** replied, "Huh?" PUMPKIN stated, "You can hear it in my voice." **BEA** replied, "Oh, yeah, yeah, yeah, yeah. For sure, man; take your time, goddamn it." PUMPKIN stated, "Yeah." **BEA** stated, "A'ight; just let me know when you need

me." PUMPKIN stated, "Yeah, it's decent, man." **BEA** asked, "Good, good decent, huh?" PUMPKIN confirmed, "Yeah." **BEA** stated, "Fo'sho, man." PUMPKIN stated, "Yeah, but you have to take your time with it." **BEA** replied, "Huh?" PUMPKIN stated, "You have to take your time with it; nigga just can't dive into that." **BEA** replied, "Yeah." PUMPKIN asked, "You know what I'm saying?" **BEA** stated, "Fo'sho, fo'sho. Well, I'm just tryin' to get a little money; that, that will do it then." PUMPKIN stated, "Uh, [U/I] are waiting on it." **BEA** replied, "Yeah, whatever" PUMPKIN stated, "Okay; 'cause they keep asking me, right." **BEA** stated "Yeah." PUMPKIN stated, "I don't know what kind of prices are coming." **BEA** stated, "Man, shit... see what they're paying and try to beat it." PUMPKIN stated, "Alright." **BEA** replied, "Alright? Go down five dollars or whatever on them niggas; ten, five, or whatever." PUMPKIN stated, "Right." **BEA** stated, "Just let me know; whatever you hear, we'll figure out whatever number they tell you we'll, we'll figure it out." PUMPKIN stated, "Alright."

141.    Case agents know ████████████ AKA "PUMPKIN" is an associate of **BEA** who lives in an apartment █ within 3947 N. Teutonia Ave., next door to Bar 1000. Based on training and experience and knowledge of this investigation, case agents believe that **BEA** provided "PUMPKIN" with narcotics, specifically heroin, and "PUMPKIN" was praising the product saying it was good. Both **BEA** and "PUMPKIN" referenced "taking your time with it" which case agents believe refers to the strength of the product and not wanting to overdose. They discussed further sale of narcotics and **BEA** instructed "PUMPKIN" to beat a competitor drug dealer's price.

142.    The following day on December 12, 2024, at approximately 8:29 p.m., **BEA**, using TARGET TELEPHONE 3, received a phone call from ████████████ AKA "PUMPKIN" at ████████████. **BEA** asked, "What's happenin', man?" PUMPKIN replied, "[U/I]. Hey, that thing

you had [U/I]..." **BEA** asked "Yeah?" PUMPKIN stated, "You've [U/I] me." **BEA** asked, "It's bad?" PUMPKIN stated, "[Voices overlap] this nigga ain't got no [U/I] time." **BEA** asked, "No?" PUMPKIN stated, "No." **BEA** replied, "No yeah. I thought that was something different yesterday, god damn." PUMPKIN asked, "Huh?" **BEA** stated, "I said, I thought you told me something different yesterday, god damn." PUMPKIN stated, "Uh-uh. See what [U/I] yesterday it hit me, right?" **BEA** replied, "Yeah." PUMPKIN stated, "But when I woke up..." **BEA** replied, "Yeah." PUMPKIN continued, "[U/I] wake up, shit." **BEA** replied, "Oh, okay." PUMPKIN asked, "You know what I'm saying?" **BEA** stated, "I got you, yeah." PUMPKIN stated, "[Voices overlap] [U/I] playin', man." **BEA** stated, "Oh, okay." PUMPKIN asked, "You see what I'm saying now?" **BEA** replied, "Yeah, yeah, yeah, yeah. Yeah, fo'sho'. I got you." PUMPKIN stated, "Yeah, yeah." **BEA** confirmed, "You good though?" PUMPKIN asked, "Huh?" **BEA** stated, "I said you a'ight though?" PUMPKIN replied, "No, not really." **BEA** stated, "Man. Shit, I..." PUMPKIN asked, "[Voices overlap] You out here?" **BEA** replied, "Nah, I got out the way for a lil' minute, but I know I left some with a nigga though." PUMPKIN stated, "Yeah." **BEA** replied, "Hell yeah." PUMPKIN stated, "[U/I] the money." **BEA** stated, "Oh, okay. I'mma hit him up and see where he at." PUMPKIN stated, "Alright." **BEA** stated, "A'ight."

143. I believe that this was a follow up from the call between **BEA** and PUMPKIN on December 11, 2024. Based on training and experience and knowledge of this investigation, case agents believe PUMPKIN–informed **BEA** that the previously supplied narcotics were not good quality. Case agents believe PUMPKIN told **BEA** he did not feel good the following morning. **BEA** tried confirming that PUMPKIN was okay, but PUMPKIN stated he was not. This shows **BEA** was aware that the narcotics he was distributing was poor quality.

94

144.    On December 15, 2024, at approximately 2:05 p.m., **BEA**, using TARGET TELEPHONE 3, called ▬▬▬▬▬ AKA "PUMPKIN" on his significant other's phone number of ▬▬▬▬. PUMPKIN stated, "What's happening, Timmy?" **BEA** asked, "What's happenin'?" PUMPKIN stated, "He, man, I need me one (1) for tomorrow." **BEA** replied, "You need one for tomorrow?" PUMPKIN confirmed "Yeah." **BEA** stated, "A'right. I'm gonna give my boy... I ain't around; I'll slide on you…" PUMPKIN stated, "Huh? A'right. When you get out here, I'll have it for you in the morning." **BEA** stated, "I got you. I'mma hit my boy to see if he can drive right now." PUMPKIN stated, "A'ight." **BEA** replied, "A'ight."

145.    Later in the investigation, after reviewing the contents from **BEA's** phone following his arrest on April 17, 2025, case agents observed on December 15, 2024, at 2:06 p.m., (immediately following the phone call with PUMPKIN) **BEA's** device placed an outgoing FaceTime call to **AYALA's** device at 414-350-0829. This call was 1:11 minutes in duration. FaceTime calls are not captured through TIII interceptions. Electronic surveillance from December 15, 2024, at approximately 3:19 p.m., showed that **AYALA** parked his black Ford Crown Victoria **(Subject Vehicle 7)** in the back of Bar 1000. **AYALA** got out of his vehicle and approached PUMPKIN's apartment building door within 3947 N. Teutonia Ave. A few seconds later, **AYALA** knocked on the window of the apartment unit. At approximately 3:22 p.m., **AYALA** and who case agents believe to be PUMPKIN, walked over to **AYALA's** vehicle. **AYALA** grabbed something from either his hoodie front pouch or the side of his driver door and conducted a hand-to-hand exchange with who I believe to be PUMPKIN. **AYALA** got back into his vehicle and left while PUMPKIN returned to his apartment unit.

146.    Based on their training and experience, their knowledge of this investigation, paired with the calls between **BEA** and PUMPKIN on December 11, 2024 and December 12, 2024, case

agents believe that PUMPKIN called **BEA** to ask for narcotics. **BEA** was out of town in Miami, so he contacted a trusted DTO member, **AYALA,** to bring PUMPKIN the narcotics on **BEA**'s behalf. **AYALA** brought PUMPKIN the narcotics at **BEA's** direction.

**BEA's Continued Conversations with DTO Members SIMS, BROWN, GREEN, and A. GREEN**

147.     On December 14, 2024, at approximately 2:17 p.m., **BEA**, using TARGET TELEPHONE 3, called **SIMS** at (414) 737-1183. During the call, **SIMS** stated, "Uh, shit man, trying, trying to show you I ain't bullshit, man. I got a couple bucks for you." **BEA** responded, "Uh, for sure." **SIMS** stated, "It ain't, it ain't, it ain't everything, man, but I'm trying, man [Laughs]." **BEA** stated, "Yeah, fo'sho, fo'sho. Yeah, yeah; It's cool, man. I, uh... Let's keep goin' to ... shit, I'll probably get with you, uh... What's today? Shit, I ain' gonna be back into town Thursday, man." **SIMS** acknowledged, and **BEA** further stated, "So, shit, you probably have a little more then." **SIMS** replied, "Yeah. Oh, hell yeah." **BEA** stated, "It slowed drastically, oh man." **SIMS** replied, "Man, like a mother fucker, man. I'm talking about mother fuckers that was calling me calling all the time ain't call me one fuckin' time. I'm like, what the fuck?" **BEA** stated, "It's gonna get rough, though; it's gonna get rough. It ain't gonna be nothing on those [U/I] the minute [U/I] out there." **SIMS** agreed and said, "Yeah, man. [Voices overlap], I'm hearing it." **BEA** stated, "Yeah, because the border is closin' on a nigger. Yeah, it's gonna get rough." **SIMS** replied, "Damn." **BEA** stated, "It's gonna get rough. But yeah, that's cool, man. I just get with you when I get back around." The two agreed and hung up the phone.

148.     Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **SIMS** told **BEA** that **SIMS** has some, but not all, of the money **SIMS** owes **BEA**, (a "couple of bucks" but it is not "everything"). Based on the investigation, prior interceptions, and my understanding of the relationship between **SIMS** and **BEA**, I believe that the debt **SIMS** owes to **BEA** is for previously fronted narcotics. I believe that **BEA** fronts **SIMS**

96

with narcotics and, once **SIMS** sells the narcotics, he pays **BEA** what is owed. Additionally, based on this call, case agents believe that **SIMS** has not yet sold all of the narcotics fronted to him by **BEA**, and therefore does not have all of the money that he owes to **BEA**. The two then discussed how narcotics sales have recently slowed down "drastically." **SIMS** referred to people (narcotics customers), not calling him who used to call him regularly. The two continued discussing the status of narcotics trafficking, and **BEA** referred to the border closing, which would impact the sale of narcotics. It is not known what specific controlled substance is being discussed in this call, but based on the overall investigation, case agents believe that it is likely cocaine/fentanyl.

149. On December 15, 2024, at approximately 2:11 p.m., **BEA**, using TARGET TELEPHONE 3, called Dennis **BROWN** at (414) 581-0916. During the call, **BROWN** told **BEA** that he (**BROWN**) was sick for five days, and that he "just started moving around yesterday." **BROWN** stated, "Hell, yeah; but, shit, I'm out grooving now, shit; I definitely got goddamn it be right with you, goddamn it, either tonight or in the morning, like a lick [U/I] or something, at least, shit." **BEA** replied, "I got you, bro." **BROWN** asked, "Hey, uh, man, let me know if that [U/I] these niggas [U/I]." **BEA** replied, "Yeah?" **BEA** continued, "I'm waiting; I talked to him the other day; I'm waiting, though; I said I'm gonna let you know as soon as I touch it." **BROWN** replied, "Look, I ain't not even touch none of them others you did yet." **BEA** stated, "No?" **BROWN** replied, "No; I've been laying on the couch, nigga, shit." **BEA** stated, "Yes, sir; you better get down, though." **BROWN** replied, "Hell yeah; when you get here? Hopefully yeah; I'm cool now; hopefully later on, goddamn it, I'll be hitting you."

150. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** called **BROWN** to collect money owed to **BEA** for previously fronted narcotics. **BROWN** explained to **BEA** that he was sick, and he just started "moving," which I

believe means that **BROWN** resumed selling the previously fronted drugs now that **BROWN** is no longer ill. **BEA** told **BROWN** that **BEA** was waiting on his cocaine supplier (believed to be **FOAD**) and that **BEA** would let **BROWN** know as soon as **BEA** obtains more narcotics ("I'm waiting; I talked to him the other day…" and "I'm gonna let you know as soon as I touch it."). Case agents know that as of the time of this phone call, **HAMMAD** and/or **FOAD** had not been to Milwaukee since November 20, 2024. **BROWN** indicated that he has not "touched" the other ones from **BEA** yet, and case agents believe **BEA** told **BROWN** to start selling the narcotics **BROWN** already has on hand so **BROWN** can pay **BEA** the money **BROWN** owes to **BEA** ("you better get down, though").

151. On December 23, 2024, at approximately 11:20 a.m., **BEA**, using TARGET TELEPHONE 3, placed a phone call to A. **GREEN** at (262) 395-5337. The two parties greeted, and A. **GREEN** stated, "Shit, shit, just uh... got about this little practice for you [U/I] with it." **BEA** replied, "Oh, I'm down by the [U/I]." A. **GREEN** stated, "A'ight; I finna run into lil' 'cus, he owe me a little... he got me a little a pay for me, then I'm pull up on you." Both parties agree, and **BEA** asked A. **GREEN**, "Hey, you said you can pull that apartment when [U/I] upstairs?" A. **GREEN** replied, "Yeah, yeah, yeah; it still active so, whenever you tell me to go down there, you know, it's okay; just let me know." **BEA** replied, "Okay; I got you." A. **GREEN** stated, "Hey, another thing too, uh..." A. **GREEN** continued, "A'ight, shit, this my little brother right on my [U/I], you just... you probably know him, you probably don't but most likely you probably know him, though; uh, Will, my cus... but anyway, yeah, just uh... I probably just have you all connect 'cause he's the one, you know, moving and grooving, you know what I'm saying, so..." **BEA** replied, "Oh, yeah? Okay." A. **GREEN** stated "Yeah, if you wanna keep him in motion, I'mma just connect you all; so, I'll probably just have him with me then, so you all can just chop it up

98

like, you know, whatever you need to say to him, you know what I'm saying? Just..." **BEA** stated, "I got you." **GREEN** asked, "Is cool?" **BEA** answered, "Oh, yeah; that's cool. I got you."

152. Based on what case agents have learned through the interception period, case agents believe that **BEA** supplies A. **GREEN** with narcotics. Case agents have determined that A. **GREEN** does legitimate construction work at 3941 N. Teutonia Avenue for **BEA** (**BEA** to A. **GREEN** "Hey, you said you can pull that apartment when [U/I] upstairs?"). Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: A. **GREEN** is still collecting money owed to A. **GREEN** by A. **GREEN**'s unknown drug customers for narcotics previously fronted to A. **GREEN** by **BEA** and that once A. **GREEN** receives the money, A. **GREEN** is going to pay **BEA** (A. **GREEN** to **BEA**, "A'ight; I finna run into lil' 'cus, he owe me a little... he got me a little a pay for me, then I'm pull up on you."). A. **GREEN** wanted to introduce his cousin "Will" (later identified as ▮▮▮▮▮▮▮▮ to **BEA** as a new narcotics customer ("A'ight, shit, this my little brother right on my [U/I], you just... you probably know him, you probably don't but most likely you probably know him, though; uh, Will, my cus... but anyway, yeah, just uh... I probably just have you all connect 'cause he's the one, you know, moving and grooving, you know what I'm saying, so...").

153. In a phone call between **BEA** and A. **GREEN** later that same day, at approximately 5:21 p.m., A. **GREEN** informed **BEA** he was going to pick up his cousin and they would all meet up. In a follow up phone call at approximately 5:24 p.m., **BEA** and A. **GREEN** agreed to meet at A. **GREEN**'s residence. At approximately 5:44 p.m., **BEA** called A. **GREEN** and told him he arrived. Case agents believe that **BEA** was meeting with A. **GREEN** and A. **GREEN**'s cousin (believed to be ▮▮▮▮▮▮▮ for A. **GREEN** to introduce his cousin to **BEA** as a new

narcotics customer. Shortly after these communications, **BEA** and ███████ ███████ communicated as detailed below.

154. At approximately 5:49 p.m., **BEA**, using TARGET TELEPHONE 3, called ███████████████ at ████████████ (herein ████████████████ answered, and **BEA** stated, "Hey my guy is outside." According to **BEA**'s location data, at approximately 5:47 p.m., **BEA**'s E-911/GPS ping data indicated a 271-meter ping near the area of N. 38th Street and Glendale Avenue. Case agents know that A. **GREEN** has an associated address of 4641 N. 41st Street, which is in .3 miles (driving distance) from the center of the ping radius. Case agents believe that **BEA** and ███████ likely met at 4641 N. 41st Street.

155. On December 26, 2024, at approximately 11:54 a.m., ████████ sent a text to TARGET TELEPHONE 3 stating, "What's good cuz, Still all bad on the blue side?" **BEA** replied, "Yea." ████████ then sent, "Aight lmk when it's good." **BEA** replied, "4sho."

156. Based on my training and experience, and knowledge of this investigation, I believe that in these messages: ███████████ asked **BEA** whether **BEA** had methamphetamine pills or cocaine. Case agents know that "blue" is a term that could be used for either narcotic. **BEA** responded saying that he still did not have the suspected narcotics (methamphetamine pills or cocaine) but would let ████████ know when he had more to sell.

157. On December 28, 2024, at approximately 4:50 p.m., ████████ sent a text to TARGET TELEPHONE 3 stating, "Wtw cuz, 10?" Shortly after sending this text, at approximately 4:56 p.m., ███████ called **BEA** on TARGET TELEPHONE 3. The two greeted and ████████ stated, "Shit, you said it still great on the other side, right?" **BEA** replied, "Yeah." ████████████ stated, "Ah, shit. I was just trynna take out like a 10 piece or something." **BEA** replied, "A ten [U/I]?" ████████ confirmed. **BEA** stated, "Oh, okay. I got you. Where you at right

now?" ███████ stated, "50th and Good Hope." **BEA** stated, "50th. That's where you gon' be at?" ███████ replied, "A'ight, for the next hour, yeah." **BEA** replied, "Okay. I'll let you know." ███████ stated, "And then--if I get moving though I'll just let you know a place or bump into you or something." **BEA** replied, "Okay, I'm gon' grab that shit in one lil' bit."

158.    Based on my training and experience, and knowledge of this investigation, I believe that in these communications: ███████ inquired about a specific amount ("10") of an unknown narcotic. Case agents also believe that during this call, ███████ inquired whether **BEA** had a different kind of narcotic (different than the "blue side" that ███████ asked about in the December 26th call) ("…it still great on the other side, right?"). **BEA** had that substance available, that ███████ ordered a "10 piece," and they agreed to meet up later to consummate the drug transaction. It is not known what specific controlled substance is being discussed in the above calls between **BEA** and A. **GREEN** and ███████ but based on the overall investigation, case agents believe that it is likely cocaine or heroin.

**HAMMAD ISA Drug Delivery to Timothy BEA on December 29, 2024**

159.    On December 29, 2024, case agents believe that **HAMMAD** met with **BEA** at **BEA's** residence to supply **BEA** with narcotics. At approximately 1:36 p.m., **HAMMAD**, using TARGET TELEPHONE 2, received a phone call from **FOAD** using TARGET TELEPHONE 4 (TT-4). After greeting each other, **FOAD** asked, "Where are you?" **HAMMAD** replied, "What is up dad? Dad, I'm calling the numbers, but it's not connecting." **FOAD** said, "Okay, let me call him right now." **HAMMAD** stated, "Just tell him I'm by him right now." **FOAD** asked, "Did you arrive?" **HAMMAD** responded, "Yes, I arrived," which **FOAD** acknowledged. Case agents reviewed **HAMMAD's** E-911/GPS ping location data at approximately 1:52 p.m. and observed that **HAMMAD** was near 3941 N. Teutonia Avenue in Milwaukee, Wisconsin.

101

160.    At approximately 1:40 p.m., Timothy **BEA**, using TARGET TELEPHONE 3, sent a text message to **HAMMAD** at TARGET TELEPHONE 2 that read, "2656 S 76th." Case agents know this to be the address next-door to **BEA**'s residence. **BEA** resides at 2636 S. 76th Street, West Allis, Wisconsin. Case agents believe that **BEA** mistyped the correct address.

161.    Case agents conducted electronic and physical surveillance at **BEA**'s known address (2636 S. 76th Street). At approximately 1:42 p.m., electronic surveillance (pole camera video of the exterior of 2636 S. 76th Street) revealed the overhead garage door at 2636 S. 76th Street opened. At this same time, a red Ford Fusion arrived and parked immediately in front of this residence. A taller black male exited the driver's seat and retrieved a dark suitcase from the trunk. A black female exited the front passenger seat of the Fusion, then entered the driver's seat. While this was happening, **BEA**'s black Escalade exited the garage of the residence and drove around to the rear of the residence. The overhead garage door closed. The black male from the Fusion wheeled the suitcase to the front door as the Fusion departed the area. A short time later, the black male with the suitcase was allowed entry into the residence.

162.    At approximately 1:47 p.m., case agents established physical surveillance in the area of **BEA**'s residence. At approximately 1:55 p.m., **FOAD**, using TARGET TELEPHONE 4, called **HAMMAD** at TARGET TELEPHONE 2. **FOAD** asked, "Did he talk to you?" **HAMMAD** answered, "Yeah, yeah. I'm going to his mom's house." **FOAD** acknowledged.

163.    At approximately 2:06 p.m., **HAMMAD**'s silver Lexus arrived at **BEA**'s residence, and the overhead garage door opened. **HAMMAD** pulled his Lexus into the garage, at which point the garage door closed. Location data for TARGET TELEPHONE 2 revealed it was in the vicinity of **BEA**'s residence at approximately 2:07 p.m. and 2:22 p.m. At approximately 2:25 p.m., the overhead garage door opened, **HAMMAD**'s Lexus exited, and it departed the area.

**BEA Coordinates Marijuana Distribution to Marijuana Customers – Ngadah KAMANDA and** ▮▮▮▮▮▮▮▮▮

164. At 2:38 p.m. **BEA**, using TARGET TELEPHONE 3, called **KAMANDA** at (414) 467-4928. After exchanging greetings, **BEA** said, "Shit, I was gonna let you know I got some greens around me man. Probably, come check 'em out whenever you get a chance." **KAMANDA** asked, "What some za or something?" **BEA** replied, "Yeah, man, come check 'em out. What you paying for them boys?" **KAMANDA** answered, "Oh, shit, too much, shit." **BEA** asked, "You say too much?" **KAMANDA** confirmed, "Hell, yeah." **BEA** said, "I'm trying to beat them numbers for you, man." **KAMANDA** said, "Hell yeah, that motherfucker is too much, shit." After a brief back and forth, **BEA** said, "Let me know, man. They pretty, they pretty decent ones. They pretty decent ones, though." **KAMANDA** responded, "Shit, I'mma, I'mma have to take a look at 'em, shit." **BEA** said, "Well, whenever you get a chance." **KAMANDA** replied, "I will let know."

165. Case agents know "greens" and "za" are slang terms often used to refer to marijuana. Based on my training and experience, and knowledge of this investigation, I believe that in this call: **BEA** told **KAMANDA** that **BEA** had marijuana for sale and wanted **KAMANDA** to look at the marijuana with the prospect of purchasing some ("I got some greens around me man. Probably, come check 'em out whenever you get a chance"). **BEA** asked what **KAMANDA** typically paid for "za" ("What you paying for them boys?"), because **BEA** was trying to sell marijuana to **KAMANDA** for cheaper ("I'm trying to beat them numbers for you, man"). **BEA** advised that the marijuana **BEA** had for sale was high-quality ("They pretty decent ones, though"), and **KAMANDA** told **BEA** that **KAMANDA** would come look at the marijuana ("I'mma, I'mma have to take a look at 'em, shit").

166. At 4:33 p.m., **BEA**, using TARGET TELEPHONE 3, called **KAMANDA** at (414) 467-4928. **KAMANDA** asked, "Yeah, you said it's uh, it's still fucked up on the other way?"

**BEA** responded, "Yeah, waiting like a motherfucker." **KAMANDA** asked, "You said... what, what's the number on them zaddies [ph]? So I can uh, tell another motherfucker know or something." **BEA** answered, "Hell, no; I've been doing like four-fifty, four-hundred for these cuties and shit." **KAMANDA** said, "A'ight." **BEA** stated, "If they like that I think, you know, a motherfucker come through get a whole one I might charge them sixteen and a half or something." **KAMANDA** clarified, "Sixteen and a half?" **BEA** replied, "Yeah, that's usually what I've been going for this business." **KAMANDA** said, "A'ight, shit, a'ight. I'll let you know somethin'."

167.     Based on my training and experience, and knowledge of this investigation, I believe that in this call: **KAMANDA** inquired whether **BEA** still did not have cocaine and/or heroin available for purchase, ("it's still fucked up on the other way?"), and **BEA** confirmed he did not, ("Yeah, waiting like a motherfucker"). **KAMANDA** then asked how much **BEA** would charge for "zaddies" (believed to be marijuana) ("what's the number on them zaddies [ph]? So I can uh, tell another motherfucker know or something"). Based on training and experience, case agents know "a cutie" is often used as coded language for a quarter pound of marijuana. Case agents believe that **BEA** advised he charged $400-$450 for a quarter pound of marijuana ("I've been doing like four-fifty, four-hundred for these cuties and shit.") and that **BEA** noted that if somebody wanted a whole pound of marijuana, **BEA** would charge $1,650 for that pound ("a motherfucker come through get a whole one I might charge them sixteen and a half or something"). Case agents believe that **KAMANDA** asked to clarify $1,650 ("Sixteen and a half?"), and **BEA** confirmed.

168.     That same day, between 2:40 p.m. through 4:29 p.m., **BEA**, using TARGET TELEPHONE 3, also exchanged text messages with ▆▆▆▆▆▆▆ at ▆▆▆▆▆▆▆. **BEA** asked, "What you paying," and ▆▆▆▆▆ replied, "Wht Yu want? Can I jus bring bck it like I was"? **BEA** texted, "I'll hit you whn I get around thr." ▆▆▆▆▆ wrote, "Ok, Yu didn't answer

the question." **BEA** answered, "1700." ████████ replied, "Thts must be za." **BEA** said, "Ima drop sum off n will go from thr." ████████ wrote, "Ok thts high … Yu goin to let me bring the money back?" **BEA** replied, "Yea."

169.    Based on my training and experience, and knowledge of this investigation, I believe that these messages show:  **BEA** knows ████████ has an alternate source of supply of marijuana and asked how much ████████ was paying ("What you paying"). ████████ asked how much **BEA** was charging and if she could pay the same amount that she did the last time ("Wht Yu want? Can I jus bring bck it like I was").  **BEA** advised he would charge ████████ $1,700 per pound ("1700"), and ████████ indicated that **BEA** must have a certain strain of marijuana ("Thts must be za").  **BEA** advised he would drop some off with ████████ to see if she liked it, ("Ima drop sum off n will go from thr"), and ████████ confirmed whether **BEA** would let ████████ pay later and front her the marijuana, ("Yu goin to let me bring the money back?").  **BEA** confirmed. Based on the timing of these communications, and the earlier observations and interceptions, case agents believe that **HAMMAD** delivered marijuana to **BEA** at **BEA**'s residence and, thereafter, **BEA** reached out to his marijuana customers (████████ and **KAMANDA**) to sell said marijuana.

170.    Case agents noted that **KAMANDA** and ████████ are the only customers that case agents observed **BEA** reach out to in order to sell marijuana. Case agents know that **BEA** consistently sells narcotics (not marijuana) to **SIMS**, **THOMAS**, **ROBERTSON**, **KIMBLE**, A. **GREEN**, **TREADWELL**, among others. Case agents believe that marijuana is not the primary drug that **BEA** distributes and believe the previous mentioned individuals are cocaine/fentanyl customers. Moreover, based on the question asked by **KAMANDA**, "it's still fucked up on the other way?" case agents believe **KAMANDA** is also a customer for separate narcotics distributed by **BEA,** whereas ████████ appears to be solely a marijuana customer.

**HAMMAD ISA and FOAD ISA Discussion on December 29, 2024, of Suspected Forthcoming Kilogram-level Drug Deal**

171.    At approximately 2:59 p.m., on December 29, 2024, approximately 30 minutes after **HAMMAD**'s vehicle was observed leaving **BEA**'s garage, **FOAD**, using TARGET TELEPHONE 4, called **HAMMAD** at TARGET TELEPHONE 2. **FOAD** stated, "I talked to him, [U/I] and he will talk to me for Saturday [PH]." **HAMMAD** responded, "What did you tell him? Because, they are good, very good." **FOAD** stated, "For seventeen (17)." **HAMMAD** replied, "Yeah, yeah, that's good." **FOAD** stated, "Yeah I gave it for seventeen (17), fuck him, you remember [U/I] this time. [Voices overlap]" **HAMMAD** replied, "No, no, I told him and he told me, no, no, I talked to you dad but, [U/I] [Voices overlap]." **FOAD** stated, "Yeah, fuck him. [Voices overlap] Where are you?" The conversation continued about **HAMMAD** ordering food and bringing it home before the call ended.

172.    Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **FOAD** and **HAMMAD** discussed an upcoming drug transaction with an unspecified customer wherein the customer would be charged $17,000, and that the deal would occur on Saturday ("…he will talk to me for Saturday…" and "…I gave it for seventeen…"). Based upon case agents training and experience, the overall investigation, and my knowledge of regional drug prices, case agents believe that **FOAD** and **HAMMAD** are discussing a kilogram-level quantity of drugs.  Specifically, that the price of one kilogram (likely of cocaine) for this particular customer would be $17,000.

███████████████ **Offers Assurance to FOAD via Voicemail**

173.    On December 31, 2024, at approximately 9:00 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ███████████ used by ███████████ **FOAD** did not answer the call, and ███████████████ left a voicemail message.

██████████████████████ stated, "Bobaneza [PH], I am very sorry for the late on the work, but you know, things happen. You made me pick up the time, because of the date, you know. End of December means something went wrong, but everything is good. I just talked to my friend and he just told me, 'I'm sorry, that's it.' So, on the 1st day of the year, um, maybe the 2nd or the 3rd. The latest the 3rd. The 3rd, we gonna be able to work good from now and on Bobaneza [PH]. I'm sorry, we gonna start the year working, working, working like crazy. Uh-um, have a good end of the year. Happy New year; Happy New Year everybody, brother. See you; I'm sorry for the late, brother. Bye."

174. Based on my training and experience, and knowledge of this investigation, I believe that in this message: ██████████████████ contacted **FOAD** regarding a forthcoming cocaine shipment and to tell **FOAD** that ██████████████████ supplier advised him that the narcotics will be available by January 3, 2025, at the latest ("I just talked to my friend" and "The latest the 3rd"). ██████████████████ told **FOAD** that, going forward, the drug supply will improve, and business will increase ("…we gonna be able to work good from now…" and "…we gonna start the year working, working, working like crazy…").

### Third Extension of TT-2, TT-3, TT-4, TT-5 and TT-6

### BEA Reaching Out to DTO Members – SIMS and THOMAS

175. On January 13, 2025, at approximately 6:19 p.m., **SIMS**, using (414) 737-1183, called **BEA** at TARGET TELEPHONE 3. After greeting each other, **SIMS** said, "I'm trying to get you out the way, man." **BEA** acknowledged and said, "I know we should be good in a little bit, man. All the way good." **SIMS** advised, "I got little some'n for you, man." **BEA** replied, "For sure, for sure. I'll hit you when I get out."

176. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **SIMS** initially called **BEA** to tell **BEA** that **SIMS** had the money he owed to **BEA** for narcotics **BEA** previously supplied to **SIMS** ("I'm trying to get you out the way, man"). **BEA** then told **SIMS** he was expecting to obtain additional narcotics from his source of supply soon ("I know we should be good in a little bit, man. All the way good"). Then, **SIMS** again told **BEA** that he had drug proceeds to provide **BEA**, ("I got little some'n for you, man."), and **BEA** advised he would contact **SIMS** once **BEA** left his residence, ("I'll hit you when I get out.").

177. At approximately 10:24 p.m., **BEA**, using TARGET TELEPHONE 3, called **SIMS** at (414) 737-1183. **BEA** said, "Yeah, I'm right here about to pull up on you about 10 minutes." **SIMS** acknowledged. At approximately 10:30 p.m., **BEA**, using TARGET TELEPHONE 3, again called **SIMS** at (414) 737-1183. **BEA** asked, "Hey, I can pull up in the front?" **SIMS** replied, "Yeah." **BEA** said, "I'm turning the corner now."

178. During the call that took place at 10:30 p.m., cell tower data revealed that TARGET TELEPHONE 3 (**BEA's** device) was in the vicinity of the 3000 block of N. 51st Street. Case agents know **SIMS**'s residence is located at 2956 N. 50th Street (**SUBJECT PREMISES 1**), mere blocks from **BEA**'s phone location data. Based on the foregoing, case agents believe **BEA** called **SIMS** to advise he was on his way to **SIMS**'s residence ("I'm right here about to pull up on you about 10 minutes"), and then to tell him (**SIMS**) that he was close to **SIMS**'s residence ("I'm turning the corner now"). Upon arrival, case agents believe **SIMS** provided **BEA** with money he owed from a previous drug transaction.

179. On January 15, 2025, at approximately 5:17 p.m., **THOMAS**, using (262) 887-9040, called **BEA** at TARGET TELEPHONE 3. After greeting each other, **THOMAS** said, "Hey, man, I've been trying to get up with you for that last demonstration that we took care of. Yeah

man, what's going on with you?" **BEA** replied, "Man, shit, the shit been a little minute for me some other shit, man. I'm waiting." **THOMAS** said, "Yeah? 'Cause, um, I had trouble with that, though, dog; And I'll talk to you in person." **BEA** asked, "Did you?" **THOMAS** confirmed, "Yeah, man. I had trouble, dog. And I lost on it, too." **BEA** said, "Damn boy." **THOMAS** continued, "That's what I was calling you for. I was calling like, I was really calling you like... I really had trouble with that. They said had a... you know what? We'll talk in person." **BEA** agreed, "Yeah, yeah, yeah, we'll talk. Yeah, it might be in a few days for me, man." **THOMAS** said, "Okay, just let me know. You know, I was wondering when you-a call me and let me know, so I said, 'Let me call this nigga, man.'" **BEA** replied, "Oh, yeah, yeah, I just been chilling. Going through some other shit, but yeah, yeah, it should be soon for sure." **THOMAS** acknowledged, "Okay, just let me know, fam. I'm here." **BEA** confirmed, "A'ight, I got you. Yeah."

180.     Based on my training and experience, and knowledge of this investigation, I believe that: "demonstration" is coded language used to describe narcotics and, therefore, **THOMAS** had been trying to speak with **BEA** about the quality of narcotics **THOMAS** previously obtained from **BEA** ("I've been trying to get up with you for that last demonstration that we took care of."). **BEA** advised he was still waiting to obtain additional narcotics from his source of supply ("I'm waiting"). **THOMAS** indicated he had difficulty selling the narcotics he previously obtained from **BEA** because of its poor quality but was careful not to discuss the specifics over the telephone ("Cause, um, I had trouble with that, though, dog; And I'll talk to you in person"). In addition, **THOMAS** said he lost money on those narcotics, ("I had trouble, dog. And I lost on it, too"). **BEA** agreed that he and **THOMAS** would discuss this in person, ("Yeah, yeah, yeah, we'll talk"), but also that **BEA** is expecting to receive a new, likely better, shipment of narcotics from his source ("it should be soon for sure").

**Meeting between FOAD and BEA in Gurnee, Illinois**

181. On January 18, 2025, at approximately 4:40 p.m., **FOAD** using TARGET TELEPHONE 4 called **HAMMAD**, at (708) 986-7822 (TARGET TELEPHONE 2). During the call, **FOAD** stated, "I went and saw him and got the money from him. I'm on my way back and I will stop by Boston [Fish Market]."

182. Case agents observed through E-911/GPS location data on TARGET TELEPHONE 4 and TARGET TELEPHONE 3, that **BEA** and **FOAD**'s telephones were in the same general area of Gurnee, Illinois between 4:25 p.m. and 4:36 p.m., as both devices pinged in the same general location. Based upon this phone location data, and the above-call between **FOAD** and **HAMMAD**, case agents believe that **BEA** and **FOAD** met in Gurnee, Illinois on January 18, 2025. Further, based upon case agents' training and experience and the investigation to date, case agents believe that **BEA** owed money to **FOAD** for previously fronted narcotics and **BEA** met **FOAD** halfway to deliver said money ("I went and saw him and got the money from him. I'm on my way back and I will stop by Boston."). Case agents know that, historically, **FOAD** and **HAMMAD** will often get food at Boston Fish Market in Wheeling, Illinois after they have made a trip to Milwaukee to see **BEA**.

**BEA Discusses Narcotic Supply Status with SIMS**

183. On January 20, 2025, at approximately 1:49 p.m., **BEA** at TARGET TELEPHONE 3, called **SIMS**, at (414) 737-1183. After greeting each other, **BEA** said, "You don't need no more of them other pills, do you?" **SIMS** stated, "I don't... Do I need some?" **BEA** replied, "Yeah, my people talking about that they got a script for some shit." **SIMS** stated, "Ah, naw I still, I still got some of them motherfuckers." **BEA** stated, "Oh, okay. Yeah so like shit I ain't finna get these motherfuckers if a motherfucker don't need them, god damnit." **SIMS** confirmed, "Ah, no I don't

110

need them, I got, I got a lot them mother fuckers, probably like 30, 40 of them bitches." **BEA** stated, "Alright, fo'sho. Fo'sho." **SIMS** told **BEA**, "Hell, yeah. I'm waiting on this nigga, man. I guess this cold got a motherfucker scared or something; I don't know, man." **BEA** replied, "Yeah, It's cold as fuck out there." **SIMS** stated, "I know, man. My motherfucking car wouldn't even start." The two then began speaking about **SIMS** vehicle until **SIMS** later stated, "Hell, yeah man, yeah man let me know when the um. When motherfucking, man [voices overlap]." **BEA** replied, "Oh yeah. Man, I'm on my peoples ass right now cause this should be this week. Fosho! I should have that, that's what we need in my hands." **SIMS** replied, "Man!" **BEA** stated, "Early this week, For sho!" **SIMS** stated, "Man, they trippin' man. But I ain't [Laughing]" **BEA** emphatically stated, "Yeah, man we gonna get em, we gonna get em. I promise you we gonna get em, boy! You motherfuckers might have to hit the floor but, boy, we gonna get em." **SIMS** laughed and **BEA** continued, "[U/I] We gone get em, man, ain't gone even believe it boy. It's gone be, yeah we got em [U/I] One minute." **SIMS** replied, "Yeah, yeah." **BEA** stated, "Yeah, I got you." **SIMS** asked, "Hey, you still got uh.. from that liquor, 'cause they been asking me 'bout that shit, man." **BEA** stated, "Yeah, I still got what you [U/I] last night was [U/I] that mother fucker; I'll [U/I] whatever is out." **SIMS** stated, "A'ight; yeah, man, I'mma see if they still want the shit; but shit, I ain't got a motherfucking ride; I'mma [Laughs]." **BEA** stated, "Yeah, it's nothing to [U/I], man." **SIMS** continued, "[Laughs] [U/I] this motherfucking car, man." **BEA** stated, "[U/I] go up there; you just bring bread from there, man." **SIMS** confirmed, "A'ight." **BEA** stated, "You can take shit with you, man." Both parties agreed and hung up the phone.

184. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** asked **SIMS** if **SIMS** needed any pills ("You don't need no more of them other pills, do you?"). Case agents believe that **BEA** has access to individuals who have

specific prescription narcotics that **SIMS** either sells or utilizes as cutting agents when expanding his product. Case agents believe that **SIMS** owed money to **BEA** and was waiting on one of his drug customers to pay **SIMS** so he could pay **BEA** ("Hell, yeah. I'm waiting on this nigga, man. I guess this cold got a motherfucker scared or something; I don't know, man."). Further, case agents believe, based on the context of this phone call, that **SIMS** was asking **BEA** about when he is going to get more narcotics ("Hell, yeah man, yeah man let me know when the um. When motherfucking, man [voices overlap]."). Case agents believe, based on the context of this phone call, that **BEA** replied that he is putting pressure on his source of supply and that he should have the product soon ("Oh yeah. Man, I'm on my peoples ass right now cause this should be this week. Fosho! I should have that, that's what we need in my hands."). Case agents know that **BEA** and **FOAD** met each other in Gurnee, Illinois on January 18, 2025—two days before **BEA** made this statement to **SIMS**. The timing of this statement leads me to believe that **BEA**'s "people" is **FOAD/HAMMAD,** and that **BEA** is waiting on the ISAs to deliver narcotics, specifically cocaine or heroin. Further, I believe that **BEA** continued to reassure **SIMS** that he would be getting the narcotics soon ("[U/I] We gone get em, man, ain't gone even believe it boy. It's gone be, yeah we got em [U/I] One minute.").

**Distribution Coordination between FOAD and ███████████████ and Drug Source of Supply "███████**

185.    On January 20, 2025, at approximately 7:28 p.m., **FOAD**, using TARGET TELEPHONE 5, called ████████████████ using (323) 416-0334.    After ████████████████ answered the phone, **FOAD** asked "What happen, man?" ████████████████ replied "Bobanza [PH] I'm in the hospital, inside, I call you tomorrow. I'll be home tomorrow". ████████████████ explained that something happened to him but that he would be ok, and the two would speak tomorrow.

186. Records reflect that **FOAD** called ███████████████ at ███████████, but the completed call appears to have occurred over (323) 416-0334. Case agents confirmed that ███████████████ was the user of phone number (323) 416-0334 during the January 20th call via voice comparison. Case agents contacted T-Mobile for an explanation of why **FOAD** called ███████████ yet the communication appears to occur over (323) 416-0334. No response has been received from T-Mobile however, case agents believe the (323) 416-0334 is essentially a routing number that is automatically generated.

187. On January 21, 2025, at approximately 5:00 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ███████████, used by ███████████ After greeting one another, ███████████████ explained why he was in the hospital. ███████████████ discussed his health issues and **FOAD** asked ███████████ "What happened with the guy man? I need one at least." ███████████ instructed **FOAD**, "Abu Neza [PH], turn the other phone on. I gonna have uh ███████ kid, uh-um ███████ He's in LA, I'm gonna have him call you and we gonna go back to ███████ This guy, he never went to Detroit. He wants you to come to [UI]. Saint Louis is too far for you." **FOAD** responded, "Ok. No, no, see by Saint Louis if he got anything. I need one right away, to grab one right away and I'll pay him right away for it." ███████ replied, "Okay, Abu Neza [PH], turn the other phone on, I'm gonna give the other number, okay?" **FOAD** agreed and stated, "Send the number here, send the number here" and "Send the new number to this phone and I'll call you from the other one." ███████ replied, "I'm gonna have, I'm gonna give your number, the new phone you have, I'm gonna give it to that dude". **FOAD** ISA responded "Okay, okay". ███████████ replied, "To ███████ [Countryman]. Okay, bye." Shortly thereafter, the phone call ended.

188.    During the interception period for TARGET TELEPHONE 4 and 5, case agents noted that ▆▆▆▆▆▆▆▆▆▆ primarily called **FOAD** and rarely, if ever, did **FOAD** initiate communication by calling ▆▆▆▆▆▆▆▆▆▆ However, in this instance, **FOAD** contacted ▆▆▆▆▆▆▆▆▆▆ Case agents believe, based on the context of the calls, the overall investigation, and case agents training and experience, that **FOAD** was telling ▆▆▆▆▆▆▆▆▆▆ that he needs a kilogram of narcotics very quickly ("What happened with the guy man? I need one at least."). Case agents further believe that ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆ informed **FOAD** that the "other guy" has not come through and that they are now going to go through a previous drug source who ▆▆▆▆▆▆▆▆▆▆ refers to as "▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ informed **FOAD** that "▆▆▆▆ son now lives in Los Angeles. Case agents believe that ▆▆▆▆▆▆▆▆▆▆ explained to **FOAD** that "▆▆▆▆▆▆ is working as a narcotics trafficker and will be the person that will coordinate the kilogram drug deal with **FOAD**. ("Abu Neza [PH], turn the other phone on. I gonna have uh ▆▆▆▆▆ kid, uh-um ▆▆▆▆▆ He's in LA, I'm gonna have him call you and we gonna go back to ▆▆▆▆ This guy, he never went to Detroit. He wants you to come to [UI]. Saint Louis is too far for you."). Case agents believe that **FOAD** badly needed the narcotics as he told ▆▆▆▆▆▆▆▆▆▆ that he would go through the source in St. Louis (showing that **FOAD** is willing to travel several hours from his hometown to acquire drugs). Case agents believe that **FOAD** also indicated he would pay for the narcotics right away instead of being fronted with the narcotics ("Ok. No, no, see by Saint Louis if he got anything. I need one right away, to grab one right away and I'll pay him right away for it."). Case agents believe that the content of the call shows that **FOAD** has another phone and that **FOAD** would use that phone to communicate with

██████████ ("I'm gonna have, I'm gonna give your number, the new phone you have, I'm gonna give it to that dude.").

189.   On January 22, 2025, at approximately 8:53 p.m., **FOAD** using TARGET TELEPHONE 5 called ████████████████ using ████████ ████████ ████████ stated, "Abu Neza [PH]." **FOAD** stated, "Yeah, I talked to him. He speaks good English. You sure this ████████ ████████ stated, "Yeah, is ████ ████ Uh, listen, listen, listen, uh, uh, talk to him. I think, I think, somebody, the guy, the, the one brings it by you, he is charging a little bit. So, maybe... I don't know. You just discuss the number with him. [SIC]" **FOAD** replied, "I just talk, I just..., listen, listen, I just talked to him. He didn't know what I'm talking about it. Tell him, "Old Man." He don't know nothing. Tell him exactly what, what, what I need, you now." ████████ stated, "Yeah, yeah, uh, okay, okay. I will, I will." **FOAD** stated, "Tell him,...listen ████ , ████ [PH], I tell him, I'm paying here between 17 and 18. I used to pay for it last time [SIC]." ████████████ stated, "Okay, uh-uh..." **FOAD** continued, "He is saying..., he talking, he talking about twenty; he said, "Hey senor (Sir) I wanna give ████ some" and this and that. You know, tell him, I could, I could give him 19, you know, before he bring them; I could give him 19. More than that, I can't pay. Because, I wanna make little some money on it." ████████ replied, "Okay, okay. I will let..., I, I'm gonna tell him." **FOAD** stated, "And make sure, uh, make, I'm gonna take 2 of them. Make sure everything good, because I'm gonna go pay him. I wanna take 2 and pay him for it." ████████ stated, "Okay, Abu Neza [PH], Abu Neza [PH]..." **FOAD** confirmed and ████████ stated, "Uh, uh-um, you know, they come over night, Boom, uh, uh, only one uh ... like if you say, "Yeah, I'm ready, I'm ready tomorrow," you're..., and, and, and then they just gotta be ready over there, give it to the guy, and

the next day is here. So, I make sure, I make sure, you get it Friday or Saturday." **FOAD** replied, "He say, he saying, he saying on a weekend. Just make sure that the guy clean. I'm no need no problem, ██████ [PH]. ████████████████ stated, "No, no, no, no, everything clean, everything. No problem, no problem." **FOAD** confirmed, "You know, make sure..." ████████████████ stated, "He, he..." **FOAD** continued, "...the, make [Stutters] the stuff good too, anyway." ████████████████ stated, "Oh, uh, yes, you not gonna have complaints.., listen, uh, ██████ got 2 sons, okay. And the 2 sons into ... uh, uh, are working. So, we're okay. We're okay. UH, Uh-um..." **FOAD** stated, "Like I say, like I say, if everything good, we could move a month about 2 or 3 a month, you know." ████████████████ stated, "Very good; very good; very good; very good. Okay, okay, so, I gonna, uh, tell him, 19 is the most and that, and, and they gonna, they gonna say okay, no problem." **FOAD** stated, "Uh, I'm gonna take 2. Tell him COD (cash on delivery) too." ████████████████ stated, "Okay, okay, and, uh,.." **FOAD** continued, "Just make sure, make sure..." ████████████████ confirmed, "Alright." **FOAD** again stated, "...make sure everything good. I'm no need no problem. Make sure everything good, the stuff good, the man good, and everything good, you know." ████████████████ replied, "Alright, okay. The man, maybe, maybe, you can work on it and instead of 2 you can make it two and a half (2 1/2), no problem, or you just..." **FOAD** stated, "No, no, I'm no go..., uh, listen, I'm no go work on it nothing. Just tell him, I need something good and that's it." ████████████████ stated, "Okay, very good." **FOAD** replied "I need something good and that's it. Because, I wanna take care of my guy, you know." ████████████████ stated, "Okay, okay, it's gonna be something special. Don't worry, Abu Neza [PH]." **FOAD** stated, "Yeah, please, tell him, something good. If his is good, you know, I'm gonna need 2 or 3 of them, anyway." ████████████████ replied, "Oh, uh, okay, okay, alright. So,

I'm gonna tell him to, to, to give it to the man, uh, and they do it, uh tonight, tomorrow, you know, after the guy is got it, the next day, you, it's gonna be on your hands." Both parties agreed.

190.    Case agents believe this call is related to the phone calls between ███████████ ███████████ and **FOAD** on January 20, 2025, and January 21, 2025 as detailed above. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **FOAD** coordinated the purchase of two kilograms through ███████████████████ **FOAD** spoke with ███████████ on an unknown platform/phone number ("Yeah, I talked to him. He speaks good English. You sure this ███████████████ was going to have a third party bring the narcotics to **FOAD** but that this third party charges a high price for the narcotics ("Yeah, is ███████████ Uh, listen, listen, listen, uh, uh, talk to him. I think, I think, somebody, the guy, the, the one brings it by you, he is charging a little bit. So, maybe... I don't know. You just discuss the number with him. [SIC]"). **FOAD** told ███████████████████ that **FOAD** has already worked out a price of $19,000 per kilogram of "old man." ("Hey senor (Sir) I wanna give ███████████ some" and this and that. You know, tell him, I could, I could give him 19, you know, before he bring them; I could give him 19. More than that, I can't pay. Because, I wanna make little some money on it."). Case agents have heard **FOAD** reference "old man" with ███████████████████ before and believe that "old man" is a type of narcotic, likely heroin or fentanyl. **FOAD** indicated that ███████████████ did not know what "old man" was and **FOAD** asked ███████████████ to tell him ("Old Man." He don't know nothing. Tell him exactly what, what, what I need, you now."). **FOAD** insisted that ███████████████ made sure the "old man" was good quality and explained that if it was good quality, **FOAD** would consistently purchase two or three kilograms every month ("Like I say, like I say, if everything good, we could move a month about 2 or 3 a month, you know."). **FOAD** again indicated to

117

███████████████████████████ that **FOAD** would pay for the kilograms up front ("Uh, I'm gonna take 2. Tell him COD (cash on delivery) too.").

191.     Based on case agents training and experience, the investigation to date, and the content of these calls, case agents believe that **FOAD** wanted to acquire two kilograms of heroin ("old man") from a drug source ("█████████ son) coordinated through ███████████ █████████ and that if the price and quality of the narcotics is good, **FOAD** will continue to buy drugs from this source in the future.  Case agents further believe that **FOAD** had not purchased drugs from "█████████ son in the past, that "█████████ son is unfamiliar with the drug terminology used by **FOAD** and █████████████████ Therefore, **FOAD** requested that ███████████████ communicate with "█████████ son to make sure **FOAD** gets the correct kind of high-quality narcotics.

192.     On January 30, 2025, at approximately 7:30 p.m., **FOAD**, using TARGET TELEPHONE 5, received a call from ███████████ used by ███████████████ **FOAD** greeted, "What's up ████ [PH]." ███████████████ stated, "I'm gonna sleep here in the city, because, uh, the orthopedic doctor is coming first thing in the morning and I see what they gonna do with me. [U/I]." **FOAD** replied, "Okay." ███████████ stated, "Anyway, uh-uh, the guy, the guy that goes by you, he's hadn't, he hadn't got the, the right quantity to take over there. He can take ten (10) at a time. So, he only got four (4). He's needing, he needs to get three (3) more from some other guy so he can go overnight. He gets..., this..., the guy the one with the three (3), he's coming to us and that's why he's coming down there by you. That is ..." **FOAD** asked, "What happen now; what happened? Just tell me solution. What happen, when, when; what happen?" ███████████ replied, "Okay. The guy, soon, the guy, he's ...." **FOAD** stated, "You've been saying almost 10 days, you know. If he be late, no good for me.

You know, I can't do nothing after that." ████████████████ stated, "Okay, uh, let me, I gonna call, I gonna call today to see the guy..." **FOAD** stated, "Call him. If nothing, no worry about it after that. I'm no need it." ████████████████ stated, "Huh?" **FOAD** stated, "You know, if this take long, I'm no need it. You know, because the guy, he waiting, waiting, you know. I don't know if he's still waiting, you know." ████████████████ replied, "Abu Neza [PH], if you think, if you think the guy is here from somewhere else, you can do a favor for me, when the guy take it over there, take it or keep it, and hold it, then when you, uh-uh, give the money for him for the two (2), then you pay for. It doesn't matter if you wait a week or two. It doesn't matter, because that's what I gonna tell these people."

193.    The call continued and **FOAD** asked, "Okay, how many, how many you wanna bring?" ████████████████ stated, "He needs to bring seven (7). Now, he got four (4) so far. He got two (2) from ████████ and he got two (2) from the other guy, from another guy. Now, he's waiting for another guy to get three (3) to complete the seven (7) because he only takes seven (7) at a time." **FOAD** confirmed, "Uh-huh." ████████████████ continued, "So, he's got only four (4). Now, like you say, if your friend go somewhere else, it doesn't matter. Soon, the guy gets the three (3) he needs to complete the seven (7), he's gonna take it over there. Then, you take two (2) out of the seven (7), and then from your end for you, you give the money, like I'll say a week or 10 days, two weeks. It doesn't matter, you, then you pay for it, you know. The longer you, uh, like that you gonna have it with you." **FOAD** replied, "Huh." ████████████ stated, "That's how we gonna do it. I mean, uh, the guy don't pay, he's gonna do..." **FOAD** replied, "Well, okay, whatever. You know, whatever." ████████ stated, "Just be in touch; just be in touch." **FOAD** replied, "Okay, whatever; whatever. Just let him know I'm here. You know, whatever." ████████████ stated, "Just be there brother;

be there." **FOAD** confirmed, "Okay, alright, okay."  stated, "Like that, I gonna need a little bit of money for my doctor, because I gonna get a surgery done." **FOAD** asked, "How much you want?" _____ stated, "Huh?" **FOAD** asked, "200, 300 hundred?" _____ stated, "If you can, if you can, I send you, I send you the information for my niece so you can help with that." **FOAD** confirmed, "Yeah, send me the information, I send you this tomorrow." _____ replied, "Okay, okay. I send it to you first thing in the morning, Abu Neza [PH]." **FOAD** stated, "Okay, alright." _____ said, "Okay, thank you; thank you. Bye" **FOAD** replied, "A'right, okay, bye-bye." _____ stated, "Hey, brother, brother." **FOAD** asked, "Yeah?" _____ stated, "Okay, the other thing, the Guera, uh-uh." **FOAD** stated, "The Guera, Guera, I tell him, I tell him one (1), three (3); one (1), three (3). No more than that." _____ confirmed, "I know, I know. Now, if, okay... I got chance to talk to that owner, Abu Neza [PH]. I got the chance to talk to the owner, but..." **FOAD** replied, "Talk to..., talk to him. If he drops for me whatever, ten (10), twenty (20) and he just wait for the money, you know. I'll be okay, you know." _____ stated, "Okay, now, on the Guera, the Guera, uh-uh, how many I can put in your hands. I juss gotta call and they'll put it in your hands. How many do you need?" **FOAD** said, "Okay, you could put between ten (10) and twenty (20). Just give me some little time and I give you the money. I need a week." _____ stated, "Okay, uh, 10 or 20 and then in a week we will get ready." **FOAD** stated, "A week, 10 days, you got the money." _____ stated, "Okay, okay. Uh, uh..." **FOAD** replied, "Guarantee; I guarantee..." _____ stated, "I gonna do the best I can. Okay?" **FOAD** again confirmed, "You know, everything with me guarantee. No worry about it." _____ stated, "Alright, brother. I gonna do

the best I can to get some of those. Okay?" **FOAD** replied, "Okay, a'right." ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ stated, "okay, okay, brother."

194.    Case agents believe that this phone call between **FOAD** and ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ was follow up from the previous phone calls listed in this affidavit on January 21,
2025, and January 22, 2025. Based on my training and experience, and knowledge of this
investigation, I believe that: **FOAD** still has not received the previously mentioned two kilograms
of "old man." ▮▮▮▮▮▮▮ explained to **FOAD** that the third party who will be
bringing the kilograms to **FOAD** needs to get a total of seven kilograms before he will drive it to
**FOAD** overnight. ▮▮▮▮▮▮▮ stated the third party already has four kilograms
but needs to get three more before he will drive it down ("Anyway, uh-uh, the guy, the guy that
goes by you, he's hadn't, he hadn't got the, the right quantity to take over there. He can take ten
(10) at a time. So, he only got four (4). He's needing, he needs to get three (3) more from some
other guy so he can go overnight. He gets..., this..., the guy the one with the three (3), he's coming
to us and that's why he's coming down there by you. That is ..."). Case agents believe that the
reason the third party needs at least seven kilograms to travel is due to making the trip worth the
risk and the third party has a vehicle that has a "trap" that can hold a total amount of 10 kilograms.
Case agents believe that **FOAD** is trying to apply pressure on ▮▮▮▮▮▮▮ to get
the kilograms in his possession and **FOAD** told ▮▮▮▮▮▮▮ to forget about the
deal if **FOAD** doesn't receive the kilograms soon. However, case agents do not believe that **FOAD**
is disinterested in the kilograms; rather, **FOAD** is trying to speed up the pace of this specific
transaction because he has already been waiting "10 days." ("You've been saying almost 10 days,
you know. If he be late, no good for me. You know, I can't do nothing after that.") ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮ further reassured and explained to **FOAD** that he wants **FOAD** to take all seven

kilograms that the third party brings. ████████████████████ further explained that **FOAD** can pay for the initial two kilograms and just hold onto the other five kilograms and pay for those later. ("Abu Neza [PH], if you think, if you think the guy is here from somewhere else, you can do a favor for me, when the guy take it over there, take it or keep it, and hold it, then when you, uh-uh, give the money for him for the two (2), then you pay for. It doesn't matter if you wait a week or two. It doesn't matter, because that's what I gonna tell these people.")

195. Based on this statement, case agents believe that ████████████████████ is having the third party bring **FOAD** seven kilograms of "old man." Case agents further believe that **FOAD** will pay $38,000 (previous calls **FOAD** stated he would pay "19" equaling $38,000 for two kilograms) for two kilograms and will be fronted with the other five kilograms that he will pay for at a later time. The parties agreed and the conversation shifted to the topic of "Guera." I know that Guera translates to "blonde" or "blonde girl." Based on case agents training and experience, case agents believe that "blonde" or "girl" are coded terms for cocaine. Based on this coded language, case agent's began to interpret that "old man" is reference to heroin, as "boy" or "man" is often coded language for heroin. Case agents believe that **FOAD** spoke to a third party and informed this third party that he would only pay $13,000 for each kilogram of cocaine. ("The Guera, Guera, I tell him, I tell him one (1), three (3); one (1), three (3). No more than that."). ████████████████████ confirmed this and informed **FOAD** that he spoke to the "owner." ("I know, I know. Now, if, okay... I got chance to talk to that owner, Abu Neza [PH]. I got the chance to talk to the owner, but...") Case agents believe the "owner" is reference to ████████████████████ boss and ultimate source of supply. ████████████████████ asked **FOAD** how many kilograms of cocaine ("guera") he wanted, and **FOAD** informed ████████████████████ that if fronted, he would take anywhere from 10 to 20 kilograms of

cocaine and that he would pay for them after he presumably makes his money from sales. ("Okay, you could put between ten (10) and twenty (20). Just give me some little time and I give you the money. I need a week.") **FOAD** assured ████████████████████ that he would pay for all of the kilograms that he gets fronted. ("A week , 10 days, you got the money…You know, everything with me guarantee. No worry about it.") Based on case agents' training, experience, and knowledge of this investigation, case agents believe this phone call further supports the belief that ████████████████████ is one of **FOAD**'s sources of supply for both heroin and cocaine.

### FOAD and BEA Discuss BEA's Drug Debt

196. On February 1, 2025, at approximately 7:01 p.m., **FOAD**, using TARGET TELEPHONE 5, called ████████████████ at ██████████ ████████████ ██████████ said, "Abu Neza [PH], I call, uh, ██████ and he told me he'll call me back." **FOAD** replied, "Okay, we talk this later on. I wanna tell you something. Listen...I wanna go to one black guy. He owe me some money. When I call you, I'm gonna ask you, what happen... you owe the people money. You say, 'Yeah, we owed those people money,' and you lost your brother, because of the money, Okay?" ████████████████ acknowledged, "Okay." **FOAD** continued, "Just when I tell you, what happen with your brother because of the money. You say, I lost it, because of you Fred (**FOAD**), because I'm your co-signer… Because, the guy, he owe me about two hundred thousand. I just wanna just...I'm gonna go see him. When I be there I'm gonna call you. You say, 'Please, this time no fuck up with me, please,' okay?" ████████████████ repeated, "Okay, please, don't fuck up with me, fuck up with me this time." **FOAD** said, "Yeah, yeah, tell me this time, please. I'm go co-signer for you, no fuck up for me, please." ████████████████ verified, "I will co-signer for you, okay, okay. The conversation continued and **FOAD** stated, "If he asks you what happen with your brother? You lost your

123

brother, because...why? It's about the money, okay?" ████████████████ replied, "You know what, Abu Neza [PH], what you just telling me to say to you, it happened to me in the real life. You know my brother, my oldest brother, they killed him in my town, because of the money from the brother." **FOAD** said, "Yeah, I know, I know. Just this guy, he owe me money. I wanna, I wanna just show him what happened, you know." ████████████████ agreed, "Okay, okay. I'll tell him, I lost my brother." **FOAD** reiterated, "Okay, when I'm go call you just respond. I'm go tell you, what happened with your brother. You say, I lost him, because, I'm your co-signer and you owe all the people money, okay?" ████████████ agreed.

197. Based on my training and experience, knowledge of this investigation, and previously intercepted calls, I believe that in this phone call: ████████████ still intended to have "████████████ deliver kilogram quantities of narcotics to **FOAD**, and ████████████ told **FOAD** he was waiting for "████████ to call him to discuss the transaction. **FOAD** dismissed this and wanted to talk to ████████ ████████ about meeting with a person (I believe to be **BEA**), who owed **FOAD** money ("I wanna go to one black guy. He owe me some money".) Case agents observed that during the time of this phone call, **FOAD's** phone location data showed the device was traveling northbound into Wisconsin. Case agents believe that **FOAD** advised that he would call ████████ ████████ once **FOAD** met with **BEA** and prepared ████████████ to tell **BEA** about what happened to ████████████ brother when **FOAD** and ████████████ owed people money ("When I call you, I'm gonna ask you, what happen... you owe the people money. You say, 'Yeah, we owed those people money,' and you lost your brother, because of the money, Okay?" "...You say, 'I lost it, because of you Fred, because I'm your co-signer...'") ████████████ told **FOAD** that his brother was

killed because of money the brother owed (case agents believe was for a drug debt) ("You know my brother, my oldest brother, they killed him in my town, because of the money from the brother"). I believe that **FOAD** was aware of **ARREDONO-**▮▮▮▮▮▮▮ brother being killed but reiterated that **BEA** owed **FOAD** money. ("Yeah, I know, I know. Just this guy, he owe me money"). I believe that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ brother's death had no relation to the ISAs or **BEA**. Rather, I believe **FOAD** wants to encourage **BEA** to pay his drug debt and wanted **BEA** to know that if **BEA** did not repay his drug debt with **FOAD** and ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ suppliers could commit acts of violence against them.

198.    On February 1, 2025, at approximately 7:23 p.m., **FOAD**, using TARGET TELEPHONE 5, called ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ using ▮▮▮▮▮▮▮▮▮▮ When the phones connected, a male voice believed to be **BEA** could be heard talking to **FOAD**. ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ stated, "Hello." **FOAD** stated, "Yeah, ▮▮▮▮▮ [PH]." ▮▮▮▮▮▮▮▮▮▮▮▮▮ asked "What [U/I] with you? Hey, what happened?" **FOAD** stated, "Listen." ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ replied, "Huh." **FOAD** stated, "I'm by the guy. Just tell him when I'm gonna receive the stuff." ▮▮▮▮▮▮▮▮▮▮▮ stated, "Oh, okay. Where the guy at? Is he with you now?" **FOAD** answered, "He's next to me. He's listening." ▮▮▮▮▮▮▮▮▮▮▮▮▮ replied, "Okay, listen, listen, my brother, I lost him. He passed away. He's the oldest of the family..." **FOAD** is also heard speaking to **BEA** on the side, stating: "he lost his brother, because of those people. He's the co-signer. He lost his brother [audio glitch]. He [U/I] 150. He was the co-signer for me. Now, he doing just the stuff again for me." **BEA** stated, "Yeah." **FOAD** continued, "It's for me" ▮▮▮▮▮▮▮▮▮▮▮▮▮ stated, "...and, and I don't know what's gonna happen. When we gonna get this done. Don't, don't, don't fuck with me; don't fuck with me like that, you know." **FOAD** stated, "Listen, listen." ▮▮▮▮▮▮▮▮▮▮▮ replied, "Huh." **FOAD** asked, "When

we get the new..."  stated, "Tell me." **FOAD** asked, "...stuff. When we get..., the new one, when we get it?" stated, "Maybe, uh, maybe a week. I don't know, uh, we'll see what happen Monday." **FOAD** stated, "Please [PH], we need it bad, man." replied, "Okay, okay, uh, okay." **FOAD** stated, "Tell him..., listen, tell him to drop whatever four (4), five (5), six (6), seven (7). This time guaranteed, man. No problem." replied, "Oh, okay. Don't, don't screw up anymore, you know." **FOAD** stated, "Please, no, no, no. Don't worry about it." stated, "We keep in touch. We keep in touch." **FOAD** stated, "We go cover it in the future. No worry about it. We'll cover it." **BEA** stated, "Yeah, for sure." replied, "Okay, okay, okay." **FOAD** informed "The guy is listening. You know, we go cover it." **BEA** said, "Yeah, that's for sure, for sure." replied, "Alright, okay, good." **FOAD** stated, "Just tell..., tell him to drop whatever, five (5), six (6), seven (7). We go take it; no problem." stated, "Okay, alright, okay, okay." **FOAD**, "Okay?" "Okay, brother." **FOAD** confirmed, "Okay, alright." stated, "Okay brother. Let's keep in touch; keep in touch." **FOAD** stated, "Okay, alright." stated, "Alright, bye."

199. At approximately 7:21 p.m., **FOAD** arrived at **BEA**'s residence and proceeded to be let inside as observed on electronic surveillance. After **FOAD** was already inside the residence, case agents set up physical surveillance on **BEA**'s residence. In the phone call, **BEA** can be heard speaking with **FOAD** in the background. Case agents were able to recognize **BEA**'s voice based on review of numerous prior intercepted voice calls over TARGET TELEPHONE 1 and TARGET TELEPHONE 3. As discussed in **FOAD** and conversation at 7:01

p.m.,  began speaking about his brother getting killed due to a drug debt. **FOAD** told ▓▓▓▓▓▓▓▓▓▓ that he was by **BEA** and asked ▓▓▓▓▓▓▓▓ to tell **BEA** when they were going to get what case agents believe to be the kilograms of "old man" or heroin. ("I'm by the guy. Just tell him when I'm gonna receive the stuff."). **FOAD** informed **BEA** on the side that ▓▓▓▓▓▓▓▓▓ is his co-signer, which case agents know based on training and experience means someone who is also liable if a drug debt does not get paid. In front of **BEA**, **FOAD** begins to again push ▓▓▓▓▓▓▓▓ to get the kilograms of heroin to **FOAD** so he could further distribute them to **BEA**. ("Tell him..., listen, tell him to drop whatever four (4), five (5), six (6), seven (7). This time guaranteed, man. No problem.") ▓▓▓▓▓▓▓▓ informed **FOAD** they would stay in touch. Case agents believe that **FOAD** drove to Wisconsin to meet with **BEA** and call ▓▓▓▓▓▓▓▓ to (1) ensure **BEA** that **FOAD** has been in contact with a source of supply of narcotics for **BEA**; and (2) instill fear into **BEA** to pay his current and future drug debts. I believe that this shows that the narcotics previously supplied to **BEA** by **FOAD/HAMMAD** in Milwaukee were narcotics supplied to **FOAD/HAMMAD** through ▓▓▓▓▓▓▓▓.

### Fourth Extension of TT-3, TT-4, TT-5

### BEA and Dennis BROWN Discuss Payment

200. On February 8, 2025, at approximately 10:46 a.m., **BEA**, using TARGET TELEPHONE 3, called **BROWN** at (414) 581-0916. The parties greeted and **BROWN** was speaking aside to a third party. **BROWN** stated, "How you doing [U/I]? Hey, I ain't forgot about you brother, that's why I was calling you for, I ain't forgot about you ma nigga." **BEA** replied, "For sure, bro." **BROWN** stated, "Imma whatchamacallit, uh..uh should I give you, I give you a nickel within the next couple of days bro. I ain't forgot about you ma nigga. I just, I just, keep it one

hundred, I just start cashing [U/I]." **BEA** replied, "Yeah." **BROWN** stated, "Hey, we, we are in a regular time, shit. Let you know [PH]."

201. Through this investigation, I know that **BEA** supplies **BROWN** with narcotics. Case agents believe that **BROWN** still owes **BEA** money from the last time **BEA** provided him **BROWN** narcotics. Case agents believe **BROWN** is a kilogram-level drug distributor in the Milwaukee area and is sourced by **BEA**. Based on this context, case agents believe **BROWN** told **BEA** that **BROWN** would pay **BEA** $5,000 (a "nickel") in the next few days.

### BEA in Communication with Narcotic Customers KAMANDA, THOMAS and KIMBLE

202. On February 19, 2025, at approximately 4:54 p.m., **BEA**, using TARGET TELEPHONE 3 called **KAMANDA** at (414) 467-4928. After greeting each other, **KAMANDA** asked, "Uh, shit, you still smoking?" **BEA** replied, "Yeah, I got a little something; I got a check a little [U/I]; I got like, probably a cutie left, or shit, right now. I think I got like a cutie to the side right now." **KAMANDA** questioned, "Oh, shit; which, which one is it?" **BEA** responded, "You can come check it out whenever you get a chance, I'm down here." **KAMANDA** acknowledged, "A'ight, I'mma slide on you."

203. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **KAMANDA** asked if **BEA** had any marijuana to sell ("…you still smoking?"). Case agents believe **BEA** told **KAMANDA** that he had about a quarter pound of marijuana left for sale ("I got like, probably a cutie left…"). Case agents know that "cutie" is a term commonly used to describe a quarter pound of marijuana. Furthermore, based on data pertaining to the location of TARGET TELEPHONE 3, case agents believed **BEA** was at his business, ICare Childcare/Bar 1000, 3941 N. Teutonia Avenue. Therefore, case agents believe **BEA** encouraged **KAMANDA** to come to ICare Childcare/Bar 1000 to look at the marijuana

128

**BEA** had for sale ("You can come check it out whenever you get a chance, I'm down here"). **KAMANDA** advised that he would.

204.    Electronic surveillance revealed that at approximately 5:26 p.m., a gold Chevrolet Equinox (**Subject Vehicle 9**) arrived in the rear alley behind ICare Childcare/Bar 1000. At approximately 5:27 p.m., **KAMANDA**, using (414) 467-4928, called **BEA** at TARGET TELEPHONE 3. **BEA** answered, "Yeah, bro." **KAMANDA** replied, "Yeah, I'm uh, right here at the [U/I] here?" **BEA** said, "Oh, yeah." **KAMANDA** continued, "Yeah, yeah, I'm uh, I'm at the back." **BEA** confirmed, "The back? A'ight." **KAMANDA**, wearing a black hooded jacket and a hat exited the Equinox (**Subject Vehicle 9**) and walked to the rear gate of ICare Childcare. Once **KAMANDA** got to the gate, the gate appeared to have been opened by somebody inside the gate. **KAMANDA** entered the gate. At approximately 5:31 p.m., **KAMANDA** exited the gate holding a bottle in his left hand. The manner in which **KAMANDA** was walking made it appear to case agents that **KAMANDA** was also holding something underneath his left arm, inside of his jacket. **KAMANDA** re-entered the gold Equinox (**Subject Vehicle 9**) and departed the area.

205.    On February 24, 2025, at approximately 5:38 p.m., **BEA**, using TARGET TELEPHONE 3, called **THOMAS** at (262) 887-9040. **THOMAS** and **BEA** greeted. **BEA** stated, "What's up, bro?" **THOMAS** replied, "What's happening, baby?" **BEA** stated, "Oh, you got it." **THOMAS** asked, "What's going on with you?" **BEA** replied, "Man, slow motion, man." **THOMAS** stated, "Man..." **BEA** stated, "[Voices overlap] My people got it, though." **THOMAS** said, "Oh, for real?" **BEA** continued, "[Voices overlap] I just gotta orchestrate um, getting it to me right now." **THOMAS** asked, "Oh, what they talking about? What's the numbers?" **BEA** replied, "Uh, I think they was at like seventeen (17) or something." **THOMAS**

asked, "Oh, for real?" **BEA** stated, "Something like that for the whole one, yeah." **THOMAS**

stated, "Oh, okay, okay." **BEA** stated, "Yeah, but yeah, they, they most definitely say it's a

bomb; they got it, but you know, that's all. If you, if you... it just depends, if you trynna go half

way, I'll put that order in and, you know, they probably be a couple hours or something."

**THOMAS** stated, "Oh, okay with it; okay." **BEA** stated, "[Voices overlap] Getting it to me."

**THOMAS** stated, "Yeah, you know." **BEA** stated, "[Voices overlap] I just depends, whenever

you're ready." **THOMAS** replied, "Yeah; hey, man, I've been taking so many uh, losses; man,

this is like, you know..." **BEA** stated, "[Voices overlap] Yeah, it's rough out here, man."

**THOMAS** continued, "But I'mma hustler though; I, I get it in, though." **BEA** replied, "[Voices

overlap] Yeah." **THOMAS** stated, "[Voices overlap] You know what I'm saying? I get it in."

**BEA** stated, "[Voices overlap] Yeah; but it's gonna tighten up in a minute, though, you know;

border is closed, and shit; it's gonna get tight." **THOMAS** replied, "Yeah, I hope so, man." **BEA**

stated, "[Voices overlap] Yeah, it's gonna get tight; and niggas can't even...motherfucker's they

won't even be in your way no more." **THOMAS** laughed. **BEA** stated, "[Voices overlap]

[Chuckles] You know what I'm saying? They, they gonna be begging for you, god damn it, for

real. For one little minute." **THOMAS** replied, "[Voices overlap] Right, right; well, they go off

for a minute, though, man." **BEA** stated, "Man, probably half of that for/four... I gotta do the

math on that... Yeah, I gotta do the math on it, but yeah, it ain't much, somewhere, ain't too much

around what you been doing, shit." **THOMAS** stated, "Oh, yeah; okay then, well, just let me

know; I'm ready, man." **BEA** stated, "Okay; I'll let you know soon." **THOMAS** stated, "Yeah,

but uh, we gotta talk about the last demonstration, though." **BEA** replied, "…Oh, yeah."

**THOMAS** stated, "…I, I got to talk, I got to talk to you about that, though." **BEA** stated,

"…Yeah, yeah, for sure. 'Cause I, I, I didn't know nothing was wrong with that one." **THOMAS**

continued, "Man, I swear of God on my daddy, I don't... there's one thing about me, though, if I tell you something is real." **BEA** replied, "…Yeah." **THOMAS** stated, "I ain't never been fake with you; I ain't never been funny, I always kept it one hundred (100) with you." **BEA** replied, "…Oh yeah, fo'sho, fo'sho." **THOMAS** stated, "That, that shit... that's why I was calling you like that, you know what I'm saying? 'Cause you told me whatever I do, let me know." **BEA** stated, "Yeah." **THOMAS** stated, "Let you know. And I, and I was doing that with you; you know what I'm saying?" **BEA** confirmed, "…Yeah, for sure." **THOMAS** stated, "But you never answered the phone, you know what I'm saying?" **BEA** stated, "…Yeah, we will figure it out; it ain't no biggie." **THOMAS** stated, "Okay; that's cool, though. Well, you know, I'm, I'm here, man." **BEA** replied, "A'ight, yeah; I'mma, I'mma figure something out; I'mma be with you. Don't even trip."

206.     Through this investigation, case agents know that **BEA** supplies **THOMAS** with narcotics. Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **BEA** told **THOMAS** that **BEA**'s narcotics source of supply currently has possession of narcotics. Case agents believe that **BEA** is specifically referring to the **ISA**s ("[Voices overlap] My people got it, though."). **BEA** indicated that he had to get everything set up and arrange for the narcotics to get to him. ("I just gotta orchestrate um, getting it to me right now."). **THOMAS** asked **BEA** what the numbers were. **BEA** indicated he thought it would be 17 and later indicated that 17 was the price for a full one. Case agents believe that **BEA** specifically means $17,000 for a whole kilogram. Case agents have previously obtained information that **BEA** sells kilograms of cocaine for approximately $17,000 ("Uh, I think they was at like seventeen (17) or something…Something like that for the whole one, yeah."). **BEA** informed **THOMAS** that his source of supply, the **ISA**s, told **BEA** that the cocaine is great

131

quality ("bomb"). **BEA** additionally referenced that it would take his source of supply a couple hours to bring the narcotics to him. This is consistent with the drive time for the **ISA**s to bring the narcotics from Burbank, Illinois, to Milwaukee, Wisconsin ("Yeah, but yeah, they, they most definitely say it's a bomb; they got it, but you know, that's all. If you, if you... it just depends, if you trynna go halfway, I'll put that order in and, you know, they probably be a couple hours or something."). The conversation continued about how it has been a difficult time to sell narcotics. **BEA** later referenced the border tightening up, which will make getting access to narcotics more difficult. **BEA** continued by telling **THOMAS** to get the narcotics now because the demand for narcotics is going to rise ("Yeah; but it's gonna tighten up in a minute, though, you know; border is closed, and shit; it's gonna get tight . .  You know what I'm saying? They, they gonna be begging for you, god damn it, for real. For one little minute.").

207.    Later in the phone call, **THOMAS** references a "demonstration." **BEA** informed **THOMAS** that **BEA** did not realize anything was wrong with the last one. Case agents previously intercepted a phone call between **BEA** and **THOMAS** where **THOMAS** complained about the last "demonstration." I believe that **THOMAS** is using the word "demonstration" to reference the last narcotics deal between **THOMAS** and **BEA**. I believe that **THOMAS** received bad quality narcotics from **BEA** on their last drug deal, and **THOMAS** wanted to speak with **BEA** about that ("Yeah, but uh, we gotta talk about the last demonstration, though.").

208.    On February 21, 2025, **BEA**, using TARGET TELEPHONE 3, sent a text message to **KIMBLE** at (414) 610-1305: "Haven't forgot about you playboy I need a little more time . . . this T."

209.    Through this investigation, case agents know that **BEA** consistently supplies **KIMBLE** with narcotics. Based on past conversations between **BEA** and **KIMBLE**, case agents

believe that during this communication **BEA** informed **KIMBLE** that **BEA** needs a little more time to get narcotics. Case agents believe that once **BEA** has narcotics, he will supply **KIMBLE**.

### Identification of Possible Drug Supplier—Shahin JUDEH

210.     On February 18, 2025, at approximately 3:25 p.m., **FOAD**, using TARGET TELEPHONE 4, called Shahin JUDEH at (312) 502-5499. The parties greeted and **FOAD** asked, "Are you back home?" JUDEH replied, "No, man." **FOAD** stated, "They told me you were back home." JUDEH asked, "Who told you that?" **FOAD** stated, "Everyone. I do not remember who told me, they saw you back home." JUDEH stated, "No Man. [U/I]" **FOAD** replied, "Yeah." JUDEH stated, "Yeah, where do I go back home." **FOAD** asked, "What is going on?" JUDEH stated, "Thank God. Where you have you been? You never show up. I came to you [U/I] man and it does not open or anything." **FOAD** replied, "I'm hopeful you can help me out uncle. The situation is really bad." JUDEH stated, "I swear it will never get better." **FOAD** replied, "[Stutters] So, your telling me [U/I], there is nothing good." JUDEH asked, "Why?" **FOAD** replied, "There is nothing. What could I bring? There is…[Thought not finished] nothing is worth it, five hundred (500)? Fuck the five hundred (500) is not worth it." JUDEH asked, "Huh? How much? [Voice overlap]." **FOAD** stated, "To make five hundred dollars ($500) fuck the five hundred." JUDEH asked, "Why? How much? [Voice overlap]." **FOAD** stated, "Nothing, I did not ask about the price." JUDEH stated, "Oh." **FOAD** stated, "Bring me couple of those ones, let us finish from this. Bring me couple and that is it." JUDEH asked, "What?" **FOAD** asked, "From the ones you gave me back in the days, you remember?" JUDEH stated, "There is nothing. I swear there is nothing from those ones. There is nothing." **FOAD** replied, "Bring me couple of them." JUDEH stated, "From where do I get you some?" **FOAD** stated, "Two (2) figure it out. Do you have some left [Voice overlap]." JUDEH stated, "Nothing. [Voice overlap] [Background: Car noise]." **FOAD**

133

believe that during this communication **BEA** informed **KIMBLE** that **BEA** needs a little more time to get narcotics. Case agents believe that once **BEA** has narcotics, he will supply **KIMBLE**.

### Identification of Possible Drug Supplier—Shahin JUDEH

210.     On February 18, 2025, at approximately 3:25 p.m., **FOAD**, using TARGET TELEPHONE 4, called Shahin JUDEH at (312) 502-5499. The parties greeted and **FOAD** asked, "Are you back home?" JUDEH replied, "No, man." **FOAD** stated, "They told me you were back home." JUDEH asked, "Who told you that?" **FOAD** stated, "Everyone. I do not remember who told me, they saw you back home." JUDEH stated, "No Man. [U/I]" **FOAD** replied, "Yeah." JUDEH stated, "Yeah, where do I go back home." **FOAD** asked, "What is going on?" JUDEH stated, "Thank God. Where you have you been? You never show up. I came to you [U/I] man and it does not open or anything." **FOAD** replied, "I'm hopeful you can help me out uncle. The situation is really bad." JUDEH stated, "I swear it will never get better." **FOAD** replied, "[Stutters] So, your telling me [U/I], there is nothing good." JUDEH asked, "Why?" **FOAD** replied, "There is nothing. What could I bring? There is…[Thought not finished] nothing is worth it, five hundred (500)? Fuck the five hundred (500) is not worth it." JUDEH asked, "Huh? How much? [Voice overlap]." **FOAD** stated, "To make five hundred dollars ($500) fuck the five hundred." JUDEH asked, "Why? How much? [Voice overlap]." **FOAD** stated, "Nothing, I did not ask about the price." JUDEH stated, "Oh." **FOAD** stated, "Bring me couple of those ones, let us finish from this. Bring me couple and that is it." JUDEH asked, "What?" **FOAD** asked, "From the ones you gave me back in the days, you remember?" JUDEH stated, "There is nothing. I swear there is nothing from those ones. There is nothing." **FOAD** replied, "Bring me couple of them." JUDEH stated, "From where do I get you some?" **FOAD** stated, "Two (2) figure it out. Do you have some left [Voice overlap]." JUDEH stated, "Nothing. [Voice overlap] [Background: Car noise]." **FOAD**

133

believe that during this communication **BEA** informed **KIMBLE** that **BEA** needs a little more time to get narcotics. Case agents believe that once **BEA** has narcotics, he will supply **KIMBLE**.

### Identification of Possible Drug Supplier—Shahin JUDEH

210.     On February 18, 2025, at approximately 3:25 p.m., **FOAD**, using TARGET TELEPHONE 4, called Shahin JUDEH at (312) 502-5499. The parties greeted and **FOAD** asked, "Are you back home?" JUDEH replied, "No, man." **FOAD** stated, "They told me you were back home." JUDEH asked, "Who told you that?" **FOAD** stated, "Everyone. I do not remember who told me, they saw you back home." JUDEH stated, "No Man. [U/I]" **FOAD** replied, "Yeah." JUDEH stated, "Yeah, where do I go back home." **FOAD** asked, "What is going on?" JUDEH stated, "Thank God. Where you have you been? You never show up. I came to you [U/I] man and it does not open or anything." **FOAD** replied, "I'm hopeful you can help me out uncle. The situation is really bad." JUDEH stated, "I swear it will never get better." **FOAD** replied, "[Stutters] So, your telling me [U/I], there is nothing good." JUDEH asked, "Why?" **FOAD** replied, "There is nothing. What could I bring? There is…[Thought not finished] nothing is worth it, five hundred (500)? Fuck the five hundred (500) is not worth it." JUDEH asked, "Huh? How much? [Voice overlap]." **FOAD** stated, "To make five hundred dollars ($500) fuck the five hundred." JUDEH asked, "Why? How much? [Voice overlap]." **FOAD** stated, "Nothing, I did not ask about the price." JUDEH stated, "Oh." **FOAD** stated, "Bring me couple of those ones, let us finish from this. Bring me couple and that is it." JUDEH asked, "What?" **FOAD** asked, "From the ones you gave me back in the days, you remember?" JUDEH stated, "There is nothing. I swear there is nothing from those ones. There is nothing." **FOAD** replied, "Bring me couple of them." JUDEH stated, "From where do I get you some?" **FOAD** stated, "Two (2) figure it out. Do you have some left [Voice overlap]." JUDEH stated, "Nothing. [Voice overlap] [Background: Car noise]." **FOAD**

133

replied, "You have millions of people." JUDEH replied, "Nobody have some. Do you have a customer for it or no?" **FOAD** informed, "Yeah, there are customers for this one." JUDEH stated, "No, the other one, the other one." **FOAD** clarified, "No, I'm talking about the light one." JUDEH confirmed, "Oh, "the white one." **FOAD** stated, "Hum." JUDEH replied unintelligibly. **FOAD** stated, "I swear, I have to speak to some people and see if there are customers for it." JUDEH asked, "Huh?" **FOAD** asked, "Is there business for it?" JUDEH confirmed, "There is and there is someone, he always has some man." **FOAD** stated, "Yeah." JUDEH continued, "But, there is no customer man. Very bad, very bad." **FOAD** replied, "[U/I] I want you to get me couple of that one man." JUDEH stated, "That one he quit coming man." **FOAD** stated, "No, he has, he has a lot, but [U/I] is done, is not here." JUDEH stated, "The first one? The one we used to bring it in the beginning?" **FOAD** replied, "Yeah, yeah. The hard one man." JUDEH asked, "Are you home?" **FOAD** replied, "No, outside. I just left the house." JUDEH stated, "Huh? [Voice overlap]." **FOAD** confirmed, "Yeah." JUDEH asked, "Are you gonna be home tomorrow or the weekend?" **FOAD** stated, "Yeah, call me." JUDEH stated, "Okay, listen." **FOAD** asked, "What?" JUDEH continued, "Find me someone that pay up front." **FOAD** asked, "For how much?" JUDEH asked, "Huh?" **FOAD** asked, "For how much?" JUDEH stated, "I swear, my cost is fifteen (15)" **FOAD** confirmed, "Your cost is fifteen (15)" JUDEH stated, "Yeah." **FOAD** stated, "[Clearing throat] Let me check with the Milwaukee guy. We will take it to him together." JUDEH stated, "The money must be paid right away." **FOAD** stated, "There, there. He will pay us there. He does not bring it here. We will take it to him over there and he will pay right away. We will come back with it." JUDEH asked, "Do we go to him?" **FOAD** stated, "Huh?" JUDEH asked, "We go to him?" **FOAD** stated, "Yeah, I go to him, you do not worry." JUDEH stated, "There is a lot as much as they need, but sons of bitches. You know." **FOAD** stated, "Maybe, I take him eight (8) or nine (9)

in one shot. No, problem six (6) or seven (7) or eight (8)." JUDEH stated, "Listen, if he takes ten (10) will be cheaper." **FOAD** stated, "Fine, let me check, let me check with him." The parties had social conversation and **FOAD** stated, "Talk to me on the weekend and we will meet. No, problem." JUDEH asked, "Can I come to the house or no?" **FOAD** agreed, "Yeah, come over man." JUDEH stated, "I do know. As you know [Voice overlap]." **FOAD** replied, "No, man. You are welcome dear." Social conversation continued and JUDEH stated, "Okay, check with him. Check with him." **FOAD** stated, "Fine, I will check with him. Trust in God." JUDEH replied, "Okay." **FOAD** stated, "Fine, uncle." The two said goodbye and hung up the phone.

211.    Based on my training and experience, and knowledge of this investigation, I believe that in this phone call: **FOAD** asked JUDEH if he was back home. Based on the context, case agents believe that **FOAD** was referencing "home" as their place of birth within the Middle East. **FOAD** asked JUDEH for assistance in getting narcotics. When **FOAD** is referencing the situation being bad, he is referring to getting access to narcotics ("I'm hopeful you can help me out uncle. The situation is really bad."). **FOAD** was originally referencing selling pills when he stated that making $500 in profit is not worth it. Case agents suspect that **FOAD** sells counterfeit Viagra, Cialis, and Levitra pills. Case agents believe that **FOAD** is referring to making $500 in profit selling these counterfeit pills and that it is not worth the profit. **FOAD** asked JUDEH to bring him a "couple" of the other ones they used to get. **FOAD** is referencing kilograms of cocaine. ("Bring me couple of those ones, let us finish from this. Bring me couple and that is it."). **FOAD** referred to the ones that JUDEH gave to him in the past, which indicates that JUDEH has supplied **FOAD** with narcotics in the past. ("From the ones you gave me back in the days, you remember?"). JUDEH initially stated there was nothing and asked **FOAD** if he has any customers. **FOAD** clarified that he was speaking about the "the light one" and JUDEH then

135

clarified by stating "the white one." This further confirms that JUDEH and **FOAD** were discussing cocaine. Case agents believe that **FOAD** asked JUDEH if there are suppliers of cocaine. ("Is there business for it?"). JUDEH indicated that there is someone who always has some, however, the customer base was not good. ("There is and there is someone, he always has some man...But there is no customer man. Very bad, very bad.") **FOAD** indicated again that he wanted some. JUDEH asked if **FOAD** was going to be around on the weekend. JUDEH wanted to meet in person to further discuss. JUDEH will not front any of his narcotics as he wants to money up front and that he charges $15,000 per kilogram. ("Find me someone that pay up front...I swear, my cost is fifteen."). **FOAD** further indicated that he would talk to his guy in Milwaukee. Based on the knowledge gained throughout this investigation, case agents believe that **FOAD** is referencing **BEA** as his guy in Milwaukee. Case agents know that **FOAD** is **BEA**'s narcotics source of supply, and that **BEA** has been requesting narcotics from **FOAD**. **FOAD** additionally told JUDEH that JUDEH can come with him to deliver the kilograms of cocaine to Milwaukee. ("Let me check with the Milwaukee guy. We will take it to him together."). **FOAD** indicated that he goes to **BEA** and that **BEA** would provide the money when they were onsite in Milwaukee. This further corroborates that **FOAD** referred to **BEA** as his guy in Milwaukee. Case agents know that throughout the entirety of this investigation, **FOAD** always delivers the narcotics to **BEA** in Wisconsin. **FOAD** referenced potentially bringing 8 or 9 kilograms to Milwaukee. ("Maybe, I take him eight (8) or nine (9) in one shot. No, problem six (6) or seven (7) or eight (8)"). JUDEH informed **FOAD** that if he brought 10 it would be cheaper. Based on case agents' knowledge and experience, they know that narcotics dealers will often lower the price per kilogram if the customer buys more during a single transaction ("Listen,

136

if he takes ten (10) will be cheaper."). **FOAD** indicated he would check, presumably with **BEA**, before the two hung up the phone.

## Overdose Investigation Involving Frank AYALA-DEJESUS

212.     On February 14, 2025, the West Allis Police Department responded to a residence within West Allis for a report of a female overdosing, identified herein by initials DLJ. DLJ was found unresponsive by her live-in boyfriend (herein identified by initials CAS). Upon officers' arrival, DLJ was found not breathing and without a pulse before officers began life saving measures. Eventually DLJ regained a pulse and was conveyed to St. Luke's Hospital. Officers located a cut straw with white powdery residue, marijuana, and drug paraphernalia throughout the house. CAS showed signs of drug use and was arrested, booked, and cited for Possession of THC and Possession of Drug Paraphernalia. DLJ later died at the hospital.

213.     Later on this same date, CAS was read his *Miranda* Rights and agreed to answer questions. CAS stated: he went to DLJ 's residence after work and arrived there around 7pm.  He bought her a few gifts for Valentine's Day and wanted to celebrate so they had a few alcoholic beverages.  DLJ started snorting an unknown white powdery substance that he thought was cocaine, so he joined her.  While the two were snorting the substance, he then observed it was not cocaine and did not know what it was.  DLJ then started going in and out of consciousness and that's when he called 911. She went unresponsive and he started doing chest compressions on her before first responders arrived. He had no idea where she got the substance.

214.     West Allis Police Department Detective Ondricka spoke with DLJ 's daughter, who reported that DJL was a cocaine user due to a previous injury, that DLJ previously resided with a man herein referred to by initials MD, and that MD indicated that he knows who DLJ purchases cocaine from.  Detective Ondricka called MD, who stated:  he was close friends with

DLJ and has known DLJ since 2005. DLJ resided with MD starting in 2013 for approximately eight years. He picked DLJ up on February 14, 2025, at approximately 1445 hours to drive DLJ to an appointment. CAS was at DLJ 's residence when MD picked up DLJ. MD also took DLJ to get a new cell phone. MD and DLJ arrived back to her residence at approximately 1630 hours. DLJ made MD food and he left at approximately 1750 hours. MD remembered DLJ telling CAS that "Franko," later identified as Frank **AYALA,** was coming over that night. MD did not remember if he heard DLJ tell CAS this in person when he picked her up or if it was an overheard phone conversation when they got back to DLJ's residence. MD has observed **AYALA** twice in the past. **AYALA** would come to DLJ's residence for a quick visit which was consistent with a drug deal. MD described **AYALA** as a black or Puerto Rican male, larger build, possibly in his 50's. MD observed **AYALA** drive an SUV at one time and a "car" another time. MD thought DLJ met **AYALA** through CAS. DLJ and CAS would argue constantly. DLJ would tell CAS to leave her residence but would take him back again. MD stated CAS would harass DLJ. DLJ was an alcoholic and recently started using cocaine. DLJ has a security system which was professionally installed at her residence.

215. Detective Ondricka called CAS, who did not wish to meet in person but agreed to speak over the phone. CAS stated: **AYALA** sold DLJ the fatal dose of narcotics. CAS left DLJ 's residence to get her a Valentine's Day present and he believed **AYALA** came to DLJ 's residence while he was gone. CAS stated the surveillance system at DLJ 's residence would show **AYALA** coming to DLJ 's residence. **AYALA** should be in DLJ 's cell phone contacts.

216. Detective Ondricka spoke with CAS again on February 25, 2025 to confront him regarding his inconsistent statements. CAS advised that he was at DLJ s residence when **AYALA** came over. **AYALA** came in the front door. **AYALA** and DLJ went into the back

138

office together. **AYALA** left shortly after. DLJ stated she did not feel well. CAS observed cocaine on the desk in the office and put his finger in the cocaine. CAS "tasted" the cocaine and immediately felt different. He advised DLJ that the substance was not cocaine. CAS has only seen **AYALA** twice which is when **AYALA** came to DLJ 's residence. DLJ contacts **AYALA** and CAS does not have **AYALA's** phone number. CAS advised DLJ's friend (herein identified by initials KS) also knows **AYALA**.

217. Detective Ondricka was able to view the video surveillance from February 14, 2025 at DLJ 's residence. There was a video at 1834hrs where a black or Hispanic male comes to the south door of DLJ 's residence. This male was not **AYALA**. The male was holding what he appeared to be a cell phone in his left hand and a plastic baggie in his right hand. The male rings the doorbell and someone opens the door. The male says, "How you doing Ms. Lady." The person lets this male inside the residence. There is a dark colored pickup truck parked on S. 62 St. in front of DLJ's residence.

218. On February 25, 2025, Detective Ondricka went to DLJ's residence to speak with DLJ's daughter. While there, Detective Ondricka observed small flakes of a white powdery substance on the desk. Detective Ondricka collected a small sample and tested the substance for fentanyl using the Nark II Narcotics Analysis Reagent Kit. The test was positive however, there was not enough fentanyl to collect.

219. On May 2, 2025, Detective Cerqua and Detective Ondricka responded to 9629 W. Hampton Ave. #11 and made contact with KS, who stated: DLJ was her best friend and she has known DLJ since they were 13 years old. DLJ drinks alcohol (canned lemonade drinks) every day. DLJ also uses cocaine. DLJ gets her cocaine from "Franko" (**AYALA**) who comes to DLJ's residence. Schilling has been at DLJ's residence three times when **AYALA** came

over. KS described **AYALA** as a heavy set older black male. She did not know what he drives. DLJ met **AYALA** through her boyfriend, CAS. CAS knew **AYALA** first. Detective Ondricka asked if CAS would have to order the cocaine and KS stated DLJ can call **AYALA** herself to order. **AYALA** is the only cocaine supplier that KS knows DLJ to call.

220. Detective Ondricka advised KS there was communication with DLJ on February 14, 2025 regarding KS sending someone to DLJ 's house. KS stated DLJ was looking for marijuana. KS called "Jay" and asked him to deliver marijuana to DLJ. KS provided Jay's phone number to DLJ so she could speak with him. KS pulled up Jay's Facebook account which had the name "Nathaniel Wilson." KS stated Wilson is her daughter's fiancé's brother. She's only known Wilson to supply marijuana. Detective Ondricka observed the Facebook photo of Nathaniel Wilson and identified Wilson as the person who arrived at DLJ's residence on February 14, 2025 at 6:34 p.m. KS stated she used to use cocaine/ crack cocaine but she has been clean for 25 years.

221. **AYALA's** phone number, 414-350-0829, was located in DLJ's cell phone. DLJ had communication with Franko on January 2, 2025, February 1st, 2nd, 3rd, 6th, 9th and 13th, as well as many other communications in 2024. The communication on this cell phone went back to July 25, 2024. The communication was only phone calls and there were no text messages. Through deconfliction and law enforcement databases, "Franko" was identified at Frank **AYALA DE JESUS**.

222. Detective Ondricka reviewed the video surveillance clips from DLJ's home camera system. Detective Ondricka reviewed the video surveillance from DLJ's residence and observed the following clips:

- February 6, 2025 @ 10:45 p.m.: **AYALA** is observed walking from W. Grant St. to DLJ's side door which faces W. Grant St. **AYALA** tries the doorknob but the door appears to be locked. **AYALA** knocks on the door and the video ends.

- February 6, 2025 @ 11:16 p.m.: **AYALA** exits the residence from the south door. **AYALA** is laughing and DLJ is holding the door when he exits. DLJ asks **AYALA** to look in her mailbox. **AYALA** opens the mailbox and hands the mail through the door to DLJ. DLJ drops a piece of mail outside the door and exits the residence as she continues talking to **AYALA**. **AYALA** walked toward a vehicle which is parked in the 6200blk W. Grant St. DLJ goes back into the residence and the video ends. DLJ had the following phone communication from her cell phone# 262-719-5210 to **AYALA**'s 414-350-0829 on February 6, 2025: 10:31 p.m. (missed phone call), 10:32 p.m. (outgoing 0 min 49 sec), 11:18 p.m. (outgoing call 0 min 38 sec), 11:23 p.m., (outgoing 0 min 57 sec).

- February 9, 2025 @ 2:19 p.m.: **AYALA** walked toward DLJ 's south door from W. Grant St. **AYALA** opened the door and walked into DLJ 's residence. **AYALA** closed the door behind him and the video ends.

- February 9, 2025 @ 2:41 p.m.: CAS is standing near W. Grant St. with a male who in the distance appears to be Frank **AYALA** from his build and clothing. DLJ is standing in the south door talking to CAS and **AYALA**. **AYALA** walks out of view on W. Grant St. and CAS walks toward the south door to the residence. DLJ and CAS go inside. A vehicle out of sight but nearby can be heard starting. DLJ had the following phone communication from her cell phone# 262-719-5210 to **AYALA** 414-350-0829 on

141

- February 9, 2025 @ 12:39 p.m. (outgoing 1 min 15 sec), 1:29 p.m. (outgoing 7 mins 39 sec), 1:46 p.m. (outgoing 1 min 31 sec), 2:29 p.m. (incoming 0 mins 3 sec), 5:36 p.m. (outgoing 1 min 0 sec), 5:40 p.m. (outgoing 0 min 3 sec).

- February 13, 2025 @ 5:20 p.m.: The indoor camera inside DLJ's bedroom which faces the backyard catches DLJ speaking to someone inside the residence. DLJ asks "Can you get soft?", "How much?" DLJ asks, "Alright listen do you have anything different, like good stuff?" CAS is observed walking in the backyard and it is suspected that DLJ is on the phone with Frank. DLJ has an outgoing phone call on her cell phone to Franko 414-350-0829 on February 13, 2025 at 5:20 p.m., with the duration of 1 minute and 30 seconds.

223.    Based on my training and experience, and the information provided by CAS, MD, KS, and Detective Ondricka's investigation, I believe that each of these above visits by **AYALA** at DLJ's residence were **AYALA** arriving to distribute cocaine.

224.    Since the beginning of this investigation, case agents have identified **AYALA** as a very trusted associate of **BEA's**. **BEA** and **AYALA** have remained in consistent contact with each other through the entirety of this investigation and **AYALA** has been observed at Bar 1000/ICare Childcare on numerous occasions. In the previously described interception in December 2024 between **BEA** and WILSON, AKA "PUMPKIN," **BEA** sent **AYALA** to meet with "PUMPKIN" after "PUMPKIN" requested what I believe to be a quantity of narcotics. I believe that **AYALA** assists **BEA** in his drug trafficking activities and believe that **AYALA** sells narcotics that are ultimately provided to him by **BEA**.

**Post TIII Investigation**

142

225.    In an intercepted phone call between **FOAD** and ███████████ that occurred in late January 2025, ████████████████ directed **FOAD** to get a new phone number so they could discuss their narcotic distribution activities in further detail. Following this conversation, case agents identified the phone number 708-513-3943 as **FOAD**'s new number. Based on pen data, case agents identified that ████████████ and **FOAD** began speaking to each other using **FOAD**'s newly obtained phone number through the WhatsApp platform. Due to this, case agents were no longer intercepting phone calls between ████████████████ and **FOAD**. Beginning in mid-February 2025, case agents began seeing a slow decrease in phone communication between ████████████████ and **FOAD**. Additionally, on February 18, 2025, **FOAD** reached out to a separate source of supply (Shahin JUDEH) and indicated he needed to bring narcotics to Milwaukee as previously detailed. Based on the decrease of communication between ████████████████ and **FOAD,** paired with **FOAD** reaching out to a separate supplier, case agents believe the drug deal that had been discussed in depth in late January 2025, fell through due to unknown reasons. Additionally, the potential drug transaction between **FOAD** and JUDEH did not seem to come to fruition.

226.    Case agents observed from March 7, 2025, through April 4, 2025, that neither **HAMMAD** nor **FOAD's** devices traveled outside of the Northern District of Illinois. With no observations of Wisconsin travel conducted by either **FOAD** or **HAMMAD**, case agents do not believe that **BEA** had been resupplied with any narcotics throughout this time period. However, in the later portion of March 2025, case agents observed multiple phone calls between **FOAD**'s confirmed tertiary phone number (708-513-3943—herein TARGET TELEPHONE 7) and the **ISA** DTO's source of supply, ████████████████ Additionally, case agents observed phone contact between **FOAD's** device (TARGET TELEPHONE 5) and ███████████████



143

███████████ device. Furthermore, case agents observed multiple contacts between

██████████████████████ device and Mexican phone number ███████████ who case

agents believe to be used by "████████ or "████████████ With the influx of phone

activity, case agents believe that **FOAD** was still waiting to obtain narcotics from

████████████████████████ and those narcotics would ultimately be distributed

to **BEA** within the Eastern District of Wisconsin.

227.    Case agents observed on March 21, 2025, that **BEA**'s secondary phone (262-525-

9081) called **FOAD**'s secondary phone (TARGET TELEPHONE 5). This phone call did not

appear to be answered. Case agents know that **BEA** and **FOAD** generally speak to each other

using a separate communication platform unknown to case agents. Case agents suspect when

**FOAD** does not answer **BEA** on this separate communication platform, **BEA** transitions to

calling **FOAD** on TARGET TELEPHONE 5.

228.    Beginning on March 24, 2025, case agents began to observe an influx of

communication between **FOAD's** device and ████████████████ device. By this

time, all Title III interceptions had ended, but case agents had pen register/trap and trace data and

precision phone location data (pings) for TARGET TELEPHONE 2 (**HAMMAD**), TARGET

TELEPHONE 3 (**BEA**), TARGET TELEPHONE 4 and 5 (**FOAD**). The phone calls between

**FOAD's** devices (TARGET TELEPHONE 5 and TARGET TELEPHONE 7) and

████████████████████ device remained consistent between March 24, 2025 and April 4,

2025. Likewise, the phone communication between ████████████████ device and

Mexican phone number ██████████ also remained consistent during that timeframe. Case

agents have also observed a new phone number (319-471-8887) in regular communication with

**FOAD's** phone number (TARGET TELEPHONE 7). Contact with this phone number also began

around the same timeframe of March 24, 2025. Since TARGET TELEPHONE 7's activation, case agents have rarely observed **FOAD's** device in contact with any other phone numbers (over TARGET TELEPHONE 7) aside from ████████████████ device. As of today's date, case agents have not been able to identify the user of 319-471-8887. Case agents believe that the user of this phone number is involved in the coordination of narcotic trafficking. Case agents believe that the influx of phone activity between ███████████████ and **FOAD** was signaling a future narcotic resupply. Case agents believed that once **FOAD** possessed the narcotics, he would supply **BEA** with narcotics.

229. On April 7, 2025, case agents observed multiple phone calls being made between **BEA's** device and **SIMS's** device. At approximately 11:42 a.m., via electronic surveillance, case agents observed **SIMS** approaching the back of Bar 1000 with his phone up to his ear. According to pen data generated from **BEA's** TARGET TELEPHONE 3, case agents observed that **SIMS'** device did indeed call **BEA's** device at 11:42 a.m. After standing outside of the back gate for approximately one minute, **SIMS** walked into the bar area, out of view of electronic surveillance. Based on what case agents have learned about **BEA** and **SIMS'** relationship, case agents believe the two parties were discussing/coordinating a future drug transaction.

### Meeting Between FOAD and BEA on April 8, 2025

230. On April 8, 2025, case agents again observed multiple phone calls between ███████████████ device and **FOAD's** 708-513-3943 and 312-841-4635 phone numbers. Case agents observed **FOAD's** device received incoming phone calls from ███████████████ device at 1:12 p.m., 1:14 p.m., 1:39 p.m., and 1:40 p.m. Case agents are not sure if any of these calls were connected.

231. In review of E-911/GPS ping data and electronic surveillance, case agents observed that **FOAD** left his home residence of 8509 Natoma Avenue in his known black Ford Edge at approximately 6:33 p.m. At approximately 6:59 p.m., **FOAD** returned home. Case agents were unable to determine where **FOAD** went during this time due to a large ping radius. Case agents suspect that **FOAD** may have met with a potential source of supply between 6:33 p.m. and 6:59 p.m. to obtain narcotics.

232. **BEA** recently obtained a white shuttle bus. Through observation of electronic surveillance and physical surveillance, case agents observed this shuttle bus parked in various places at **BEA's** residence (2636 S. 76th Street) over the last month. At approximately 7:43 p.m., via electronic surveillance, case agents observed the shuttle bus pull up and park on the street in front of 2636 S. 76th Street. Due to the camera angle, case agents were unable to see who exited the shuttle bus. At approximately 7:54 p.m., **BEA's** ping data indicated his device was still in the area of his residence. **BEA's** next ping indicated he was traveling southbound. Simultaneously, at 8:04 p.m., **FOAD**'s ping indicated that his device was at his residence in Burbank, Illinois. In review of electronic surveillance, **FOAD**, in his black Ford Edge, left his residence at 8:04 p.m. **FOAD**'s next ping indicated his device was driving northbound.

233. Case agents monitored both **FOAD** and **BEA's** pings as **FOAD** proceeded northbound and **BEA** proceeded southbound. At approximately 9:04 p.m., case agents received a ping from both **FOAD** and **BEA's** devices. **BEA's** ping was approximately an 865-meter radius while **FOAD**'s ping was approximately a radius of 973 meters. The two pings almost completely overlapped with one another, indicating the two devices were likely together at 9:04 p.m. Each respective ping placed both devices near Gurnee, Illinois near the Gurnee Mills Mall. **FOAD**'s next ping at 9:14 p.m., indicated his device was back traveling southbound. **BEA's** next ping at

approximately 9:14 p.m., indicated his device was back traveling northbound. Case agents believed that **FOAD** provided **BEA** with narcotics. Utilizing law enforcement databases that capture license plates, case agents observed **BEA's** known black Cadillac Escalade placed **BEA's** vehicle in Gurnee, Illinois at 8:47 p.m., approximately 15 minutes before I believe that **FOAD** and **BEA** met. Case agents have observed in the recent months that **BEA** typically only utilizes this Escalade when he is conducting suspected narcotic activities.

234.    Case agents set up physical surveillance at **BEA's** West Allis residence in anticipation of **BEA** returning home after meeting with **FOAD**. While traveling back from Illinois, case agents observed on the pen register/trap and trace data that **BEA's** device called **SIMS** at 9:52 p.m. This phone call lasted 46 seconds. At approximately 9:54 p.m., **BEA's** device pinged in the area of Interstate 43 and Keefe Avenue. Case agents observed there was a large construction dumpster in the area behind the bar in the area that **BEA** usually parks. Additionally, there was a SUV that was parked blocking the entrance of the parking area behind the bar. Based on this, case agents believed that **BEA** would likely park in the front area of the bar. At approximately 9:58 p.m. through 10:01 p.m., case agents observed headlights shining between 3941 N. Teutonia Ave. and 3947 N. Teutonia Ave. Case agents know there is a parking area between the two buildings. **BEA's** next ping at approximately 10:04 p.m., was in the area of N. 11th Street and Keefe Ave. The following ping was at approximately 10:14 p.m., and showed **BEA's** device was already back near **BEA's** residence in the area of Brewers Blvd. and W. Greenfield Ave.

235.    At approximately 10:21 p.m., **BEA's** device placed an outgoing phone call to his mother, Jeanette **BEA**. In review of electronic surveillance, case agents observed the exterior motion lights on **BEA's** house turn on. Case agents know that on the North side of **BEA's**

residence there is a gated area that has an area to park vehicles. Case agents believe that **BEA** contacted Jeanette **BEA** to open this gate. At approximately 10:26 p.m., case agents observed the shuttle bus move out of view of electronic surveillance. Case agents observed a ping generated from **BEA**'s phone that placed **BEA's** device near his residence. At approximately 10:40 p.m., case agents conducted physical surveillance and observed the shuttle bus parked within the gated area that was previously described. Case agents believe that when **BEA** arrived home, he parked the black Cadillac Escalade in the gated area of his residence. After parking the Escalade, **BEA** moved the shuttle bus in the gated area as well.

236.     On April 9, 2025, case agents observed on electronic surveillance that **BEA** arrived to 3941 N. Teutonia Ave., at approximately 10:50 a.m. Prior to arriving, case agents observed incoming and outgoing phone calls between **BEA's** device and **SIMS's** device according to pen data derived from **BEA**'s cell phone (414-206-8589). At approximately 11:01 a.m., via electronic surveillance, case agents observed **SIMS** arrive to the back of 3941 N. Teutonia Ave., holding a cell phone up to his ear. According to pen data, **SIMS'** device made an outgoing phone call to **BEA's** device at 11:00 a.m., leading case agents to believe that **SIMS** was indeed calling **BEA** when **SIMS** was observed on his phone. At approximately 11:02 a.m., **SIMS** was let inside the back gate of 3941 N. Teutonia Ave. At approximately 11:03 a.m., **SIMS** was observed walking out of the 3941 N. Teutonia Ave area and then out of view of electronic surveillance. At approximately 11:05 a.m., **SIMS'** known black Nissan Altima bearing WI registration 625-RVL **(Subject Vehicle 1)**was observed driving southbound through the alley out of electronic surveillance view.

237.     Later on April 9, 2025, case agents observed more phone contact between **BEA's** device and **SIMS'** device. Case agents believe that **BEA** was supplied with narcotics while

148

meeting with **FOAD** in the Gurnee, IL area on April 8, 2025. Case agents know that **SIMS** is a trusted customer and associate of **BEA's**. Due to the short duration of **SIMS'** visit on April 9, 2025, I believe that **BEA** provided **SIMS** with narcotics that **BEA** received from **FOAD**.

## Seizure of Kilogram of Heroin on April 17, 2025

238. On April 17, 2025, case agents were monitoring E-911/GPS pings for **BEA** (414-206-8589) and **FOAD** (312-375-5886). At approximately 4:14 p.m., **FOAD's** ping indicated his device was near his residence. According to electronic surveillance located at 8509 Natoma Ave., case agents observed **FOAD's** known black Ford Edge bearing IL registration EA93867 backing out and stopping near the mouth of the driveway. At approximately 4:12 p.m., the Ford Edge left the area out of view of electronic surveillance. Case agents monitored **FOAD's** pings and observed that **FOAD's** device was traveling northbound toward Wisconsin.

239. Case agents reviewed electronic surveillance footage from **BEA's** residence at 2636 S. 76th Street and observed that at approximately 4:58 p.m., **BEA** pulled into the driveway of the residence in his known silver Jaguar. **BEA** exited the driver's seat and Crystal Robinson, **BEA's** significant other, exited the passenger seat. **BEA** grabbed what appeared to be a larger black bag out of the backseat of the Jaguar. Both parties entered the front door of the residence.

240. At approximately 5:05 p.m., case agents observed **BEA's** known white shuttle bus pull out from what I believe to be the back gated area of the residence (not observable on electronic surveillance). The bus parked on the road in front of the residence and **BEA** exited the bus. Case agents know that **BEA** had been parking his black Cadillac Escalade in the back fenced area of the residence and when he needs to access the Escalade, **BEA** needs to move the shuttle bus. Case agents also know that since approximately October 2024, **BEA** has primarily utilized the silver Jaguar as his everyday vehicle and case agents believe he utilizes the black

Escalade primarily to conduct narcotics related activities. Case agents did not observe the black Escalade leave the residence, but a ping generated from **BEA's** phone at approximately 5:24 p.m., indicated **BEA's** device was traveling southbound. Based on the Jaguar being parked in the driveway and the observation of **BEA** moving the shuttle bus, case agents believe that **BEA** was traveling in the black Cadillac Escalade.

241.    Case agents continued to monitor both **BEA** and **FOAD's** pings as it appeared they were driving toward each other. At approximately 5:35 p.m., **BEA's** device pinged in the area of Mount Pleasant, Wisconsin while **FOAD's** device pinged in the area of Gurnee, Illinois. After **BEA's** ping at 5:35 p.m., case agents stopped receiving ping alerts from 414-206-8589 (**BEA's** device). Case agents believe that **BEA** turned his phone off in attempt to avoid law enforcement from observing his current location. Case agents observed that approximately 5:44 p.m., **FOAD's** ping indicated his device was in the area of the Pleasant Prairie Outlet Mall, in Pleasant Prairie, Wisconsin. **FOAD's** ping remained in this area until approximately 6:44 p.m.

242.    At approximately 6:14 p.m., case agents again began receiving ping alerts from **BEA's** device indicating **BEA** turned his phone back on. The 6:14 p.m. ping indicated **BEA's** device was in the Mount Pleasant, Wisconsin area. Case agents additionally monitored pen data generated from **BEA's** 414-206-8589. While **BEA** was apparently still traveling back to Milwaukee, case agents observed **BEA's** device begin to make outgoing phone calls to his known narcotic customers. At 6:17 p.m., **BEA's** device called **TREADWELL's** device (at 414-982-8254). At 6:18 p.m., **BEA's** device called **ROBERTSON's** device (414-248-7180). At 6:21 p.m., **BEA's** device called A. **GREEN's** device (262-395-5337). Case agents later discovered after downloading **BEA's** telephone (TARGET TELEPHONE 3) following **BEA's** arrest that **BEA** also placed a FaceTime call to **AYALA** at 6:15 p.m.

243.     Based on my training, experience, and knowledge of this investigation, I believe that **BEA** received heroin from **FOAD** in the Pleasant Prairie area and while driving back to Milwaukee, **BEA** placed outgoing phone calls/FaceTime calls to DTO members **AYALA**, **TREADWELL**, **ROBERTSON**, and **GREEN**, to alert them that **BEA** now had the heroin and to arrange future distribution.

244.     In anticipation of **BEA** driving back toward either his house or 3941 N. Teutonia Ave., case agents set up surveillance along northbound Interstate 41. In the area of Caledonia, Wisconsin, TFO Timothy Filter observed **BEA** traveling northbound in the black Cadillac Escalade. Surveillance units followed this vehicle while coordinating a traffic stop with the Milwaukee County Sheriff's Department. Deputies observed illegal tint on the front windshield of the Cadillac Escalade and thereafter conducted a traffic stop of the Cadillac Escalade on I-43 at Michigan Ave. **BEA** was identified as the driver of the vehicle and Crystal ROBINSON was identified as the passenger of the vehicle. A drug detection police K9 was on the scene of the traffic stop, and when it circled the Cadillac Escalade, the drug detection K9 alerted to the presence of controlled substances in/on the Cadillac Escalade. Subsequently, officers conducted an on-scene search of the Cadillac Escalade and located a brick-shaped object under the hood. The suspected controlled substance was field tested and it tested positive for the presence of fentanyl, a Schedule II controlled substance. Subsequent crime lab testing revealed that the substance contained heroin, not fentanyl. Additionally, recovered from the traffic stop/arrest was a white/gold iPhone with a cracked back located on **BEA's** person, a pink/gold iPhone and a white/gold iPhone in a pink case on ROBINSON's person, a black iPhone located in the vehicle, an Apple iPad located in the vehicle, and keys located on **BEA's** person. **BEA** and ROBINSON were arrested.  Case agents conducted a *Mirandized* interview with ROBINSON. ROBINSON

151

waived her rights and agreed to answer questions. ROBINSON admitted that she traveled with **BEA** to the Pleasant Prairie area, where they obtained food at McDonalds. ROBINSON denied meeting with anyone in the Pleasant Prairie area and maintained, in sum, that she and **BEA** traveled from Milwaukee to the Pleasant Prairie area because that particular McDonalds had the best food. Based on case agents training and experience, knowledge of this investigation, and phone location data, case agents believe that **FOAD** and **BEA** met in the Pleasant Prairie area, where **BEA** obtained the kilogram of heroin later located in his engine compartment from **FOAD**. Case agents further believe that ROBINSON was present in the vehicle at the time of this meeting. Based on my training and experience, I know that it is common for drug traffickers involved in the transportation of large amounts of drugs to enlist a passenger to ride with them to and from the transaction because drug traffickers believe that law enforcement will be less suspicious of a couple than a single male travelling alone. Based on this, I believe that ROBINSON was aware of the purpose of this trip to Kenosha (to obtain drugs) and that her involvement was purposefully designed to reduce the chance that **BEA** would be stopped or suspected of a crime by law enforcement.

245. Case agents later reviewed pen data generated from **FOAD**'s phone numbers surrounding the apparent meeting between **FOAD** and **BEA**. Case agents observed that at 4:42 p.m., **FOAD's** device had an incoming phone call to 312-841-4635 (TARGET TELEPHONE 5) from 754-544-4636. At 4:51 p.m., **FOAD's** device (TARGET TELEPHONE 5) received a call from 572-400-3079. Also, at 4:51 p.m., **FOAD's** device (TARGET TELEPHONE 5) received a call from 760-640-1399. Prior to the suspected meeting between **FOAD** and **BEA**, **FOAD's** device placed an outgoing phone call to **HAMMAD's** device (708-986-7822--TARGET TELEPHONE 2) at 5:15 p.m. Case agents know based on past Title III interceptions that **FOAD**

would often call **HAMMAD** while doing narcotics-related business to inform **HAMMAD** of what **FOAD** was doing. Case agents believe that **FOAD** calls **HAMMAD** at these times because **HAMMAD** is involved in **FOAD**'s narcotic distribution network and so that **HAMMAD** knows that if **FOAD** does not return home, that something bad occurred (e.g. **FOAD** has been arrested). Case agents observed that later that evening, **FOAD's** device (708-513-3943) attempted to call **BEA** on 262-525-9081 three times at 9:31 p.m., 9:31 p.m., and 9:59 p.m. Case agents believe this was **FOAD** attempting to ensure that **BEA** arrived home safely (and was not arrested). Additionally, on April 17, 2025, case agents observed that **HAMMAD's** device (TARGET TELEPHONE 2), attempted to contact **BEA's** device on a prior phone number (TARGET TELEPHONE 1) at 10:10 p.m. Case agents believe **HAMMAD** called **BEA** after **FOAD** did not receive a response from **BEA** to inquire about whether **BEA** arrived back in Milwaukee with the recently supplied narcotics.

246.     Case agents observed that **FOAD's** device (312-375-5886-TARGET TELEPHONE 4), called  who utilizes ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ telephone number (TARGET TELEPHONE 6) was previously intercepted pursuant to court order during this investigation.  Though the investigation, case agents learned that ▮▮▮▮▮▮▮ had historic contact with **BEA** and with **FOAD** and case agents suspect that ▮▮▮▮▮▮▮ is the one who introduced **FOAD** and **BEA** in the past. **FOAD's** device called ▮▮▮▮▮▮▮ device at 9:32 p.m., one minute after attempting to contact **BEA**. **FOAD's** device again called ▮▮▮▮▮▮▮ device at 10:10 p.m., immediately after **HAMMAD's** device attempted to call **BEA**. At 10:23 p.m. and 11:41 p.m., ▮▮▮▮▮▮▮ device called **FOAD's** device. Based on case agents' knowledge of this investigation, case agents believe that ▮▮▮▮▮▮▮ is a relative of the **BEA** family and was ultimately the person who introduced

**BEA** to the **ISAs**. Case agents believe that due to **FOAD** not being able to get in contact with **BEA**, **FOAD** proceeded to call ████████████ in an attempt to find out what happened to **BEA**.

247.     During **FOAD's** apparent attempts to contact **BEA** after **BEA's** arrest, **FOAD's** device contacted devices used by Salameh ABUELHAWA (708-631-8048) and Ali JAG (312-925-8612). Case agents know that ABUELHAWA is a trusted associate of **FOAD**. Case agents also know that ABUELHAWA has access to a storage unit at Safeguard Self Storage located at 9800 S. Harlem Ave., Bridgeview, IL that **FOAD** utilizes. **FOAD's** device attempted to contact ABUELHAWA and JAG**'s** devices at 10:15 p.m. and ABUELHAWA**'s** device again at 12:50 a.m. (April 18, 2025).  Case agents believe that **FOAD** may have contacted ABUELHAWA due to contents within the storage unit. Case agents believe that by at the time of his contacts with ABUELHAWA, **FOAD** likely knew/suspected that **BEA** was arrested with narcotics. Case agents observed **FOAD's** device received an incoming message from ████████████ ████████████ at 10:21 p.m.

### Seizure of Suspected Fentanyl, Cocaine, and 13 firearms (including a machinegun) on April 18, 2025

248.     On April 18, 2025, the Honorable Stephen C. Dries, United States Magistrate Judge for the Eastern District of Wisconsin, authorized search warrants for **BEA's** residence, located at 2636 S. 76th Street, West Allis, Wisconsin, and ICare Childcare/Bar 1000, located at 3941 N. Teutonia Avenue, Milwaukee, Wisconsin.

249.     A search of I-Care Childcare/Bar 1000 resulted in the recovery of the following: approximately 5,375 grams (5 kilograms) of suspected fentanyl, approximately 1,055 grams (approximately 1 kilogram) of suspected cocaine. All narcotics were field tested and indicated positive results for their respective controlled substance. All narcotics were weighed while in the respective packaging. The suspected cocaine has now been tested by the crime

laboratory and approximately 41 grams has been confirmed to be cocaine base but not the remaining substance. Additionally, case agents located 3 firearms including a shotgun and 2 pistols, one with a switch, which converts the firearm from semi-automatic to fully-automatic inside 3941 N. Teutonia Avenue. Law enforcement officers also located an envelope addressed to **BEA** at the address of ICare Childcare/Bar 1000.

250.     A search of **BEA's** house resulted in the recovery of the following: 2 kilogram presses, a money counter, 10 firearms, including 5 pistols and 5 rifles, and ammunition. Numerous firearms were located in a bedroom identified by his mother as belonging to **BEA**, and an additional firearm was located in a vehicle believed to be used by **BEA**. Furthermore, located within the residence were multiple documents for "Bar 1000"/3941 N. Teutonia Avenue, and mail addressed to **BEA** at the address for ICare Childcare/Bar 1000.

**Continued Communication between FOAD and** ███████████████

251.     Since the fentanyl seizure on April 17, 2025, **FOAD** has stopped using his other identified phone numbers, 312-841-4635 (**TARGET TELEPHONE 5**) and 708-513-3943, to call others. The only activity case agents have observed on these phone lines from May 2, 2025 through June 9, 2025 is incoming phone calls/texts. **BEA's** phone seized on the date of his arrest was seized and searched pursuant to a federal search warrant. Through the phone download of one of **BEA's** phones, case agents observed that **BEA** communicated with **FOAD** on his 312-841-4635 phone number. Case agents believe that **BEA's** arrest led **FOAD** to stop using the 312-841-4635 phone number to avoid any law enforcement detection. Additionally, over the course of the interception period, **FOAD** communicated with his source of supply, ███████████████████ over his 312-841-4635 and 708-513-3943 phone numbers. Since **BEA's** arrest, ███████████ ███████████ has communicated with **FOAD** over 312-375-5886 (**TARGET TELEPHONE** 4),

generally using the WhatsApp application. Case agents believe the change in **FOAD's** behavior after **BEA's** arrest is a calculated effort to avoid detection of law enforcement.

252.     Between May 2, 2025 through June 9, 2025, ███████████████ using ███████████████, has communicated with **TARGET TELEPHONE 4** multiple times, primarily through WhatsApp. Specifically, phone records reflect that ███████████████ called **TARGET TELEPHONE 4** on May 2, 3, 4, 5, 15, 16, 22, 24, 27, 31, 2025, and June 6 and 7, 2025, while **FOAD**, using **TARGET TELEPHONE 4**, called ███████████████ on May 15, 2025, May 31, 2025, June 6, 2025, and June 7, 2025. Case agents believe that these contacts between **TARGET TELEPHONE 4** and ███████████████ indicate that **FOAD** is still involved in drug trafficking activities. Case agents believe the kilogram of heroin that was seized on April 17, 2025, was fronted to **BEA**. Case agents are unsure is the kilogram was fronted to **FOAD** before he provided it to **BEA** but believe that if it was fronted, **FOAD** would still own money for this kilogram. Case agents believe this is a potential reason ███████████████ is attempting to contact **FOAD**, to collect proceeds for the kilogram of fentanyl.

### Vehicles, Basements and Outbuildings

253.     I know based upon my training and experience that controlled substances and evidence of narcotics trafficking can be secreted in any part of a residence including garages, storage areas related to the premises, vehicles on and associated with the premises, and on persons engaged in drug trafficking within the residence; that through personal training and experience in investigating drug trafficking, affiant knows controlled substances are frequently stored with drug proceeds and other drug paraphernalia at drug traffickers residences; that the execution of a search warrant usually results in the seizure of such items of personal property as utility bills, canceled mail envelopes, bank statements, keys, photographs, videotapes, and other items or documents which establish the identities of persons residing in or having control of the premise; and that these

items can be stored in various locations accessible to the target residence including vehicles and garages. Therefore, I believe it is reasonable to believe that an individual engaged in drug trafficking would conceal evidence related to drug trafficking in multiple areas associated with their residence including vehicles, garages and basements.

254. Through training, experience, and discussions with other experienced agents, I know that:

a. Drug traffickers commonly maintain books, papers, files, and other records which reflect the names, addresses, and/or telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.

b. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other files relating to the purchase, packaging, sale, distribution, and transportation of their product.

c. Drug traffickers conceal in their residences and/or places of business the proceeds of their illegal activity, including large amounts of United States currency, financial instruments, precious metals, jewelry, rare coins, works of art, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

d. When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits, often accomplishing this goal by using the services of banks, other financial institutions, and real estate brokers, and maintain books and papers related to such efforts.

e. It is common for drug traffickers to maintain the aforementioned books, papers, and documents in secure places within their residences and/or places of business so that the drug traffickers have ready access to such information.

f. Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates in the drug trade, property acquired from the distribution of drugs, and their product, and such photographs are often kept in their residences and/or places of business. Drug traffickers often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies. Drug traffickers continue to use these assets and to exercise dominion and control over them even though the assets are nominally owned by others. It is common practice for drug traffickers to conceal in their residences and/or places of business secure places to store the contraband including but not limited to safes and that once a sizeable load of contraband has been delivered, to repackage and break-down larger quantities of illegal drugs into smaller more easily handled and concealed quantities for distribution. Paraphernalia related to the packaging, cutting, weighing and distribution of contraband is usually secreted or stored in their residences and/or places of business Drug traffickers frequently possess firearms and ammunition to protect their illegal product.

157

j.   Drug traffickers frequently keep the aforementioned evidence set forth in their residences because, for example, drug traffickers keep detailed records of their activities close at hand as they receive calls from other members of the organization at all hours of the day and night and need access to those materials. Additionally, although some drug traffickers prefer to store contraband outside of their known places of residence, in my training and experience, they do not have the same concerns when it comes to items set forth in above because said items are not illegal to possess.

255.   In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises being searched. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

## Computers, Electronic Storage and Forensic Analysis

256.   As described above and in Attachments B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

257.   *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because

158

when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

258.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

e.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the

159

attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

160

g.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.   I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

259.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an

161

image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

> k. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.
> .

> l. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

> m. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

260. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The

later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

261. The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

262. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

263. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

163

264. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

265. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

266. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

267. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

268. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

269. Due to the foregoing, with respect to any person who is located in a SUBJECT PREMISES during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

270. Because several people may share the **SUBJECT PREMISES** as a residence, it is possible that one or more of the **SUBJECT PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## VII.    CONCLUSION

271.    Based on the foregoing, I believe there is probable cause to believe that the TARGET SUBJECTS are committing violations of federal law, including the Target Offenses. I further believe that there is probable cause to believe that located at and in the **SUBJECT PREMISES** and **SUBJECT VEHCILES** described in Attachments A1 to A9, there is evidence of the Target Offenses. Case agents believe there are currently documents and records showing dominion and control of the **SUBJECT PREMISES** and vehicles, cellular telephones, electronic devices, and other computers, and other evidence evincing the TARGET SUBJECTS' involvement in the drug trafficking offenses described above, located within the premises, and vehicles, described in Attachments A1 to A9. For all of the foregoing reasons, I request authorization to search the premises and vehicles more fully described in Attachments A1 to A9 for the things described in the corresponding Attachments B.